**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

TARA J. LOUX, M.D.,

  Plaintiff,

v.            Case No.  8:21-cv-01891

BAYCARE MEDICAL GROUP, INC.;
ST. JOSEPH'S HOSPITAL, INC.; and
ANAND NAYEE, M.D.,

  Defendants.

_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

  Plaintiff, TARA J. LOUX, M.D. (Plaintiff or Dr. Loux), hereby sues Defendants BAYCARE MEDICAL GROUP (BMG), ST. JOSEPH'S HOSPITAL, INC. (St. Joseph's or Hospital), and ANAND NAYEE, M.D. (Dr. Nayee) (collectively, Defendants) and alleges as follows:

**PARTIES, JURISDICTION AND VENUE**

  1. Dr. Loux is a physician employed by BMG and St. Joseph's in Hillsborough County, Florida at all times relevant to the allegations in the complaint.

  2. Defendant, BMG, is a Florida corporation which conducts substantial business in Hillsborough County, Florida, whose principal place of business is in Pinellas County, Florida, and who employed Dr. Loux.

3.     Defendant, St. Joseph's, is a Florida corporation, with its principal place of business located in Hillsborough County, Florida, and who employed Dr. Loux in 2016 and granted her medical staff privileges starting in 2015.

4.     Defendant Dr. Nayee is employed by BMG and works exclusively at St. Joseph's in Hillsborough County, Florida as a hospitalist.

5.     This Court has subject matter jurisdiction over the claims in this action based on federal law pursuant to 28 U.S.C. 1331 because this case arises under the laws of the United States and has supplemental jurisdiction pursuant to 28 U.S.C. 1367 over the other claims in this lawsuit because they are so related to claims in the action that are based on federal law that they form part of the same case or controversy in that they derive from a common nucleus of operative facts.

6.     This Court has personal jurisdiction over the parties to this action in that all parties engage in substantial business activities in Hillsborough County, Florida, St. Joseph's is a Florida corporation with its principal place of business located in Hillsborough County, Florida, BMG is a Florida Corporation with its principal place of business located in Pinellas County Florida, Dr. Nayee works for BMG in Hillsborough County, Florida, and the core facts giving rise to the claims in this case occurred in Hillsborough County, Florida.

7.     Venue is appropriate in the Middle District of Florida, Tampa Division in that Dr. Loux was employed by BMG and St. Joseph's in Hillsborough County, Florida, all parties engage in substantial business activities in Hillsborough County, Florida, St. Joseph's is a Florida corporation with its principal place of

business located in Hillsborough County, Florida, BMG is a Florida Corporation with its principal place of business located in Pinellas County Florida, Dr. Nayee works for BMG in Hillsborough County, Florida, and the core facts giving rise to the claims asserted in this case occurred in Hillsborough County, Florida.

## FACTS UNDERLYING ALL CLAIMS

8.      BMG and St. Joseph's are both part of BayCare Health Care Systems, Inc. (BayCare) which, according to its annual report, operates 14 hospitals with 3,482 hospital beds, 18 urgent care centers, 5 surgery centers, 12 outpatient imaging facilities, 124 physician practice locations and 33 walk-in care facilities in Publix supermarkets, employing more than 29,000.

9.      Dr. Loux graduated with honors from University of Alabama School of Medicine in 2005.  She completed her residency in general surgery at the University of Pittsburgh Medical Center, followed by a fellowship in pediatric surgery at Miami Children's Hospital.  Dr. Loux is double Board-certified, holding certifications in general surgery and pediatric surgery by the American Board of Surgery.  At the time of her initial certification, Dr. Loux was one of only 1,397 physicians around the world to have a pediatric Board certification designation. She has co-authored 14 peer reviewed papers.

10.     Dr. Loux was trained, during her pediatric surgery fellowship at Miami's Children's Hospital, in performing a wide range of pediatric surgeries utilizing minimally invasive and robotic methods which significantly decrease recovery time and often increase the success rate of the procedure.

3

11.     Upon completing her pediatric surgery fellowship, BMG hired Dr. Loux in May 2015 as a pediatric surgeon.  During this time, Dr. Tuan Pham, M.D. (Dr. Pham) was the head of the pediatric surgery division for BMG.

12.     Dr. Loux developed an extremely successful practice and, within four years, she had significantly more pediatric surgery referrals and revenue than any other pediatric surgeon at St. Joseph's and/or at BMG.

13.     Dr. Loux also developed a strong reputation in the medical community, leading to additional referrals.  Dr. Martinez, who practiced with Dr. Loux at BMG as a pediatric general surgeon for more than four years, said Dr. Loux "became the busiest partner in our practice", "she took care of the most compromised patients and performed successfully complex procedures with an unusual dexterity for the early stages of her career", "[t]hese operations frequently included minimally invasive techniques which she navigated with precision and patience" and her "surgical abilities are outstanding".

14.     While employed by BMG and St. Joseph's, Dr. Loux was continually subjected to discrimination on the basis of her gender.  Despite her credentials as a pediatric surgeon, Dr. Loux was repeatedly subjected to less favorable treatment than her male peers.

15.     The disparate treatment faced by Dr. Loux became much worse after Dr. Martinez retired and Dr. Pham left BMG to practice in another location. Specifically, BMG hired Dr. Grant Geissler (Dr. Geissler), a male, who became the head of the pediatric surgery division at St. Joseph's.  Dr. Geissler made a regular

point to belittle and criticize Dr. Loux without justification.  Further, Dr. Loux's patient load was over 50% higher than that of her peers, including Dr. Geissler, at the time of separation.

16.     After raising concerns over her disparate treatment, BMG retaliated against Dr. Loux by requiring her to see a psychiatrist.  Dr. Loux complied with the unprecedented demand to see a psychiatrist with the agreement (confirmed in writing) that she would receive a copy of the psychiatrist's report.  Although Dr. Loux later learned the psychiatrist did not find that Dr. Loux had any psychiatric concerns, BMG refused to provide her a copy of the report.

17.     Also in retaliation for raising concerns about disparate treatment of females at BMG and St. Joseph's, Dr. Geissler contacted Drs. Stephen Butler (Dr. Butler) and Dennis Alfonso (Dr. Alfonso) both at BMG and falsely told them that Dr. Loux "has a high complication rate in general, but had a series of complications starting back in November which seem to be accelerating".  This statement is false and Dr. Geissler knew it was false.  Dr. Geissler, although he has access to this information as division chief of pediatric surgery for BMG and the Hospital, did not provide Dr. Loux's actual complication rate because Dr. Loux's complication rate is below the complication rate for pediatric surgeons performing similar procedures.  Regarding his claim that she "had a series of complication starting back in November", the statement is false and Dr. Geissler knew it was false.  Her complication rate was lower than the other BMG pediatric surgeons, including Dr. Geissler, in performing similar procedures.

18.     Although neither is a pediatric surgeon, making them unqualified to perform a review, Drs. Butler and Alfonso, both male, then took the unprecedented step of reviewing every complication Dr. Loux had in every case she handled over the prior three years. No concerns were ever raised to Dr. Loux in her almost five (5) years practicing pediatric surgery at BMG and St. Joseph's. Entities that would have raised concerns, if such concerns existed, were the St. Joseph's Medical Executive Committee (MEC), the Peer Review Committee (Committee), Risk Management (Risk) or the Quality Improvement Department (Quality) – yet, no concerns were raised by *any* of those entities.  Instead, in a fishing expedition, BMG's Drs. Butler and Alfonso took the unusual step of reviewing all of Dr. Loux's complications in the previous three (3) years, and of those cases created a list of 19 cases spanning three years; none of these cases had ever been raised by the MEC, the Committee, Risk or Quality with Dr. Loux.  No male surgeon had all of their complications reviewed by BMG or St. Joseph's going back three years when none of those cases had previously been discussed with the physician.

19.     Numerous male BMG and St. Joseph's surgeons had substantially worse, and had more, complications than Dr. Loux, yet they were not disciplined. This disparate treatment has been recognized by many other surgeons.  For example, Dr. Patricia Ricalde, a pediatric maxiofacial surgeon points out that male surgeons working for the Defendants "have done, in this hospital, terrible things [and] have made huge mistakes and they are not being treated as Dr. Loux is being treated …  As a female surgeon, I do question whether they may be some gender

gap issues here."   She also points to dangerous male surgeons who are "the arrogant cowboy" whose actions BMG and St. Joseph's "tries to sweep it under the rug".

20.    BMG's Drs. Butler, Alfonso and Geissler then presented these 19 cases to the Committee, orchestrating a recommendation from the Committee that BMG would use as a pretext to terminate her employment.

21.    Specifically, on April 5, 2020, the Committee provided Dr. Loux the list of 19 cases, demanding that she appear to address these cases on three days' notice on April 8, 2020.  The list did not identify the area of concern and in many instances did not involve an adverse event or involved normal risks of any procedure, such as an infection.

22.    Despite inadequate notice and the denial of her request for time to prepare, Dr. Loux appeared at the April 8, 2020 Committee meeting (Drs. Geissler was also present although he was not a member of the Committee) and she agreed to provide the Committee a list of remedial measures to address concerns first raised by the Committee at hearing.

23.    Rather than waiting to receive Dr. Loux's proposed remedial measures, on the same day as the Committee meeting (April 8, 2020) the Committee sent a letter to Dr. Loux stating she must either accept a "collegial intervention" of a 90-day "scrub-in" requirement with another pediatric surgeon on all surgeries and a 90-day ban on NICU, PICU, ER and call (the Sanction), *or*

the Committee would recommend an emergency suspension of her privileges that would be reported to the National Practitioner's Data Bank (NPDB).

24.     The NPDB is a database operated by the U.S. Department of Health and Human Services that contains adverse action reports on health care professionals.  Hospitals submit information on physicians, including clinical privileges restrictions.  A report that a hospital has restricted a physician's medical staff privileges is devastating to a physician's career, because most hospitals (including many BayCare hospitals) will not even permit a physician to apply for medical staff privileges if another hospital reports that it restricted a physician's privileges.

25.     Dr. Loux was concerned primarily about three issues on whether to agree to the Sanction: (a) avoiding an NPDB report, recognizing that an NPDB report will prevent her from obtaining staff privileges at most hospitals, follow her throughout her professional career, and make it extremely difficult to obtain employment as a pediatric surgeon; (b) whether BayCare would provide the support necessary to fulfill the requirements of the Sanction, since the only pediatric general surgeons practicing at St. Joseph's are employed by BMG and she would need a pediatric surgeon to "scrub in" with her on every procedure and to provide coverage for NICU, PICU, ER, and call for 90 days; and (c) whether the Sanction would affect her employment with BMG.

26.     Dr. Loux e-mailed Dr. Nayee on April 15, 2020 asking him to clarify whether the restrictions constitute a "proctorship", whether she would receive

8

support from BayCare to fulfill the sanction, and whether BMG might use the restriction to terminate her employment.  Dr. Nayee, an BMG employee and agent, on April 16, 2020 falsely represented to Dr. Loux that it is not a proctorship and that BMG will have to coordinate coverage "through their means available" (Representations).

27.     Dr. Loux reasonably relied on the Representations by agreeing to the Sanction on April 20, 2020.

28.     Contrary to the Representations that it was not a proctorship, on April 23, 2020 St. Joseph's reported to the NPDB, three days after she accepted the Sanction, that Dr. Loux was subject to a proctorship of more than 30 days due to quality of care issues.

29.     Contrary to the Representations that BMG will have to provide coverage, BMG refused to provide any support for the Sanction and terminated Dr. Loux's employment because of the Sanction on April 23, 2020.

30.     Specifically, BMG refused to provide another pediatric surgeon to "scrub in" with Dr. Loux for all procedures and refused to provide coverage for Dr. Loux for NICU, PICU, ER and call, despite the fact that two BMG pediatric surgeons (neither of whom were members of the Committee) and multiple BMG employed physicians were at the Committee meeting where the Sanction was imposed.

31.     In addition to terminating Dr. Loux's employment on April 23, 2020 because of the Sanction, BMG further demanded Dr. Loux pay BMG $54,990.34

for insurance tail coverage asserting that the Sanction permitted Dr. Loux to be terminated "for cause"; most of $54,990.34 was involuntarily removed from her last paychecks.  BMG also confiscated Dr. Loux's St. Joseph's Hospital badge and informed her that her noncompete prohibited her from practicing at the Hospital.

32.    On April 28, 2020, Dr. Loux revoked the acceptance of the Sanction, since the acceptance of the Sanction was based on the false Representations that that it was not a "Proctorship" and that BMG would provide support and coverage for the Sanction.

33.    Despite St. Joseph's acceptance of Dr. Loux's revocation of the Sanction, BMG refused to reinstate her employment.  Similarly, St. Joseph's refused to remove the NPDB report stating that Dr. Loux was subject to a proctorship due to quality of care concerns, when the revocation of the Sanction meant she was no longer required to be proctored.  St. Joseph's left the false NPDB report filed for six months, making it impossible for Dr. Loux to find other employment during that time-period.

34.    On May 19, 2020, St. Joseph's notified Dr. Loux that it was instituting an emergency suspension of her medical staff privileges because she was an "imminent danger to the health and/or safety of" patients.  Dr. Loux was prohibited from practicing at the Hospital due to BMG's confiscation of her badge, BMG telling her she was prohibited from practicing at the Hospital due to the termination of her employment and her non-compete, and Dr. Loux had agreed not to practice at the Hospital during the investigation.  If Dr. Loux could not

practice medicine or otherwise see patients she could not be an "imminent danger to the health and/or safety" of any patient.  Further, based on the actions taken by BMG, Dr. Loux believed she no longer had medical staff privileges at St. Joseph's, so she didn't understand how the Hospital emergently suspended staff privileges she no longer held.

35.     Dr. Loux sought a review of the emergency suspension by the MEC because Dr. Loux could not be an "imminent danger to the health and/or safety" of any patient since she could not practice at the Hospital.  The MEC lifted the suspension, but imposed the same sanction recommended by the Committee as a part of the "collegial intervention" – another pediatric surgeon "scrub in" on all of Dr. Loux's surgeries and no NICU, PICU, ER or call for 90 days (Second Sanction).

36.     Under the terms of Dr. Loux's employment contract with BMG, the Hospital's affiliate, Dr. Loux could not practice medicine at the Hospital following her termination.  Yet, around the same time the Hospital imposed the Second Sanction, the Hospital informed Dr. Loux that her medical staff privileges had been "automatically relinquished" because she could not provide an office within the geographical zone required by the Hospital.  Dr. Loux contacted the Hospital regarding this issue because if she had an office within the geographical zone required by the Hospital it would have violated her non-competition agreement with St. Joseph's affiliate BMG, but the Hospital was unresponsive resulting in what it unfairly termed an automatic relinquishment.

37.     The Second Sanction was imposed in bad faith since Dr. Loux could not comply with the Second Sanction due to the Hospital's and BMG's actions in prohibiting her from practicing medicine at the Hospital.  Each part of the Second Sanction required Dr. Loux to be able to practice medicine at the Hospital, which she could not do.  Specifically, the Second Sanction restricts her medical staff privileges by requiring, for 90 days, that another pediatric surgeon "scrub-in" with Dr. Loux for all surgeries and that she not have NICU, PICU, ER or call.  Since Dr. Loux was deemed to "automatically relinquish" her staff privileges and BMG had confiscated her Hospital badge and told her she could not practice at the Hospital because of her non-compete, restricting staff privileges Dr. Loux does not have is nonsensical.  The only purpose of the Second Sanction was to justify the Hospital filing an adverse report with the NPDB to ruin her career in order to discriminate against Dr. Loux based on her gender and perceived disability and retaliate against her because she complained of gender discrimination.

38.     Dr. Loux sought a review of the MEC's decision to impose the Second Sanction through a peer review hearing.  At the hearing the Hospital did not present an expert from outside the Hospital or BMG.  Instead, Dr. Geissler testified about 10 cases going back three years, including one case never raised until the hearing.  Further, Geissler's principal criticism of Dr. Loux at the hearing was that she did not have a "proper field of vision" while doing certain minimally invasive procedures – a criticism never raised by Dr. Geissler, the Committee, the MEC or BMG previously.  Since Dr. Geissler was not trained or qualified (and did do these)

procedures, he was not competent to testify to this issue.  The Hospital also elicited hearsay testimony about what other physicians (whose names the Hospital refused to disclose) allegedly thought about Dr. Loux's method and the perception of those unnamed physicians that Dr. Loux had a high complication rate.  Despite demand by Dr. Loux, Dr. Geissler and the Hospital refused to provide Dr. Loux's or the other pediatric surgeon's actual complication rate.  The Second Sanction was upheld by the hearing panel, with a minor modification.  Dr. Loux appealed the hearing's decision to the Hospital Board and the decision was upheld.

39.    Dr. Loux employed the law firms of Trenam Kemker, Scharf, Barkin, Frye O'Neill & Mullis, P.A. and Barbas Cremer, PLLC to represent her in this matter and has agreed to pay the firms a reasonable fee for their services, which fee defendants BMG and St. Joseph's are obligated to pay.

40.    All conditions precedent to this cause of action have occurred or have been waived, including the exhaustion of all administrative remedies.

## COUNT I

41.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 40 of this Complaint as if fully set forth herein.

42.    This is a cause of action against BMG for discrimination and retaliation in employment pursuant to Title VII of the Civil Rights Act of 1964 (Act), as codified in 42 U.S.C. §§ 2000e to 2000e-17.

43.    Dr. Loux timely filed a charge with the Equal Employment Opportunity Commission against BMG regarding the defendant's discriminatory conduct based on gender and retaliation.

44.    The Equal Employment Opportunity Commission issued a Notice of Right to Sue letter to Dr. Loux, which she received on May 13, 2021, a copy of which is attached as **Exhibit A**.

45.    Dr. Loux was continually subjected to discrimination on the basis of her gender by BMG and despite her numerous credentials as a pediatric surgeon, she was repeatedly subjected to less favorable treatment than her male peers.

46.    BMG discriminated against Dr. Loux based on her gender and retaliated against Dr. Loux for complaining about gender discrimination by orchestrating a bad faith retrospective review of Dr. Loux's cases, then defrauding Dr. Loux into accepting the Sanction, then using the Sanction as a basis to terminate her BMG employment, and then refusing to reinstate her after the revocation of the Sanction.  No male BMG surgeon has ever been similarly treated, even though the male surgeon's conduct, complications and performance was much worse than Dr. Loux.

47.    BMG intentionally and maliciously discriminated and retaliated against Dr. Loux and acted with reckless indifference to the federally protected rights of Dr. Loux.

48.     Dr. Loux was damaged as a result of the discriminatory and retaliatory conduct by BMG and is entitled to an award of attorneys' fees in pursuing these claims pursuant to the Act and other applicable law.

**WHEREFORE,** Dr. Loux prays this Court enter a judgment in favor of Dr. Loux and against BMG for compensatory and consequential damages, past lost wages, future lost wages, pain and suffering, punitive damages, attorney's fees, costs, and such other and further relief as may be deemed appropriate by this Court.

## COUNT II

49.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 40 of this Complaint as if fully set forth herein.

50.     This is a cause of action against St. Joseph's for discrimination in employment based on gender and retaliation pursuant to Title VII of the Civil Rights Act of 1964, as codified in 42 U.S.C. §§ 2000e to 2000e-17.

51.     Dr. Loux timely filed a charge with the Equal Employment Opportunity Commission (EEOC) against St. Joseph's regarding the defendant's discriminatory conduct based on gender.

52.     The EEOC issued a Notice of Right to Sue letter to Dr. Loux, which she received on May 13, 2021, a copy of which is attached as **Exhibit B**.

53.     Dr. Loux was continually subjected to discrimination on the basis of her gender by St. Joseph's and, despite her numerous credentials as a pediatric surgeon, she was repeatedly subjected to less favorable treatment than her male

peers.  For example: (a) the male adult trauma director, a nearly identical position, was paid more and received more support than she received as the pediatric trauma director; (b) male surgeons at the hospital were able to select their operating teams or reject assigned teams if desired, but female surgeons were not; (c) she was frequently required to work without pay, while her male counterparts were not; (d)  male surgeons had serious quality of care concerns ignored by the Hospital, while female surgeons were subjected to harsh treatment for concerns much less serious than male counterparts; and (e) Dr. Loux was treated less respectfully than male physicians.  For example, Hospital officials referred to Dr. Loux by her first name "Tara", while male surgeons were referred to as "Doctor".

54.     Dr. Loux raised these and other concerns over the disparate treatment of women at St. Joseph's, including with Hospital Chief Medical Officer Charvat, St. Joseph's Children's Hospital Chief Medical Officer Brooks, and trauma program manager Dinova.  After Dr. Loux raised these concerns, she was retaliated against by St. Joseph's, worsening her work conditions by requiring her to work more hours without pay, denigrating her attempts to improve quality of care for pediatric trauma, and being referred to using adverse stereotypical female adjectives such as being "overly emotional".  Dr. Loux reached the point where she could no longer tolerate the hostile work environment and tendered her resignation.  The actions of St. Joseph's constitute a constructive discharge by St. Joseph's of Dr. Loux's employment.  St. Joseph's then hired a less qualified male

as the pediatric trauma director, even though he is not a pediatric surgeon, and paid him more money and provided him greater resources to do the job.

55.    St. Joseph's further retaliated against Dr. Loux by subjecting her to a bad faith and fraudulent peer review, initiated and conducted in violation of the Hospital's Medical Staff Bylaws and the Credentials Policy, resulting in the Hospital submitting an adverse action report to the NPDB.

56.    St. Joseph's intentionally and maliciously discriminated and retaliated against Dr. Loux and acted with reckless indifference to the federally protected rights of Dr. Loux.

57.    Dr. Loux was damaged as a result of the discriminatory and retaliatory conduct by St. Joseph's and is entitled to an award of attorneys' fees in pursuing these claims pursuant to the Act and other applicable law.

**WHEREFORE,** Dr. Loux prays this Court enter a judgment in favor of Dr. Loux and against BMG for compensatory and consequential damages, past lost wages, future lost wages, pain and suffering, attorney's fees, costs, punitive damages, and such other and further relief as may be deemed appropriate.

## COUNT III

58.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 40 of this Complaint as if fully set forth herein.

59.    This is a cause of action against BMG for discrimination in employment pursuant to the Americans with Disabilities Act of 1990 (ADA), as codified, 42 U.S.C. §§ 12112 to 12117.

60.    Dr. Loux filed a charge with the EEOC against BMG regarding the defendant's discriminatory conduct based on a perceived disability.

61.    The EEOC issued a Notice of Right to Sue letter to Dr. Loux, which she received on May 13, 2021, a copy of which is attached as Exhibit A.

62.    BMG discriminated against Dr. Loux based on a perceived psychiatric disability.

63.    Specifically, Dr. Butler BMG Medical Director, told Dr. Loux that she had a mental disability and required her to complete a psychiatric evaluation by a Baycare affiliate psychiatrist.

64.    Despite the psychiatrist determining that Dr. Loux does not have a psychiatric disability and is fit to continue to work as a surgeon at the Hospital, BMG continued to discriminate against her based on BMG's perception that she had a disability.

65.    For example, BMG senior officials, including Drs. Alfonso and Butler, called Dr. Loux "psychotic", "crazy", and "overly emotional", resulting in BMG treating Dr. Loux differently based on its perception that Dr. Loux had a psychiatric disability.  Specifically, BMG orchestrated a bad faith retrospective review of Dr. Loux's cases, then defrauded Dr. Loux into accepting the Sanction, then used the Sanction as a basis to terminate her BMG employment, and then refused to reinstate her after the revocation of the Sanction.  No BMG surgeon, who is not perceived to have a psychiatric disability, has been similarly treated,

even though such other surgeon's conduct, complications and performance was much worse than Dr. Loux.

66.    BMG intentionally and maliciously discriminated and retaliated against Dr. Loux and acted with reckless indifference to the federally protected rights of Dr. Loux.

67.    Dr. Loux was damaged as a result of the discriminatory and retaliatory conduct by BMG and is entitled to an award of attorneys' fees in pursuing these claims pursuant to the ADA and other applicable law.

**WHEREFORE,** Dr. Loux prays this Court enter a judgment in favor of Dr. Loux and against BMG for compensatory and consequential damages, past lost wages, future lost wages, pain and suffering, attorney's fees, costs, punitive damages, and such other and further relief as may be deemed appropriate.

## COUNT IV

68.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 40 of this Complaint as if fully set forth herein.

69.     This is a claim for fraud against St. Joseph's, BMG, and Dr. Nayee.

70.    On April 8, 2020 Dr. Nayee sent Dr. Loux a letter stating that she must either accept a "collegial intervention" of a 90-day "scrub-in" requirement with another pediatric surgeon and a 90-day ban on NICU, PICU, ER and call (previously defined in this Complaint as the Sanction), *or* the Committee would recommend an emergency suspension of her privileges that would be reported to the NPDB.

71.     Dr. Loux was concerned primarily about three issues: (a) avoiding an NPDB report, recognizing that an NPDB report will prevent her from obtaining staff privileges at almost all institutions, follow her throughout her professional career, and make it extremely difficult to obtain employment as a pediatric surgeon; (b) whether BayCare would provide the support necessary to fulfill the requirements of the sanction, since the only pediatric general surgeons practicing at St. Joseph's are employed by BMG; and (c) whether the Sanction would affect her employment with BMG.

72.     Dr. Loux e-mailed Dr. Nayee asking him to clarify whether the restrictions constitute a "proctorship", whether she would receive support from BayCare to fulfill the Sanction, and whether the Sanction would affect her BMG employment.

73.     St. Joseph's and BMG, through their agent Dr. Nayee, represented to Dr. Loux that it is not a proctorship and that BMG will have to coordinate coverage through their means available (the Representations).

74.     At the time St. Joseph's, BMG, and Dr. Nayee made the Representations, they knew the Representations were false.

75.     Dr. Nayee, St. Joseph's and BMG made the Representations with the intention that Dr. Loux rely on the Representations by agreeing to the Sanction.

76.     Dr. Loux reasonably relied on the Representation by agreeing to the Sanction.

77.    Contrary to the Representations that it was not a proctorship, St. Joseph's reported to the NPDB, three days after she accepted the Sanction, that she was subject to a proctorship.

78.    Contrary to the Representations that BMG will have to provide coverage, BMG refused to provide any support for the Sanction and terminated Dr. Loux's employment because of the Sanction.

79.    Specifically, BMG refused to provide another pediatric surgeon to "scrub in" with Dr. Loux for all procedures and refused to provide coverage for Dr. Loux for NICU, PICU, ER and call.

80.    In addition to terminating Dr. Loux's employment on April 23, 2020 because of the Sanction, BMG further demanded Dr. Loux pay BMG $54,990.34 for insurance tail coverage, most of which was involuntarily removed from her last paychecks.  BMG confiscated Dr. Loux's St. Joseph's Hospital badge and informed her that her non-compete prohibited her from practicing at the Hospital.

81.    Dr. Loux was damaged as a result of her reasonable reliance on the Representations.

82.    BMG, St. Joseph's and Dr. Nayee had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to Dr. Loux would result and, despite that knowledge, intentionally pursued the course of conduct set forth in this claim, resulting in injury and damage to Dr. Loux.

83.    BMG's, Dr. Nayee, and St. Joseph's conduct was so reckless and wanton in care that it constituted a conscious disregard or indifference to the safety or rights of Dr. Loux.

**WHEREFORE**, Plaintiff prays this Court enter a judgment in favor of Dr. Loux and against BMG, St. Joseph's, and Dr. Nayee, for compensatory and consequential damages, including past and present lost wages, pain and suffering, damage to her reputation, interest, costs, punitive damages, and such other and further relief as may be deemed appropriate by the Court.

## COUNT V

84.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 40  and paragraphs 70 through 83 of this Complaint, as if fully set forth herein.

85.    This is a cause of action for breach of contract against St. Joseph's.

86.    In Florida medical staff bylaws, and policies enacted pursuant to medical staff bylaws, constitute a contract between the hospital and each member of the medical staff, breach of which gives rise to a claim for breach of contract.

87.    St. Joseph's adopted medical staff bylaws (Bylaws) and, pursuant to Section 9.B of the Bylaws, St. Joseph's adopted the Credentials Policy (Policy), which has the same force and effect of the Bylaws unless the Policy is in conflict with the Bylaws.  Because St. Joseph's may consider the Bylaws and the Policy to be confidential and proprietary, they are not attached to this Complaint.

88.    Dr. Loux, at all times relevant to the allegations in this claim, was a member of the medical staff of St. Joseph's.

89.    St. Joseph's breached the Bylaws, as set forth specifically below.

90.    Section 8.E(1) of the Bylaws only permit certain specified individuals in the hospitals to suspend or restrict a physician's medical staff privileges pending an investigation if "failure to take action may result in imminent danger to the health and/or safety of any individual".

91.    St. Joseph's breached section 8.E(1) of the Bylaws because the Hospital suspended Dr. Loux despite that fact that she was prohibited from practicing at the Hospital due to BMG's confiscation of her badge, BMG telling her she was prohibited from practicing at the Hospital due to the termination of her employment and her non-compete, she did not have an office so she could not see patients outside of the Hospital, and Dr. Loux's agreement not to practice at the Hospital during any investigation.  If Dr. Loux could not practice medicine or otherwise see patients she could not be an "imminent danger to the health and/or safety of any individual".

92.    St. Joseph's breached section 6.B of its Policy which sets forth the requirements for the Hospital to conduct an investigation of a physician, in the following ways:  (a) Pursuant to section 6.B.2(a) of the Policy, only the Medical Executive Committee (MEC) may initiate an investigation into a physician ("An investigation shall begin only after a formal determination by the [MEC] to do so.").  The investigation of Dr. Loux was not initiated by the MEC but was initiated

23

by employees of BMG; (b) Pursuant to section 6.B.2(b) of the Policy the MEC "shall inform the individual that an investigation has begun".  Dr. Loux was not informed that an investigation had begun, but rather was notified after the unauthorized investigation was completed by BMG; (c) Pursuant to section 6.B.3(a) the MEC "shall" either investigate the matter itself or appoint an individual or Committee to conduct the investigation.  The MEC never investigated the matter itself or appointed an individual or committee to investigate.  Rather, BMG officials appointed themselves and were not appointed by a vote of the MEC; and (d) Pursuant to section 6.B.3(d) the physician being investigated "shall have an opportunity to meet with the investigating committee before it makes its report." Dr. Loux was not given an opportunity to meet with the investigating committee before it issued its report.

93.    St. Joseph's breached section 6.D.2 of the Bylaws, which requires a quorum of 50% of the members to take action.  When the MEC purported to impose the Second Sanction, it did not have 50% of the members present.

94.    St. Joseph's breached section 7.A.3 of its Policy which requires the CEO to give special notice to the physician of the recommendation for discipline by the MEC, including the statement of the recommendation and the general reasons for it and a copy of Article 7 of the Policy.  The CEO did not send a special notice to Dr. Loux setting forth the recommendations or the general reasons for the recommendation and did not provide a copy of Article 7 of the Policy to Dr. Loux.

24

95.    St. Joseph's breached section 7.A.5 of the Policy which requires the President of the Medical Staff to provide by special notice to the physician detailed information about the hearing, including "a statement of the specific reasons, including a list of patient records (if applicable), and information supporting the recommendation." The President of the Medical Staff did not provide any of the information required by section 7.A.5.

96.    St. Joseph's breached section 7.C.4 of its Policy which only permits hearsay evidence to be admitted "if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs." In breach of this provision hearsay was admitted into evidence in the Hearing where individuals were permitted to testify about what other individuals thought about Dr. Loux, including general allegations such as that Dr. Loux was "rough" while doing procedures or the "perception" that Dr. Loux had a high complication rate when the actual complication rate was available to the Hospital but not presented to any decision-makers. The individuals who testified about these hearsay statements, however, refused to identify the names of the individuals who made these statements, making it impossible to question the veracity of the statements. Such hearsay is not "the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs."

97.    St. Joseph's breached section 7.D.3 of its Policy which requires the hearing panel "[w]ithin 20 days after final adjournment of the hearing (which may be designated as the time the Hearing Panel receives the hearing transcript or any

25

post-hearing statements, whichever is later), the Hearing Panel shall conduct its deliberations . . .".  The Hearing Panel did not conduct its deliberations within 20 days after final adjournment.

98.   As a result of the breaches Dr. Loux has been damaged.

99.   Since the Policy states in section 2.C.2(e) that St. Joseph's is entitled to an award of attorney's fees if it prevails in any legal action, Dr. Loux is entitled to an award of fees if she prevails in this action pursuant to Fla.Stat. 57.105(7).

**WHEREFORE**, Plaintiff prays this Court enter a judgment for compensatory and consequential damages, interest, attorney's fees, costs, and such other and further relief as may be deemed appropriate by the Court.

## COUNT VI

100.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 40 of this Complaint, as if fully set forth herein.

101.   This is a claim of action for breach of contract against BMG.

102.   BMG hired Dr. Loux pursuant to a written contract, attached hereto as **Exhibit C**.

103.   BMG breached the contract by purporting to fire Dr. Loux for cause by orchestrating a bad faith retrospective review of Dr. Loux's cases, then defrauding Dr. Loux into accepting the Sanction by promising to provide support for the Sanction, then refusing to provide support, using the Sanction as a basis to terminate her BMG employment for cause, and then refusing to reinstate her after the revocation of the Sanction.

104.   Dr. Loux was damaged by BMG's breach of contract.

**WHEREFORE**, Plaintiff prays this Court enter a judgment in favor of Dr. Loux and against BMG for compensatory and consequential damages, attorney's fees, interest, costs, and such other and further relief as may be deemed appropriate.

## COUNT VII

105.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 40 of this Complaint, as if fully set forth herein.

106.   This is a cause of action for unpaid wages.

107.   BMG owes Dr. Loux for unpaid wages based on its wrongful taking of almost all of the last two paychecks of Dr. Loux.

108.   Dr. Loux is entitled to an award of attorney's fees in pursuing this claim for unpaid wages, in accordance with Fla.Stat. 448.08

**WHEREFORE**, Plaintiff prays this Court enter judgment in favor of Plaintiff and against BMG for the amount of unpaid wages owed to her and for an award of attorney's fees, costs, and such other and further relief as may be deemed appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all claims in this action.

Dated:  August 6, 2021

*s/John D. Goldsmith*
JOHN M. GOLDSMITH
Florida Bar No. 0444278
jgoldsmith@trenam.com
svanboskerck@trenam.com
idawkins@trenam.com
TRENAM, KEMKER, SCHARF, BARKIN,
FRYE, O'NEILL & MULLIS, P.A.
101 E. Kennedy Blvd., Suite 2700
Tampa, FL 33602
813-223-7474 | 813-229-6553 (fax)

and

*s/Terin Barbas Cremer*
Terin Barbas Cremer
Florida Bar No. 88592
BARBAS CREMER, PLLC
209 S. Packwood Ave.
Tampa, FL 33606
813-421-5442
tcremer@barbascremer.com