**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

TARA J. LOUX, M.D.,

Plaintiff,

v. Case No. 8:21-cv-1891-WFJ-TGW

BAYCARE MEDICAL GROUP, INC.,
ST. JOSEPH'S HOSPITAL, INC.,
and ANAND NAYEE, M.D.,

Defendants.
_________________________________/

**ORDER ON SUMMARY JUDGMENT**

Before the Court is the motion for summary judgment filed by all Defendants, Baycare Medical Group, Inc. ("BMG"), St. Joseph's Hospital, Inc. ("St. Joseph's" or "the Hospital"), and Anand Nayee, M.D., Dkt. 222, Defendants' amended statement of undisputed facts and supporting depositions, declarations, and exhibits, Dkts. 243, 223–31, together with Plaintiff Tara J. Loux, M.D.'s corrected opposition to the motion, Dkt. 237, the declaration of Dr. Loux, with exhibits, Dkts. 236, 238, 261, Plaintiff's statement of undisputed facts, Dkt. 258, and Defendants' reply to Plaintiff's submissions, Dkts. 244, 246. Defendants move to strike the declaration of Dr. Loux, Dkt. 245, which Plaintiff opposes, Dkt. 253. After careful consideration of the applicable law, argument of counsel at the hearing held in this matter, submissions of the parties, and the entire record, the

Court concludes summary judgment is due to be granted and Dr. Loux's declaration to be stricken in part.

## BACKGROUND

Plaintiff brings this action alleging gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as codified in 42 U.S.C. §§ 2000e–2000e-17, against BMG and St. Joseph's. Dkt. 26 (Counts I–IV).[1] Other counts include: fraud against all Defendants (Count VI); breach of medical staff bylaws and policies against St. Joseph's (Count VII); breach of Plaintiff's employment agreement against BMG (Count VIII); and unpaid wages against BMG (Count IX).

Dr. Loux began working for BMG as a pediatric surgeon at St. Joseph's Hospital in August 2015, and the next year she accepted duties as the Medical Director of the Pediatric Trauma Program at St. Joseph's. At some point during her over four-year stint at St. Joseph's, Dr. Loux believed she was belittled and criticized unjustly in her well-earned position as a pediatric surgeon. She received what she considered condescending, gender-based comments from some of the male physicians.

According to Dr. Loux, the female physicians were called by their first names, rather than "doctor," in front of other physicians and hospital staff, while

[1] Plaintiff withdraws the ADA discrimination claim against BMG in Count V.

the male physicians were not. She maintains that the female physicians did not garner the respect given the male surgeons, as shown by the male surgeons' selectively preemptive choice of hand-picked operating room teams and optimal surgery times. Additionally, she believes the female surgeons were asked far less often than male counterparts to provide second opinions concerning surgical consults and interventions, to offer surgical decisions during surgery, or to assist their partners in surgery.

Expecting little change for the pediatric trauma program, Dr. Loux gave notice to the Hospital in February 2020 of her resignation as the medical director of the program. Just days later, she committed two back-to-back substantial, surgical errors involving different patients, for which she admitted responsibility.

Thereafter, a St. Joseph's medical staff review process was initiated. The Peer Review Committee of St. Joseph's proposed a collegial intervention with several 90-day restrictions requiring assistance from her three physician partners. Dr. Loux accepted the terms but certain restrictions, including no call coverage, ran afoul of her employment agreement with BMG. Afterwards, it was discovered that a restriction of privileges lasting more than 30 days is reportable to the National Practitioner Data Bank ("NPDB"). After the 90-day restrictions was reported to the NPDB, BMG terminated Plaintiff for cause pursuant to the employment contract. BMG provided a 30-day period to cure the restrictions.

Dr. Loux then revoked her acceptance of the restrictions, but BMG refused to reinstate her employment. Her revocation prompted the Hospital to issue a precautionary suspension, which was the stated alternative if Plaintiff did not accept the restrictions. The precautionary suspension was ultimately lifted, leaving most of the original 90-day restrictions in place.

What precisely triggered the medical staff's review of Dr. Loux, which led to her loss of Hospital privileges, will be examined in resolving the instant motions. This Court must consider whether termination and the restrictions imposed were the result of either unlawful discrimination and retaliation against Dr. Loux or professional decisions made for patient safety and care and whether BMG, the Hospital, or both are liable.

## PERINENT FACTS

The sequence of relevant events and hospital-physician relationships are set forth below. The following facts sometimes incorporate Plaintiff's declaration, portions of which are the subject of a motion to strike, which is addressed in the last section of this Order.

***<u>Dr. Loux's initial years at St. Joseph's</u>***

Dr. Loux is board certified in both general and pediatric surgery. Dkt. 226 at 8, 10.[2] After finishing her pediatric surgery fellowship at Miami Children's Hospital, Dr. Loux entered into a two-year Physician Employment Agreement with BMG starting mid-September 2015. *Id*. at 5–6; Dkt. 226-2. The medical staff of the Hospital granted Dr. Loux privileges effective August 2015, to renew every two years. Dkt. 226 at 8; Dkt. 226-5 at 2. When Dr. Loux's employment with BMG began in 2015, her physician partners in the pediatric surgery practice were Dr. Tuan Pham, Dr. Enrique Grisoni,[3] and Dr. Luis Martinez. Dkt. 226 at 5.

Not all physicians on staff at St. Joseph's are hired by BMG, Dr. Loux's employer. *See id*. at 8; Dkt. S-247 at 46 (Mednax is another employer). Notwithstanding, all the doctors who provide services at the Hospital comprise the medical staff at St. Joseph's. Dkt. 226 at 8. The medical staff is a different entity from BMG. *Id*. BMG's leadership team directly supervises BMG physicians. Dkt. 223 ¶ 10. St. Joseph's and BMG both fall under BayCare Health System, Inc. *Id*. ¶¶ 5, 6.

As part of her physician's duties, Dr. Loux provided 24-hour call coverage for a set number of days per year. Dkt. 226 at 7. She saw outpatients in the office a certain number of days per week and scheduled and performed outpatient and

---

[2] For purposes of reference to pleadings and exhibits, including condensed versions of depositions, the Court will cite the document page numbers assigned by the electronic docket.
[3] Dr. Grisoni left in 2016. Dkt. 226 at 15.

inpatient surgeries. *Id.* Dr. Loux received patients through the emergency room, from pediatric surgical consults or interventions from the pediatric floor, the NICU (neonatal intensive care unit) or the PICU (pediatric intensive care unit). *Id.* Patients were referred from the community to either Dr. Loux or her group. *Id.*

About a year after Dr. Loux started practicing at the Hospital, on August 8, 2016, she entered into a written agreement with St. Joseph's as the Pediatric Trauma[4] Program Medical Director at an hourly rate of $200 with a compensation cap for the first year of $30,000. *Id*. at 10; Dkt. 226-3. The medical director contract states on the front page that BMG is Plaintiff's employer and that the duties were purely administrative. Dkt. 226-3. A medical director is a physician who has an expertise in a certain area, oversees compliance with local, state, and federal standards, and acts as a liaison between the doctors and the administration of the Hospital. Dkt. 226 at 9–10; Dkt. 226-3. In her role as a medical director, she met monthly with Dr. Peter Charvat, the Chief Medical Officer of St. Joseph's. Dkt. 226 at 11.

Plaintiff soon took issue with the administrative duties taking far more time than allotted in her contract for medical director of pediatric trauma. *Id*. The trauma center had been having difficulty passing the state review and required

[4] Pediatric general surgery differs from pediatric trauma, which is taking care of children who are injured. Dkt. 226 at 9.

more attention. *Id*. Plaintiff began discussing the issue of increasing her hours as medical director with Dr. Sandra Brooks, who was the Chief Medical Officer of St. Joseph's Women and Children's Hospital, and Ms. Kimberly Guy, who was the vice president of St. Joseph's at the time. *Id*. After negotiations, Plaintiff was offered a one-time $40,000 subsidy paid over time for research to determine what was needed to rectify the pediatric trauma program's state compliance issues. *Id*. Her additional request for a 20 to 25 percent reduction in her clinical hours was denied because her physician partners would be expected to absorb the time. *Id*. at 11–12.

Apart from Plaintiff's desire to spend more compensated time in her administrative role as the medical director of the pediatric trauma program, Dr. Loux advocated for an additional nursing-level job. *Id*. at 12. Because nurses in the children's emergency room did not have much trauma experience and those in the adult emergency room did not have much pediatric experience, Plaintiff and her colleagues all shared frustration about the initial resuscitation and stabilization of patients. *Id*. at 12–13. The Hospital agreed to add this position. *Id*. at 13.

***Dr. Loux's physician partners***

In 2017, BMG hired Dr. Grant Geissler, another pediatric surgeon, and in 2018, Dr. Geissler joined St. Joseph's as a physician partner joining Plaintiff, Dr. Pham, and Dr. Martinez. *Id*. at 12, 16; Dkt. 246-1 ¶ 13. In early 2018, Dr. Pham

served as Division Head of St. Joseph's Pedatric Surgery Department. Dkt. 226 at 16; Dkt. 229 at 17, 21–22; Dkt. 246-1 ¶ 20. Dr. Grant Geissler filled this position when Dr. Pham resigned. Dkt. 226 at 16; Dkt. 246-1 ¶ 20. The division head position holds some responsibility for coordinating schedules and call coverage for the pediatric surgeons, which requires receiving and sharing communications between the pediatric surgical group and senior leadership at St. Joseph's. Dkt. 246-1 ¶ 21.

Dr. Geissler has also served as the Medical Director for Pediatric Surgery for St. Joseph's since 2018. *Id.* ¶ 23. The medical director position reviews St. Joseph's National Surgical Quality Improvement Program ("NSQIP") surgical outcome data, leads the Performance Improvement and Patient Safety meetings, and builds clinical program guidelines and safety systems. *Id.* ¶ 24. Additionally, Dr. Geissler served as the Chairman of the Process Improvement and Patient Safety Committee for Pediatric Surgery at St. Joseph's. *Id.* ¶ 26. None of the three administrative roles in pediatric surgery at St. Joseph's held by Dr. Geissler (Division Head, Medical Director, and Chairman) give the authority to hire, fire, or discipline pediatric surgeons, or impose negative consequences on the terms and conditions of Dr. Geissler's practice partners' employment. *Id.* ¶ 22, 25, 27.

By late 2019, Plaintiff's colleagues, or physician or practice partners, were Dr. Geissler, Dr. John Fitzwater, and Dr. Cynthia Reyes. Dr. Fitzwater, a pediatric

surgeon, joined as a physician partner in October 2018. Dkt. 226 at 16. Dr. Loux and Dr. Fitzwater knew each other from their medical fellowship and would often ask each other for advice as physician partners at St. Joseph's. *Id*. at 18. Dr. Reyes, a neonatal surgeon, joined as a physician partner in November 2019. *Id*. at 15–16. Dr. Loux welcomed Dr. Reyes as another woman surgeon. *Id*. at 18.

As a physician partner, Dr. Geissler was not Plaintiff's direct supervisor. *Id*. at 26. Her supervisor was Dr. Steven Butler, a general surgeon employed by BMG who began serving as the medical director of the surgeons for BMG around 2017. *Id*. at 7, 26; Dkt. 227 at 4, 6. Dr. Butler never held any leadership positions for the Hospital and never served on any peer review committees for the Hospital or on the medical executive committee for the Hospital. Dkt. 227 at 7. Dr. Butler also supervised Dr. Geissler, Dr. Fitzwater, and Dr. Reyes, as they were all employed by BMG.

It is apparent from this record that Dr. Loux's relationship with Dr. Geissler was complicated on a personal level. Plaintiff described him as "more difficult to work with, collegially." Dkt. 226 at 18. When Plaintiff initially would ask Dr. Geissler to assist, he would assume the lead surgeon position and take over the surgery. *Id*. at 19. Plaintiff soon stopped asking him for help. Dr. Loux considered his actions as one example of how he treated her like a resident instead of a peer. *Id*. at 20.

At some point during her last year of employment, Plaintiff met with Dr. Geissler, with Dr. Fitzwater present, and explained to Dr. Geissler that she felt like he treated her as a resident. *Id*. at 20–21. In response, Dr. Geissler agreed to stop scrubbing into Plaintiff's operations absent a request to assist her. *Id*. She testified that she brought up no other concerns with Dr. Geissler at this meeting. *Id*. at 20.

In her declaration, for the first time, she claims that in November 2019, there was a meeting with Dr. Geissler, Dr. Fitzwater, and Plaintiff, and she voiced several concerns *related to gender-based discrimination*. Dkt. 236 ¶ 14. She avers that Dr. Geissler treated her "like a resident rather than a partner" by contradicting her in front of the operating room staff "*because [she is] a female*." *Id*. (emphasis added). She did not relate this connection between being treated like a resident and her gender in her prior deposition. Dkt. 226 at 20–21 ("I was disappointed with [Dr. Geissler's] treatment of me as if I were a resident. . . . I expressed my concern to him of his treatment of me and requested that he treat me like a peer [at the discussion held with Drs. Geissler and Fitzwater]. . . . [Afterwards, Dr. Geissler] respected my request to not scrub into my operations.").

***<u>Discrimination</u>***

According to Dr. Loux, other physicians and staff also treated her like a resident. *Id*. at 21. Dr. Loux "had concerns about second opinions being requested on my medical judgment and being requested from my male partners, including

Dr. Fitzwater, who was not senior to me." *Id*. at 21–22. For example, a male pediatric cardiac surgeon asked Dr. Fitzwater for a second opinion about whether Plaintiff's decision to operate on surgeon's patient was the "the right thing." *Id*. 21. A male pediatric intensive care doctor requested a second opinion from Dr. Geissler concerning his patient's abdomen being full of air after a colonoscopy performed by Plaintiff. *Id*. at 22. Rather than giving his opinion, Dr. Geissler deferred to Plaintiff's judgment. *Id.* A third male neonatologist called Dr. Geissler to ask for a second opinion on Plaintiff's assessment of non-invasive treatment for his patient. *Id*. at 23. The neonatologist accepted Dr. Geissler's advice instead of Plaintiff's. *Id*. at 24.

Apart from these three individual doctors, Dr. Loux admitted at her deposition that she did not know each time that one of her male partner physicians had their judgment questioned. *Id*. at 24–25. She further conceded that Dr. Pham was bothered when physicians would seek second opinions on his judgment, but Dr. Fitzwater was not. *Id*. at 25. She testified that there was a perception that she had "a higher complication rate" and "more difficulties with patient outcomes" but claimed it was a false perception. *Id*. at 25. She stated that when she discussed with her colleague Dr. Geissler her concerns about the "false" perception leading to more frequently sought second opinions on her judgment, including that the perception was rooted in her gender, she did not receive the support she expected

from him. *Id*. at 26–27. Dr. Loux conceded that the perception could have been based on the perceived roughness in which she performed procedures and surgeries as opposed to her gender. *Id*. at 26.

Another area of disagreement between Dr. Geissler and Plaintiff arose concerning preferred surgical methods and techniques. Dr. Geissler was disturbed about Plaintiff's method for removing an appendix, which Plaintiff agreed led to an increased infection rate. *Id*. at 19 ("I looked through all of my previous patients and found that [Dr. Geissler] was right. And so I needed to do something about it."). Plaintiff made appropriate changes. *Id.* The two had ongoing disagreement about performing some surgeries laparoscopically versus open, particularly after Dr. Loux "had a lymphatic leak" after another laparoscopic procedure. *Id*. at 19–20 ("[Dr. Geissler's] suggestion to do [the LADD procedure] open for a couple of times before going back to laparoscopic. . . . [but Dr. Loux agreed that] if you lose your orientation during a laparoscopic surgery, it's very important that you regain your orientation before proceeding.").

In her declaration, which was prepared one year after her deposition was taken, Plaintiff states that Dr. Geissler made inappropriate comments regarding her attire, "crossed the line of professionalism . . . because of [her] gender," and criticized her minimally invasive and robotic" surgery techniques that Plaintiff believed were "unfounded and ageist." Dkt. 236 ¶ 14. Plaintiff raises that Dr.

Geissler "and other male surgeons" regularly referred to her and "other female physicians "by our first names in front of patients, hospital staff, and other physicians, while referring to male surgeons as 'Doctor.'" *Id*. ¶¶ 10, 14. Plaintiff also conveys that Dr. Geissler used female stereotypes by saying that Plaintiff was "too emotional," and Dr. Fitzwater told Plaintiff she was best suited for "nurturing roles" in neonatal intensive care as opposed to surgery. *Id*. ¶ 10.

Plaintiff's declaration states that she "regularly raised concerns to Drs. Geissler and Charvat [CMO of St. Joseph's] and others" that the male surgeons were allowed to select their operating teams and reject assigned teams while female surgeons were not. *Id*. ¶ 16. Her earlier deposition testimony does not support that she raised gender discrimination "regularly" or at all with Drs. Geissler and Charvat. *See* Dkts. 226, 226-1.

In her declaration, she avers that female surgeons were not asked for second opinions as frequently as male surgeons, Dkt. 236 ¶ 16, and male physicians, including those from PICU, NICU, and pediatric hospitals, would frequently request second opinions about a female surgeon's surgical judgment. *Id.* But as noted above, at her deposition, Dr. Loux admitted that she had no way of knowing how many second opinions were requested and from whom. Dkt. 226 at 24–25.

Plaintiff testified at deposition that Dr. Geissler referred to her and other female physicians by their first names in front of patients, hospital staff, and other

physicians, while referring to male surgeons as "doctor." Dkt. 226-1 at 4–5. She admitted that among the physician peers, Dr. Geissler referred to her and Drs. John Fitzwater and Cynthia Reyes by their first names. *Id*. Yet she never discussed this topic with Dr. Geissler. *Id*. at 5. Plaintiff was also offended that Dr. Geissler had commented when she wore pink scrubs and "seemed to think [it] was the reason for people not to take me seriously." *Id*. Dr. Geissler gave this reason only after Plaintiff asked him for his advice— "like, do you think people don't take me seriously because I'm a woman." *Id*. She then stopped wearing her pink scrubs "in that hospital." *Id*. at 6.

***<u>Resignation as Medical Director of the Pediatric Trauma Program</u>***

As medical director of pediatric trauma, Plaintiff requested a full-time pediatric chart processing position to accomplish rigorous chart review for safety and quality improvement. Dkt. 226 at 14. During her January 2020 meeting with Dr. Charvat (CMO of St. Joseph's), she relayed her concerns about making safety and quality improvements for pediatric trauma and demanded action, but by their February meeting, no progress had been made. *Id*. Plaintiff then informed Dr. Charvat that she would be tendering her resignation as the medical director of pediatric trauma. *Id*.

Plaintiff's resignation letter of February 7, 2020, gave her last day as March 8, 2020. Dkt. 226-4. Her stated reasons were "the considerable other effort

required by the Pediatric Trauma Program and the lack of resources available to the Medical Director position." *Id.* Plaintiff remained as medical director until March 2020 when she resigned from the position. Dkt. 226 at 8-9.

***Back-to-back surgery errors***

Five days after her notice, on February 12, 2020, Dr. Loux made a mistake with a pediatric patient when, in the process of creating a feeding tube for the patient, she incorrectly connected one of the bowel loops to itself instead of to the other bowel loop. Dkt. 226 at 28. The procedure was called a laparoscopic Roux-en-Y jejunostomy. Dkt. S-200-1 at 103. Dr. Loux failed to connect the upper part of the divided bowel (the part not used to create the path to a stoma at the side of the body for feeding) to the main section of the bowel. *Id*. at 106. She connected the upper part to itself which created a "Roux-en-O" rather than the intended "Y" formation. *Id*. The "Y" is supposed to be formed about 30 centimeters below the upper digestive tract, which is where the feedings come in from the side, so that all the gastric juices do not reflux back into the stomach. *Id*. at 105. In other words, the bowel was sewn to itself, leaving no escape of secretions other than back up into the stomach leading to the airway. *Id*. at 107.

As a result of the improper "O" formation, the child's secretions were not passing through to the main bowel, and the child developed aspiration pneumonia from the secretions moving back up. *Id*. at 106–07. When it was discovered that

the patient was not having any bowel function, Dr. Loux took the patient back into surgery six days later and corrected the error. Dkt. 226 at 28; Dkt. S-200-1 at 106. She reported the mistake to the patient's family, her partners, and the Hospital risk management team. Dkt. 226 at 28.

On the next day, February 13, 2020, Dr. Loux had another serious error. In the process of creating a colostomy due to a significant anal wound in a child whose chemotherapy had created a low immune state, Dr. Loux bisected the child's large intestine, but hooked up the lower, anal end, to the colostomy exit port, rather than the upper (stomach) end. *Id*. at 30. Rather than hook the stomach, upper end of the bowel to the exit port, she stapled it closed. *Id.*

The procedure was called a laparoscopic end colostomy. Dkt. S-200-1 at 118. The procedure entails bringing the cut sigmoid colon up to the exit port and stapling off the dysfunctional side (low anal side) and connecting the top side to the exit port. *Id*. If done successfully, there would be no fluid or material exiting the body through the impaired anus—only through the colostomy port in the side of the body. *Id*. at 119. But Dr. Loux did just the opposite.

When nothing appreciable had come out of the child's colostomy exit port in ten days and the child was distended, the patient was opened up to determine the issue. *Id*. at 118. It was then discovered (on February 25) that Dr. Loux had stapled closed the wrong upper or stomach end of the bowel so that nothing was

coming out of the exit port. Dkt. 226 at 30; Dkt. S-200-1 at 119–20, 123. Drs. Geissler and Fitzwater performed the corrective surgery. Dkt. S-200-1 at 120–21. All of the "stuff" was suctioned out of the patient, and, fortunately, the patient did not have septic shock, and the bowel was not perforated. *Id*. at 121.

Dr. Loux took responsibility for the February 2020 back-to-back surgical errors. Dkt. 226 at 39. These errors were not consistent with the standard of practice that Dr. Loux strived to attain. *Id*. at 31. Plaintiff described both errors as "never events," which will be explained next.

***<u>After the February 2020 surgical complications</u>***

On February 25, 2020, the day the second "never event" was discovered, Plaintiff forwarded emails from 2018 to her then-physician partners (Drs. Geissler, Fitzwater, and Reyes) to document "how long we have been asking for a solution to this problem." Dkt. 229-7 at 1; *see also* Dkt. 229-3. The forwarded emails concern complaints about the operating room staffing. Dkt. 229-3; Dkt. 229-7. Plaintiff attributed her "two NEVER EVENT complications in the past week" as "mostly secondary" to a "combination of inadequate help on the part of the OR," personal exhaustion, and "team member understaffing." Dkt. 229-7 at 1 (emphasis in original). Dr. Loux described a "never event" as "something that hospitals have—should have systems in place to prevent happening." Dkt. 226 at 30. Plaintiff added that "never events are not the exclusive responsibility of one

person" because "[t]hey are errors that hospital systems try [to correct]. But [hospitals] try to erect protocols, policies, systems, to prevent." *Id*. at 39. Plaintiff believed that even though the hospital should be concerned for the welfare of patients, she should have been supported and not punished. *Id*. Plaintiff concluded her email of February 25 with: "Starting today, I will not do advanced laparoscopy without an ACP [advanced care provider or practitioner] from our team, or a partner assisting me." Dkt. 229-7 at 1.

Dr. Dennis Alfonso as Chief of Surgery at the Hospital was shown this email during his deposition. Since 2013, Dr. Alfonso, a general surgeon, has been employed by both Bay Care Health Systems and BMG, splitting his time equally between the two. Dkt. 229 at 3–4. For Bay Care Health Systems, Dr. Alfonso serves as a physician advisor, Chairman of the Utilization Committee, and Chief of Surgery at St. Joseph's. *Id*. at 4–6. Dr. Alfonso was on the Medical Executive Committee ("MEC") at St. Joseph's. *Id*. at 11–12. The MEC is made up of all the department chairs. Dkt. 228 at 8. The MEC is the governing body of the medical staff. *Id*. at 9. Dr. Alfonso was unaware of any ongoing concerns with pediatric surgery, either in 2018 or in February 2020, and noted that the individuals alerted in the 2018 email were the proper ones to handle the issues at that time. Dkt. 229-3; Dkt. 229-7; Dkt. 226 at 17–19, 23–24.

The February 25, 2020, email addresses concerns only about hiring more experienced staff and physicians. Dkt. 229-7. Nothing in Dr. Loux's email, which was addressed to her physician partners, referenced disparate treatment. *Id*. Nor does the record contain a complaint made to the appropriate individuals who handle workplace discrimination.

Prior to and during her tenure at BMG, Plaintiff suffered from depression and anxiety, managed by daily Prozac, and for six to twelve months Cymbalta instead. Dkt. 226 at 32. She possibly discussed with her personal physician that she had a feeling of "overwork or burnout." *Id*. "I was concerned that my symptoms were due to severe burnout." *Id*.

***Retaliation***

Plaintiff readily admits that she did not follow Baycare policy and did not report discrimination to a department director, team resources manager, or team resources director. Dkt. 226-1 at 6–7; Dkt. 226-29; Dkt. 226-30. In her declaration, however, Plaintiff avers that she was retaliated against because Dr. Butler requested Dr. Loux undergo the fitness-for-duty exam only "after raising concerns over disparate treatment" based on her gender. Dkt. 236 ¶ 18. This claimed disparity was omitted when Plaintiff discussed the fitness for duty exam in her deposition. Dkt. 226 at 30–33.

Although Plaintiff met with Dr. Geissler and Dr. Fitzwater in November 2019 and voiced her complaints about being treated like a resident, the fitness-for-duty was not requested until after the back-to-back surgical "never events" of February 2020. *Id*. at 31. Dr. Loux admitted she was "feeling a significant burnout" then and spoke with the CMO of St. Joseph's in January 2020. *Id*. at 28. She confirmed that she resigned as medical director of pediatric trauma on February 7 partly based on her overall feeling of burnout and significant stress in her work life. *Id*.

As part of the fitness for duty consultation, Dr. Loux was examined by a psychiatrist, Dr. Naakesh Dewan, on March 2, 2020. Dkt. 227 at 16–17; Dkt. 226 at 31; Dkt. 236 at 44. In Dr. Dewan's opinion sent to Dr. Butler, Plaintiff was able to work as a surgeon. Dkt. 227 at 16; Dkt. 226 at 31, 35; Dkt. 236 at 44. Dr. Dewan relayed Plaintiff's requests to reduce her administrative responsibilities as head of pediatric trauma and her outpatient office hours, as well as to provide experienced operating room personnel and support on a regular basis. Dkt. 227 at 16–17; Dkt. 226 at 35; Dkt. 236 at 44. Dr. Dewan suggested that "BMG and the hospital evaluate the capability of the practice and institution to respond to her requests and develop a timeline if possible for implementation that would be mutually beneficial to all concerned." Dkt. 236 at 44.

On March 4, 2020, Dr. Butler confirmed that the referral to Dr. Dewan was to evaluate whether Plaintiff was fit for duty "to safely care for our patients in the setting of two complications." Dkt. 227-4. Dr. Loux admitted at the Fair Hearing on November 4, 2020, that her employer, BMG, had the right to request a mental fitness for duty test. Dkt. S-247 at 198.

On April 2, 2020, Dr. Geissler emailed both Dr. Butler, as the medical director of all surgeons for BMG, and Dr. Alfonso, who worked for both BMG and the Hospital, and claimed that Dr. Loux's complication rate was higher than the other pediatric surgeons and had gotten worse over the past five months. Dkt. 227 at 17; Dkt. 227-5. Dr. Loux disagrees with his assessment and believes her complication rate was no greater than the other pediatric surgeons and had improved over the last six months. *See* Dkt. 226 at 19, 25. In the April 2 email, Dr. Geissler referenced a list compiled by Dr. Pham of ten cases of serious concern handled by Dr. Loux before Dr. Pham left in 2018. Dkt. 227-5 at 1. Dr. Geissler also raised safety and quality care concerns about Dr. Loux's technique based on "new issues just this week" and cited three examples including one involving her female partner physician, Dr. Reyes, in which she disregarded Dr. Reyes's advice and refused her assistance. Dkt. 227 at 17; Dkt. 227-5.

Dr. Alfonso testified that in his position as Chief of Surgery and Chair of the of Utilization Committee, he looked at surgeons' cases and first had concerns

about Dr. Loux's cases four to six months before the Peer Review Committee convened on April 8. Dkt. 229 at 32. He had concerns prior to Dr. Geissler contacting him about Dr. Loux. *Id*. at 32–33. Dr. Alfonso had already spoken with the medical directors of NICU and ICU about Dr. Loux's cases while he was conducting the review. *Id*. at 33. He also spoke with the chief of the medical staff at the time. *Id*. The chief of the medical staff would then bring the issue to the MEC to be discussed in a closed session with only the physicians from the Hospital. *Id*. at 33–34. After Dr. Alfonso's review of Dr. Loux's cases and after it was discussed by the MEC, Dr. Alfonso recommended to the MEC that Dr. Loux's cases should be subject to peer review. *Id*. at 34.

On April 3, 2020, after Dr. Alfonso met with Drs. Pidala, Nayee, and Charvat, they called Dr. Loux and asked her not to take any more call or perform any more surgeries or consults. Dkt. 226 at 37; Dkt. 229-8. She would be forwarded the list of cases under surgical review. Dkt. 229-8. Later that same day, Dr. Loux received an email from Dr. Alfonso requiring her attendance at a meeting with the St. Joseph's Hospital Peer Review Committee on April 8, 2020. Dkt. 226 at 37; Dkt. 226-6. Less than 48 hours before the meeting, Dr. Loux was provided, for the first time, a list of "about 20" cases where quality of care was raised by Dr. Alfonso's recent review of her cases. Dkt. 229-10. The cases were from 2018 to 2020. *Id*. Dr. Loux was unsure why these cases of hers were chosen and

responded that "I can come up with several other patients who had complication that are not listed." *Id.*

***Peer Review Committee meeting***

On April 8, 2020, Dr. Loux met with the St. Joseph's Peer Review Committee. Dkt. 228-2; Dkt. 226 at 37. Dr. Anand Nayee was the chief of the medical staff of the Hospital in 2020, which made him the head or chair of the peer review committee. Dkt. 229 at 33–35; Dkt. 228 at 5–6, 11. Dr. Nayee was hired by BMG in 2010 as a hospitalist and held leadership positions with the Hospital over the years. Dkt. 228 at 6.

At the meeting, Dr. Alfonso presented on several of Dr. Loux's cases. Dkt. 226 at 43. Dr. Loux was asked to defend the roughly 20 cases presented, including the two February 2020 errors. Dkt. 229-10; Dkt. 226 at 37, 39. Plaintiff told the committee that she had taken remedial steps to ensure she could continue to practice safely. Dkt. 226 at 37–39.

According to Dr. Nayee, Dr. Geissler was present at the peer review committee meeting and was asked his opinion but did not provide any report. Dkt. 228 at 13. Dr. Reyes also attended and spoke on the matters. *Id*. at 18. Dr. Nayee recalled that the concerns raised about Dr. Loux involved quality regarding some surgical procedure complications. *Id*. at 14. None of Plaintiff's physician peers, Dr. Geissler, Dr. Fitzwater, or Dr. Reyes, were members of the peer review

committee. *Id*. at 16. None were present for the discussion concerning the outcome and recommendations of the committee. *Id*. at 18. Dr. Nayee confirmed that there were no discussions between BMG and the peer review committee about the recommendations and their effect on employment with BMG because the committee is a hospital committee making recommendations for patient safety and quality. *Id*.

Later that same day, April 8, 2020, Dr. Nayee, as Chair of the Hospital's peer review committee, sent a letter to Dr. Loux with the committee's recommendations. Dkt. 228-2. The letter set forth an "offer of collegial intervention" pursuant to Article 6, Section A of the Credentials Policy. *Id*.; Dkt. 226 at 38. The six components proposed (1) an official summary of the concerns and action be placed in Dr. Loux's confidential file, (2) no "ER/Trauma call" for the next 90 days, (3) no consultation with any patients in the PICU or NICU for the next 90 days, (4) mandatory assistance in surgery by one of Dr. Loux's colleagues for the next 90 days, (5) meet with your group regarding these changes, and (6) compliance with all "Bylaws and Hospital and Medical Staff Rules and Regulations." Dkt. 228-2; Dkt. 226 at 38. The letter concluded:

> If you do not agree to accept and comply with these recommendations, then a formal recommendation will be made to the Medical Executive Committee (MEC) to initiate a Formal Investigation which may lead to further disciplinary action under the Credentials Policy. In addition, if you do not agree to accept and comply with the above recommendations, the Committee may impose a Precautionary

> Suspension of your privileges, pending further action from the MEC. Such a suspension would be reportable to the National Practitioner Data Bank [NPDB] and Florida Department of Health, should that suspension exceed 30 days. Many final disciplinary actions are also reportable.

Dkt. 228-2.

On Friday, April 10, 2020, Dr. Butler emailed Dr. Andrew Fink, who was then-president of BMG, and stated that Dr. Loux voluntarily ceased operating independently and stopped taking call one week earlier. Dkt. 227 at 18; Dkt. 227-6; Dkt. 229 at 14; Dkt. 226 at 7. Dr. Butler added, "The pediatric general surgery group removed her from the call schedule for the next 30 days awaiting final guidance to come Monday." Dkt. 227-6. He conveyed that Plaintiff would receive correspondence from St. Joseph's Credentials/Quality on Monday, April 13, informing her of the four 90-day restrictions on independently performing operations and procedures, seeing consults, managing patients in NICU or PICU, and taking call. *Id*. Dr. Butler noted that Dr. Loux's employment contract with BMG requires her to report a restriction on privileges by the Hospital and gives her 30 days to cure the breach. *Id.*

***<u>Acceptance of the recommendations</u>***

When Dr. Loux received the peer review committee recommendations, she discussed the collegial intervention components with her partners as they would be affected by needing to cover her call (about three extra days of call per month for

each) and needing to assist her in the operating room. Dkt. 226 at 40. After speaking with her partners, on April 15, 2020, Plaintiff emailed Dr. Nayee and Dr. Alfonso to obtain clarification of the terms. Dkt. 226-8; Dkt. 236 at 50–51. She was concerned about three issues: (1) whether "assistance" in surgical cases constitutes a "formal proctorship" requiring form to be filled out (which would result in an NPDB report); (2) whether she would be permitted to resume normal coverage and operate without assistance at the end of the 90-day intervention; and (3) whether the sanctions would cause BMG to terminate her employment contract based on the inability to continue call coverage. Dkt. 226-8. Nothing in this communication specifically mentions NDPB, although Dr. Loux adds information in her declaration that one of her three issues was actually "avoiding an NPDB report." *Id.*; Dkt. 236 ¶¶ 43–44.

On April 16, 2020, Dr. Nayee responded to each of Dr. Loux's questions. Dkt. 226-9. He concluded that "assistance" meant that one of Dr. Loux's partners must be present as first assistant (scrubbed in) to directly observe her cases, but "[t]his is not a formal proctorship." *Id.*; Dkt. 226 at 41. Dr. Nayee also advised that Dr. Loux's colleagues would not be involved in her pre-and-post-procedure planning unless she felt the need to ask for their professional opinion on specific matters, office procedures did not need to be observed by another physician, and no formal paperwork needed to be completed by Dr. Loux at the end of the 90

days. Dkt. 226-9; Dkt. 226 at 41. Lastly, Dr. Nayee advised that the decision for observing was strictly a decision of St. Joseph's and that BMG was responsible for coordinating call coverage. *Id*.

Before sending the April 16 email, Dr. Nayee spoke with the peer review committee members. Dkt. 228 at 21. He did not discuss the matters with Drs. Geissler, Fitzwater, or Reyes, who were not members of the committee. *Id*. at 21. Nor did he discuss them with Dr. Butler, who "was not part of this process." *Id*. When asked what he meant when he wrote that the collegial intervention was not "a formal proctorship," Dr. Nayee stated that there were "no structures regarding education, filling out forms." *Id*. He confirmed that he and Dr. Loux never discussed NPDB reporting and that it was not his business as Peer Review Chair to know the NPDB rules, which he left to the medical staff office. *Id*.

***<u>Acceptance of recommendations</u>***

On April 20, 2020, Dr. Loux accepted the St. Joseph's Peer Review Committee's proposed collegial intervention. Dkt. 226-10; Dkt. 226 at 43–44. Three days after her acceptance, on April 23, 2020, Dr. Nayee and Dr. Peter Charvat as the Chief Medical Officer of St. Joseph's sent Dr. Loux a letter of clarification concerning the peer review committee's recommendations of April 8, 2020. Dkt. 226-11; Dkt. 226 at 44. The point of clarification pertains to NPDB reporting requirements:

> The [April 8] letter suggested that the actions imposed on you are not reportable to the National Practitioner Data Bank (NPDB). Per the NPDB Guidebook any investigation, restriction of privileges, or proctoring (outside of routine proctoring) lasting more than 30 days is reportable to the NPDB. Therefore, a report will be filed with the NPDB immediately.

Dkt. 226-11. Plaintiff's restrictions were reported to the NPDB that day.

That same day, April 23, 2020, then-BMG President Dr. Andrew Fink and BMG's Team Resources Director Amy Hagland met with Dr. Loux to advise her of BMG's intention to terminate her employment pursuant to Section 7.b.(vi) of her Physician Employment Agreement. Dkt. 226 at 48. The provision states:

> 7. <u>Termination</u>.
> . . . .
> b. <u>Termination for Cause</u>. Either party may terminate this Agreement for cause effective thirty (3) days after the terminating party delivers to the non-terminating party a written notice of termination, unless the for cause event has been cured to the reasonable satisfaction of the terminating party within such thirty (30) day period. The grounds for which Employer may terminate "for cause" include, without limitation, the occurrence of [one of] the following events:
> . . . .
> (vi) if, after Physician becomes a member of the staff of a Health Care Facility, Physician's position as a member of the staff of the Health Care Facility is restricted, suspended, or revoked for any reason[.]

Dkt. 226-2 at 7–8. A written notice from BMG, signed by Dr. Fink, followed that same day. Dkt. 226-12; Dkt. 226 at 48.

The letter of April 23, 2020, served as notice of termination in accordance with Section 7.b.(vi) and informed Plaintiff of her failure to notify BMG that her

privileges had been "restricted, suspended, and/or revoked by St. Joseph's Hospital." Dkt. 226-12; Dkt. 226 at 48. Plaintiff was given 30 days to provide evidence that her privileges had been reinstated. *Id.* Plaintiff's termination would become effective May 23, 2020, if her privileges were not reinstated. *Id.* Failure to cure the breach would also result in her responsibility to pay 100 percent of the cost for insurance tail coverage at about $55,000. *Id.*

***Revocation of acceptance***

On April 28, 2020, Dr. Loux, through counsel, notified Dr. Nayee as Chair of the Peer Review Committee of St. Joseph's that Plaintiff was revoking her acceptance of the collegial intervention. Dkt. 226-13; Dkt. 226 at 48. Plaintiff expressed several reasons including: (1) she believed that Dr. Nayee's representation that "assistance" was not a "formal proctorship" meant that the conditions were not reportable to the NPDB; and (2) BMG terminated her employment after it learned of the collegial intervention even though she believed BMG would have to provide the necessary support for the collegial intervention. Dkt. 226-13; Dkt. 226 at 48.

On May 1, 2020, Dr. Loux's counsel sent notice to counsel for BMG that her revocation of her prior acceptance "cured the termination reason" pursuant to Section 7.b.(vi) of the Physician Employment Agreement. Dkt. 226-14; Dkt. 226 at 48. Plaintiff requested her employment be reinstated. *Id.*

Thereafter, on May 12, 2020, Dr. Charvat as CMO of St. Joseph's-Main wrote Dr. Loux that the Hospital had learned that Dr. Loux was no longer associated with BMG. Dkt. 226-19; Dkt. 226 at 50. St. Joseph's requested that Plaintiff provide to the medical staff office an updated business address, the status of her plans to continue practicing in Hillsborough County along with a copy of her updated certificate of insurance. Dkt. 226-19; Dkt. 226 at 50. The May 12 letter advised that Plaintiff must comply by June 15, 2020, and failure to comply would result in the voluntary relinquishment of her hospital privileges. *Id.*

Plaintiff's revocation of her acceptance of the April 8 restrictions prompted the issuance of a precautionary suspension by the Hospital pursuant to the Medical Staff Bylaws of St. Joseph's. Dkt. 226-23 at 3; Dkt. 226-15. On May 19, 2020, a letter sent by Dr. Pidala, as president of St. Joseph's medical staff, to Dr. Loux stated that in consideration of the Peer Review Committee's findings of April 8 relating to Plaintiff's clinical performance, "failure to take action may result in imminent danger to the health and/or safety of a patient." Dkt. 226-15; *see* Dkt. 226 at 48–49. Dr. Pidala further advised that the precautionary suspension would be effective immediately and remain in effect for an initial period of 90 days. Dkt. 225-15; *see* Dkt. 226 at 49. The letter concluded:

> Following the issuance of this precautionary suspension, the [Medical] Executive Committee will review the reasons for the suspension, and you will be given an opportunity to meet with the Executive Committee and/or submit a written statement to the Executive Committee. The

> Executive Committee will then determine whether the precautionary suspension should be continued, modified, or lifted.

Dkt. 226-15.

***<u>Review of precautionary suspension of hospital privileges</u>***

On May 27, 2020, Dr. Pidala sent Dr. Loux a letter inviting her to attend the upcoming Medical Executive Committee meeting scheduled for June 8, 2020. Dkt. 226-16; Dkt. 226 at 49. On June 1, 2020, Dr. Pidala sent a second letter to Dr. Loux concerning the upcoming MEC meeting and attached a list of ten cases that would be discussed. Dkt. 226-17; Dkt. 226 at 49. During the June 8 meeting with the MEC, Plaintiff discussed her concerns about the precautionary suspension and her concerns about the cases selected for review. Dkt. 226 at 49. These cases were the same ones presented to the peer review committee. Dkt. 226-23 at 3.

On June 18, 2020, Dr. Pidala sent Dr. Loux a letter memorializing the MEC's decision. Dkt. 226-18; Dkt. 226 at 49–50. The MEC discontinued the precautionary suspension but reaffirmed the six restrictions set by the peer review committee on April 8, 2020. *Id.*

Meanwhile, by June 15, 2020, Dr. Loux had not complied with the Hospital's May 12 request for Plaintiff's new business address and other information, after learning Plaintiff was no longer working for BMG. Dkt. 226-19; Dkt. 226-20; Dkt. 226 at 50. Complying with this request would have violated her noncompete agreement in her Physician Employment Agreement with BMG. *See*

Dkt. 226-2 at 9–10. Consequently, on June 30, 2020, St. Joseph's president, Ms. Kimberly Guy, notified Dr. Loux that she was considered to have automatically relinquished her clinical privileges, effective June 24, 2020, due to her failure to provide the information requested in the May 12 letter. Dkt. 226-20; Dkt. 226 at 50.

***Appeal of the Medical Executive Committee's recommendation***

In July 2020, Dr. Loux appealed the MEC's decision upholding the six April 8, 2020, restrictions and requested a Fair Hearing. Dkt. 226-21; Dkt. 226 at 50. A hearing officer was selected to oversee the examination of witnesses and to help the hearing panel with organizing the information it was reviewing. Dkt. 226 at 51. After a pre-hearing conference, the hearing officer provided a list of the cases and issues expected to be discussed at the Fair Hearing. Dkt. 226-22. These cases were the same ones presented to the peer review committee and the MEC. Dkt. 226-23 at 3. The Fair Hearing began the evening of October 26, 2020, and continued for several nights. Dkt. 226 at 51. After each witness was examined, both sides had the opportunity to make written submissions to the hearing panel. *Id.*

On January 11, 2021, the hearing panel issued its report and recommendation. Dkt. 226-23; Dkt. 226 at 51. The three-physician hearing panel recommended that the MEC's decision be upheld, with one exception—the

restriction prohibiting Dr. Loux from covering ER/trauma was unnecessary given the totality of the other restrictions. Dkt. 226-23 at 4; Dkt. 226 at 51. The hearing panel weighed the evidence before it and concluded that the MEC was justified in restricting Plaintiff's clinical privileges. The report provides in pertinent part:

> Having given due weight to all of the evidence before it, the Hearing Panel concludes that MEC was justified in restricting Dr. Loux's clinical privileges.
>
> On two separate occasions, Dr. Loux misidentified portions of a patient's anatomy and improperly connected portions of the patient's bowel either to itself or to a stoma.[5] These are serious errors that Dr. Loux appropriately characterized as "never" events. In addition to these two cases, the other cases reviewed by the panel created concerns about judgment and decision making. Although Dr. Loux and her expert raised concerns about a lack of support and other environmental factors, all of the pediatric surgeons were equally affected by those factors, and Dr. Loux acknowledged that there were ways she could have tried to exercise more control over those factors.
>
> Dr. Loux's own expert testified that an informal proctoring with observation by experienced peers would be the usual way to handle concerns of this nature, and the panel agrees. In addition to proctoring with observation, the panel recommends participation in continuing medical education. Upon hearing all the testimony and reviewing the documents submitted, the panel believes the restrictions placed on Dr. Loux were reasonable and appropriate restrictions designed to enhance the quality of care delivered by Dr. Loux with just one minor change [restriction of ER/Trauma coverage is unnecessary].

---

[5] A stoma is an artificial opening made in surgical procedures, the exit port through which waste is expelled. Stoma, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/stoma (last visited Sept. 2, 2026); stoma, dictionary.com, https://www.dictionary.com/browse/stoma (last visited Sept. 2, 2026). For example, a stoma is surgically created for a colostomy.

Dkt. 226-23 at 4.

Thereafter, Plaintiff filed a written charge of discrimination, which the Florida Commission on Human Relations investigated. Dkt. 226-25; Dkt. 226-26; Dkt. 226-27. This action ensued.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if 1) there is no genuine dispute as to any material fact and 2) the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it may "affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute means evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "For factual issues to be considered genuine, they must have a real basis in the record." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993)). Conclusory arguments that lack specific facts have no probative value and will not create an issue of fact. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

The moving party bears the initial burden of identifying those portions of the record that show the lack of genuinely disputed issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If met, the burden shifts to the nonmoving party to present "'affirmative evidence' that would allow a reasonable

jury to rule for him." *Hinson v. Bias*, 927 F.3d 1103, 115–16 (11th Cir. 2019) (quoting *Anderson*, 477 U.S. at 257). It is not enough that "the jury might, and legally could, disbelieve the moving party's evidence." *Id*. at 1115–16 (citation omitted) (internal quotation marks omitted).

The court may not weigh conflicting evidence to resolve factual disputes. *Anderson*, 477 U.S. at 249. Nor may the court make credibility determinations at summary judgment, even if the court doubts the veracity of one party's evidence. *Feliciano v. City of Miami Bch.*, 707 F.3d 1244, 1252 (11th Cir. 2013).

The court must draw all reasonable inferences from the facts, not conclusions, in the light most favorable to the nonmoving party. *United States ex rel. Bibby v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1346 (11th Cir. 2021). An inference is reasonable if it is not based on pure conjecture and speculation. *Hinson*, 927 F.3d at 1115. If a party attempts to create an issue of fact through a sworn statement, that statement may "be disregarded if it 'flatly contradict[s]' earlier deposition testimony without explanation." *Pivac v. Component Servs. & Logistics, Inc.*, 570 F. App'x 899, 901 (11th Cir. 2014) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986)). There is a distinction, however, between "discrepancies which create transparent shams and [those] which create an issue of credibility or go to the weight of the evidence." *Id*.

**DISCUSSION**

### I. Count I against BMG: Gender-based discrimination under Title VII

Count I alleges that BMG's decision to terminate Dr. Loux's employment constitutes sex discrimination in violation of Title VII. For a case based on circumstantial evidence as this one, the burden-shifting analysis of *McDonnell Douglas*[6] applies, and additionally, if the plaintiff fails to meet the *prima facie* case under *McDonnell Douglas*, such as the absence of comparators, then the convincing mosaic analysis applies to determine whether intentional discrimination is inferred. *See Tynes v. Fla. Dep't of Juv. Just.,* 88 F.4th 939, 946 (11th Cir. 2023), *cert. denied*, 145 S. Ct. 154 (2024). In this single motive case, Plaintiff must show that BMG would not have taken the alleged actions against her but for her sex. *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 656 (2020). "A plaintiff can even succeed where there are multiple but-for causes: so long as the plaintiff's protected characteristic was one but-for cause of the adverse decision, that is enough to trigger the law." *Ismael v. Roundtree*, 161 F.4th 752, 761 (11th Cir. 2026) (quoting *Bostock*, 590 U.S. at 656 (citation modified)).

Under *McDonnell Douglas*, Plaintiff must establish a *prima facie* case that: (1) Plaintiff belongs to a protected class, (2) BMG subjected her to an adverse employment action, (3) she was qualified to perform the job, and (4) BMG treated similarly situated comparators outside her class more favorably. *Lewis v. City of*

[6] *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

*Union City*, 918 F.3d 1213, 1221 (11th Cir. 2019) (*en banc*) (*Lewis I*). If BMG carries the burden of articulating a legitimate, nondiscriminatory reason for its actions, then Dr. Loux must demonstrate that BMG's proffered reasons were merely a pretext for unlawful discrimination— "an obligation that merges with her ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination." *Id*. (citation modified).

The issue of pretext under the *McDonnell Douglas* burden-shifting is reached only after the *prima facie* case is met. For pretext, the plaintiff must show "both that the [employer's] reason was false, and that discrimination was the real reason" for the adverse action. *Ismael*, 161 F.4th at 761 (citation omitted). The Eleventh Circuit, however, cautions a district court on summary judgment to refrain from analyzing a discrimination or retaliation claim "through the narrow lens of *McDonnell Douglas* pretext." *Id*. at 764. The roadmap to review summary judgment motions "differs depending on whether the plaintiff can demonstrate a *prima facie* case or not." *Id*.

If the defendant successfully rebuts the presumption by proffering evidence of a legitimate reason for the adverse employment action, then the *McDonnell Douglas* analysis is "no longer relevant" and "simply drops out of the picture." *Id*. (citation omitted). At this juncture on summary judgment, the district court must proceed directly to the convincing mosaic framework. *Id*. at 765.

### *A. Comparators*

The parties agree that Dr. Loux satisfies the first three elements of the *McDonnell Douglas* approach, which leaves only the issue of comparators. The parties dispute whether Plaintiff has shown that BMG was aware of a similarly situated male comparator yet refrained from terminating that person. To establish the existence of a similarly situated comparator, Plaintiff must demonstrate that she and her proffered comparator were similarly situated in all material respects. *Lewis I*, at 1226. To be "similarly situated in all material respects," any comparators identified by Dr. Loux must have engaged in the same basic conduct (or misconduct), must have been subject to the same employment policy, guideline, or rule, will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor, and must share her employment or disciplinary history. *Id*. at 1226–27. Nonetheless, "comparator evidence can still be useful even where there are 'material differences' between a plaintiff and her comparator," and the jury's role is "to determine how much weight comparator evidence should be given." *Ismael*, 161 F.4th at 764 (citations omitted).

In her declaration, Plaintiff identified several alleged comparators on the basis that these individuals committed the same or worse actions yet had no

meaningful adverse action taken against them. Dkt. 236 ¶ 84.[7] Plaintiff argues that none of the comparators were ever reported to the NPDB or suffered adverse action. Plaintiff, however, has not identified *any* male pediatric surgeon employed by BMG—similarly situated or not—who BMG did *not* terminate or cause to suffer adverse action despite the male pediatric surgeon's inability to cure a suspension, restriction, or revocation of his privileges for any reason during the contractual 30-day cure period. According to the plain terms of Plaintiff's employment agreement, BMG was required to terminate Plaintiff for the failure to cure a restriction or suspension of privileges within a 30-day period. Plaintiff is unable to show that BMG treated a male surgeon better than Plaintiff when his privileges were suspended or restrictions in place beyond a contractual window for cure.

There is also nothing in the record showing that either Dr. Andrew Fink (President of BMG) or Dr. Stephen Butler (Plaintiff's direct supervisor at BMG)—the only decisionmakers tied to BMG's termination of Dr. Loux's employment—were aware of any other male surgeons who engaged in the same or similar conduct as Dr. Loux. Plaintiff has failed to establish a *prima facie* case of discrimination against BMG pursuant to the *McDonnell Douglas*.

---

[7] Defendants seek to strike portions of paragraph 84, which will be addressed subsequently in this Order.

***B. <u>Convincing mosaic of circumstantial evidence</u>***

On summary judgment, once it is established that the *prima facie* case under *McDonnell Douglas* has not been met, the plaintiff "does not automatically lose." *Ismael*, 161 F.4th at 764. At this juncture, "the plaintiff must produce enough evidence, on her own and without any helpful evidentiary burdens or presumptions," *Ismael*, 161 F.4th at 765, such that "a reasonable factfinder [would] infer intentional discrimination in an employment action." *Tynes*, 88 F.4th at 946. Because this convincing mosaic inquiry is not identical to the final burden-shifting stage of the *McDonnell Douglas* framework, only one question remains: "whether there is sufficient evidentiary basis for the jury to find the defendant intentionally discriminated against the plaintiff." *Ismael*, 161 F.4th at 762 (distinguishing dicta in *Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1021 (11th Cir. 2023) to the extent it incorrectly equates the pretext stage under *McDonnell Douglas* with convincing mosaic framework).

Defendants argue that using the same evidence to support a convincing-mosaic theory that was already advanced under *McDonnell Douglas* does not necessarily alter the character or significance of that evidence. *See Melton v. I-10 Truck Ctr. Inc*, 166 F.4th 905, 915 (11th Cir. 2026) ("[T]he same evidence placed in a looser frame does not transform it into something new."). While true, the Eleventh Circuit explains that the first prong of pretext under

*McDonnell Douglas*—showing the employer's reason for the adverse employment action was false—both "is not required to succeed at trial [and] detracts from the plaintiff's affirmative case that the driving cause was illegal discrimination or retaliation." *Ismael*, 161 F.4th at 761. Thus, pretext within the burden-shifting of *McDonnell Douglas* is not part of the convincing mosaic framework. *Ismael*, 161 F.4th at 762 (differentiating the two— "By contrast, the pretext inquiry lets the defendant's explanation take center stage, requiring the plaintiff to present contradictory evidence rather than direct or circumstantial evidence supporting an inference of discrimination."). Indeed, "the entire "evidentiary picture' goes further than pretext." *Ismael*, 161 F.4th at 762 (quoting *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1242 (11th Cir. 2023)).[8]

Applying a convincing mosaic, "[a]ny kind of evidence that raises a triable issue of discriminatory intent is sufficient" including: "(1) animus against non-comparators in the plaintiff's protected class; (2) whether the employer had a

---

[8] It is well-established that the "inquiry into pretext centers on the employer's beliefs about the employee's conduct." *Phillip v. Legacy Cabinets*, 87 F.4th 1313, 1324 (11th Cir. 2023) (citations omitted) (internal quotation marks omitted). Under the *McDonnell Douglas* burden-shifting analysis, Plaintiff must show that the employer's legitimate, nondiscriminatory reason was pretextual—that the proffered reason was false or that discrimination was the true reason for termination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515–19 (1993) (proving pretext for discrimination requires showing that both the reason was false and the real reason for adverse action was discrimination); *Ring v. Boca Ciega Yacht Club Inc.*, F.4th 1149, 1163 (11th Cir. 2021) (quoting *St. Mary's*, 509 U.S. at 515). As noted in the text in discussing *Ismael*, the convincing mosaic framework does not focus on whether the plaintiff "proved" the employer's reason was false.

reason to discriminate; (3) suspicious timing, ambiguous statements, and other 'bits and pieces' suggesting discriminatory intent, (4) differential treatment of similarly situated employees; (5) whether the employer's justification is pretextual; and (6) whether the decision was extraordinarily arbitrary." *Grey v. Vengroff Williams, Inc.*, No. 24-14020, 2026 WL 1165777, at *3 (11th Cir. Apr. 29, 2026) (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1341–46 (11th Cir. 2011), and *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (*Lewis II*)). Here, evidence shows that Dr. Butler and Dr. Fink were concerned about the effects of the restrictions on Plaintiff's privileges, especially the burden it would place on her physician partners. There is no evidence that Dr. Loux's gender was discussed, that either Dr. Fink or Dr. Butler was aware of any gender discrimination claims, or that either Dr. Butler or Dr. Fink has a history of animus towards female physicians. In short, Plaintiff has failed to show that either physician allowed Dr. Loux's gender to impact their decision.

Dr. Loux attempts to overcome the absence of such evidence by suggesting that Dr. Dennis Alfonso and Dr. Geissler attempted to engineer her suspension by using the Peer Review Committee. Yet, Dr. Alfonso and Dr. Geissler were not decisionmakers for BMG with respect to Dr. Loux's employment. *See* Dkt. 229 at 44; Dkt. 246-1 ¶ 28. To the extent that Dr. Loux asks the Court to infer that they acted in a biased manner when presenting evidence to the peer review committee,

any such inference would be negated by the committee's independent review. *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999) (disregarding with "grave reservations" plaintiff's disparate treatment because the causal link between animus and her termination was broken by the board's hearing and independent decision to terminate plaintiff).

Dr. Loux attempts to dispute the foregoing by citing Dr. Alfonso's deposition testimony, where he states that he "thinks" Dr. Geissler "was part of the peer review committee." Dkt. 258 at 11-12; Dkt. 229 at 38. While it is undisputed that Dr. Geissler attended and provided comment during the peer review committee meeting held for Dr. Loux on April 8, 2020, Dr. Geissler was not on the committee and did not actively participate in the subsequent deliberations. *See* Dkt. 246-1 ¶¶ 32–33. Dr. Geissler was not consulted with respect to the peer review committee's ultimate recommendation. *Id*. ¶¶ 33-35. Dr. Geissler never held a leadership position within BMG during Dr. Loux's employment. *Id*. ¶ 28. In the absence of any contradictory evidence, Dr. Alfonso's testimony does not create a dispute.

When confronted by the peer review committee's decision to restrict Dr. Loux's privileges for 90 days, Dr. Butler and Dr. Fink, both solely employed by BMG, concluded in their business judgment that the burden on Dr. Loux's peers would be unreasonable. The restrictions required, among other things, her three

fellow physician partners (Drs. Geissler, Fitzwater, and Reyes) each to take call an additional three days per month and scrub-in for Plaintiff's surgeries, all to last for 90 days. It is well-settled that a "plaintiff is not allowed . . . to substitute [her] business judgment for that of the employer." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). The "inquiry is limited to whether the employer gave an honest explanation of its behavior." *Id*. Accordingly, the Court will not second guess BMG's business judgment.

Plaintiff also attempts to support her belief that BMG influenced the outcome of the peer review committee's deliberations by citing an email dated April 10, 2020, from Dr. Butler to several individuals (who were all associated with BMG). *See* Dkt. 227 at 18. The email advises that Dr. Butler spent his morning speaking to Dr. Alfonso and Dr. Loux's practice partners: Dr. Geissler and Dr. John Fitzwater ("who spoke on behalf of Dr. [Cynthia] Reyes"). Dkt. 227-6.

Dr. Loux's reliance on this email is misplaced. First, Dr. Butler sent this email two days *after* the peer review committee rendered its decision and notified Dr. Loux of the terms of its recommended collegial intervention on April 8, 2020. Dkt. 226-7. Having been sent after the committee deliberated and issued its recommendations, the April 10 email cannot serve as evidence of influence by Dr. Butler.

Additionally, Dr. Butler was Dr. Loux's direct supervisor. Dkt. 226 at 43; Dkt. 226-1 at 3. As Medical Director for all BMG surgeons, Dr. Butler had oversight regarding all service lines, all the subspecialties in surgery, all surgeons within the medical group, and also "dealt with all of the clinical issues." Dkt. 227 at 6. When discussing this April 10, 2020, email during his deposition, Dr. Butler explained that he was informing the leadership of BMG—Dr. Loux's "employing authority"—that restrictions imposed by the peer review committee would place Dr. Loux in breach of her contract and that Dr. Loux likely would not be able to cure that breach due to the 90-day length of the recommended restrictions. *Id*. at 18-19. Dr. Butler further characterized his email as an outline of "the steps to address the various issues that are in play." *Id*. at 19.

That Dr. Butler met with Dr. Loux's physician partners two days after the peer review committee's recommendations to discuss the impact of those recommendations on their practice shows that BMG was reacting to the committee's recommendations, not orchestrating them. Furthermore, this evidence is consistent with BMG's stated reason for terminating Dr. Loux—the length of her restrictions and their impact on her peers.

Dr. Loux suggests that there is something inappropriate about Dr. Butler previewing his decision with other members of BMG leadership. The Eleventh Circuit has recently held that a comment by a decisionmaker to another supervisor

that "they were going to get rid of [plaintiff] but they had to do it the right way" was not enough to establish pretext. *Melton*, 166 F.4th at 916. As *Melton* shows, merely discussing a decision before finalizing it does not establish discriminatory intent, at least when there is no evidence that protected characteristics were considered in the discussion. Instead, the plaintiff must show that "proffered reasons were so weak, implausible, inconsistent, incoherent, or contradictory that a reasonable factfinder could find them unworthy of credence, none of plaintiff's arguments establish pretext." *Id.* (citation modified).

Here, the April 10 email does not contain any discussion of Dr. Loux's gender and appears on its face to be consistent with BMG's proffered legitimate reasons for Dr. Loux's termination. It is not evidence of discrimination.

Lastly, counsel for Plaintiff suggested at the hearing held on the instant motion that an email exchange between Dr. Butler and Dr. Alfonso evidences discriminatory intent. *See* Dkt. 261. Dr. Geissler sent the initial email to both Dr. Alfonso and Dr. Butler on April 2, 2020. *Id.*; Dkt. 227 at 17; Dkt. 227-5. Dr. Geissler discussed his concern about the accelerating numbers of complications in Dr. Loux's cases, including the back-to-back "true iatrogenic problems."[9] Dkt.

---

[9] "Iatrogenic" refers to any disease or problem that is caused by medical treatment or a doctor." *See* Iatrogenic, Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/iatrogenic (last visited Sept. 3, 2026). Plaintiff takes issue with Dr. Geissler's statement that Dr. Loux "has a high complication rate in general." Dkt. 227-5. Dr. Loux disagrees that she had a higher complication rate, but the record contains no empirical data supporting either conclusion. Dr. Loux's expert, Dr. Leopold

227-5. He referenced three complications with Dr. Loux that very week, noting that after her time off, she came back "defiant and defensive" and not "cautious" but "aggressive" in her treatment of patients. *Id*. Dr. Alfonso initially responded on April 3 advising that he is "presently" reviewing a number of her cases resulting in complications (which was delayed only because of the "present COVID 19 virus pandemic") and afterwards planned to review the cases with Dr. Geissler and Dr. Charvat. Dkt. 261. Dr. Alfonso also remarked that the only other option would be a temporary suspension of Dr. Loux's privileges, which "would have dire consequences to her." *Id*.

In the follow up exchange between just Dr. Butler and Dr. Alfonso, Dr. Butler states, "I think there is a discussion that needs to be held about the possibility of suspension." *Id*. Dr. Alfonso then responds stating, "I don't disagree, but will need to have her peers to be in agreement," and advises of the individuals that would need to be involved in the discussion. *Id*.

---

Malvezzi, testified at deposition that "I didn't say that [Dr. Loux did not have a higher rate of complications]. I just said that nobody can show me that she did." Dkt. 193-2 at 75. Dr. Malvezzi also admitted that "[t]he two cases where there was a mistake [the two never events was] a reason for proctoring." *Id*. at 83. He again referred to the two back-to-back never events as "unusual" and that "they're the ones where you need, you know, to do some kind of assistance." *Id*. at 179–80. In any event, Dr. Geissler, and others, clearly believed from personal observations that her cases suffered complications to a degree above the norm. *See*, *e.g.*, Dkt. 226 at 19–20 (Dr. Loux admitted she had an initial higher infection rate from appendix removals, and she improved it after discussing technique with Dr. Giessler).

Consistent with Dr. Alfonso's representations to Dr. Butler, Dr. Loux subsequently met with the peer review committee on April 8, 2020. Dkt. 226 at 37. Dr. Loux was asked to defend a number of cases presented including the February 2020 "never-event" errors during this meeting. *Id*. at 37, 39. Dr. Loux was subsequently placed on notice pursuant to correspondence dated April 8, 2020, that "the Committee may impose a Precautionary Suspension of [her] privileges, pending further action from the MEC," if she failed to accept and comply with the peer review committee's recommendations. Dkt. 226-7. Although Dr. Loux initially accepted the committee's recommendations on April 20, 2020, Dkt. 226-10; Dkt. 226 at 43–44, she rescinded her acceptance approximately eight days later. Dkt. 226-13; Dkt. 226 at 48.

Pursuant to the April 8 notice of restrictions sent to Dr. Loux, a precautionary suspension was issued after she revoked this acceptance. Dkt. 226-15; Dkt. 226 at 48–49. It is undisputed that Dr. Loux's privileges were restricted when the 30-day period to cure expired pursuant to her employment agreement with BMG. Dkt. 226 at 49; Dkt. 226-1 at 24.

Though the exchange between Dr. Butler and Dr. Alfonso may be evidence of the fact that Dr. Butler and Dr. Alfonso were both aware that suspension might be a potential outcome of the peer review committee's proceedings, it does not show that Dr. Butler made the actual decision to suspend or restrict Dr. Loux's

privileges. The original restrictions were proposed by the peer review committee. Dr. Butler was neither in attendance at the committee meeting nor part of its deliberations. Dr. Loux has failed to identify any evidence that would allow a reasonable jury to find that the peer review committee's recommendations were anything other than independent and unbiased.

In sum, while the evidence of pretext is relevant under a convincing mosaic framework, the Court recognizes that Plaintiff's "inability to disprove [BMG's] rationale cannot be the sole grounds for summary judgment." *See Ismael*, 161 F.4th at 764. At most, Dr. Butler anticipated that a suspension of Dr. Loux by the medical staff of the Hospital might be a real possibility, and Dr. Butler began considering the impact of the peer review committee's restrictions on Dr. Loux's contractual obligations. Neither fact is inconsistent with Dr. Butler's stated reasons for his decision. And neither fact establishes that gender played any role in that decision. Nor is there anything in the emails exchanged among Dr. Geissler, Dr. Alfonso, and/or Dr. Butler or any other evidence cited by Dr. Loux to suggest that the proffered reason for BMG's subsequent termination of Dr. Loux's employment—Dr. Loux's breach of her employment agreement due to the suspension of her privileges—was so weak, implausible, inconsistent, incoherent, or contradictory that a reasonable fact finder would find them unworthy of credence.

***C. Other adverse employment actions***

The other actions allegedly committed by BMG are neither attributable to BMG nor sufficiently material to constitute an adverse employment action. In addition to citing BMG's termination of her employment as evidence of discrimination against her by BMG, Dr. Loux cites other examples of sex discrimination she allegedly experienced including: (1) Dr. Geissler and other male surgeons regularly referring to her and other female physicians by their first names in front of patients, hospital staff, and other physicians while referring to male surgeons as "doctor"; (2) Dr. Loux rarely being consulted for second opinions by Dr. Geissler and St. Joseph's and BMG surgeons; (3) Dr. Geissler and others at St. Joseph's and BMG regularly requesting second opinions on surgical decisions made by female surgeons, including Dr. Loux, but rarely requesting second opinions on surgical decisions made by male surgeons; (4) Dr. Loux and other female surgeons being given less favorable surgery times and not being allowed to select their own operating room staff for surgery, while male surgeons were allowed to do both; and (5) Dr. Geissler and others at the Hospital and BMG describing Dr. Loux using female stereotypes such as saying that she is "too emotional" or by Dr. Fitzwater saying she is better suited for "nurturing roles" such as neonatal intensive care physician rather than surgery.[10] Dkt. 236 ¶ 10.

[10] Not all of these claims were shared by Plaintiff at her deposition. *See* Dkt. 226.

The first problem with this argument is that at least a portion of these issues are not attributable to BMG. For example, with respect to her contention that male surgeons were allowed to select their operating room staff while female surgeons were not, Dr. Loux conceded during her deposition that the operating room charge nurse, not BMG, oversaw placing the staff in the rooms. Dkt. 226-1 at 10. The nurses and clinical support staff at St. Joseph's are supervised by managers and directors who are under the direct supervision of the St. Joseph's administration—not BMG—and who ultimately report to the female President of St. Joseph's. Dkt. 223 ¶¶ 5, 11–12.

Regarding the composition of St. Joseph's Medical Staff, it included both BMG physicians and community physicians who are not employed by BMG but do provide care at St. Joseph's. Dkt. 226 at 8. Notably, Dr. Loux does not specify whether the "male surgeons" she is referring to pursuant to these allegations are employees of BMG or a different employer (or in some cases is not completely sure). *See id*. at 21–23. When asked about this subject, Dr. Loux acknowledged that at least one of the doctors who questioned her judgment was employed by a different employer—PDRX. *Id*. at 23. Dr. Loux was unsure whether the two other physicians she identified as questioning her judgment were BMG employees. *Id*. at 22–23. In the absence of evidence that BMG is liable for non-employees, the Court cannot assume that BMG should be bound by their actions.

The second problem with Dr. Loux's argument is that none of these examples rise to the level of harm that Title VII is intended to proscribe. To establish a Title VII discrimination claim, a plaintiff must show some harm with respect to an identifiable term or condition of employment. *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024). Even after *Muldrow*, which loosens the standard altering the terms or conditions of employment in "some substantial way" to "some harm," Plaintiff must show that the claimed adverse employment action caused her "some injury" or otherwise "left her worse off." *West v. Butler Cnty. Bd. of Educ.*, No. 23-10186, 2024 WL 2697987, at *2 (11th Cir. May 24, 2024) (discussing pre-*Muldrow* standard); *DeLaughter v. Verizon Communications, Inc.*, No. 6:23-cv-2370-JSS-DCI, 2024 WL 4956730, at *10 (M.D. Fla. Dec. 3, 2024). Having to share office space and being called by one's first name simply does not reach the level of harm envisioned by *Muldrow* or *DeLaughter*.

The third problem is that this portion of Dr. Loux's discrimination claim remains dominantly, if not wholly, based on her own opinion and/or conclusory allegations. Neither are sufficient to overcome summary judgment. *See Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997), *abrogated on other grounds by Lewis II*, (holding that a conclusion that incidents of sex discrimination have occurred and that plaintiff's testimony of feeling discriminated against, without more, do not establish discrimination).

For example, despite stating in conclusory terms that Dr. Geissler and St. Joseph's and BMG surgeons "rarely" consulted her for second opinions on their patients, she conceded during her deposition that her partners "occasionally" asked her to give second opinions on their patients. Dkt. 226 at 23. Regardless of whether the frequency was "rare" or "occasional," Dr. Loux has not provided the Court with sufficient information about the identity of any proposed comparators or the frequency with which they asked for second opinions. Dr. Loux has failed to provide adequate support for her allegation that male physicians at BMG regularly requested second opinions on surgical decisions made by female surgeons, including her, but not male surgeons. Dr. Loux also acknowledged that when Dr. Pham's judgment was questioned from time to time, he was "very bothered" by this. *Id*. at 25. Dr. Loux conceded that she has no way to track how often her male peers had their judgment questioned. *Id*.

Although Dr. Loux alleges that BMG described her using female stereotypes, Dr. Loux has not provided specific details to support this allegation. *See* Dkt. 226-1 at 13. Even if she had, any recovery for isolated comments would have to be based on a hostile work environment theory—a theory that Dr. Loux neither pleaded nor argued at summary judgment.

In addition to the above-mentioned issues listed in paragraph 10 of Dr. Loux's declaration, Dr. Loux also testified regarding alleged "microaggressions"

she experienced in her workplace. Dkt. 226-1 at 6 ("There are thousands of things that happen every day to me. They are called microaggressions."). However, Dr. Loux could not remember or describe that alleged conduct specifically or as to perpetrator. *Id*. If Dr. Loux cannot recall the specifics of these alleged microaggressions as to the person engaging in them, Dr. Loux cannot reasonably expect a reasonable factfinder to find that these microaggressions were materially adverse—much less that they were discriminatory. Summary judgment is warranted on Count I.

## II. <u>Count II against BMG: Retaliation</u>

To establish retaliation under Title VII, Dr. Loux must show that: (1) she participated in a protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action. *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020). Defendants assert that Dr. Loux cannot establish the first or third elements of her retaliation claim against BMG.

### *A. <u>Protected oppositional activity</u>*

As to the first element, a plaintiff engages in a "statutorily protected activity" when she demonstrates that she, while acting in subjective good faith, opposed actions of the employer that she reasonably believed to be unlawful employment practices. *Harper v. Blockbuster Ent. Corp.*, 139 F.3d 1385, 1388

(11th Cir. 1998). Plaintiff cannot rely on conduct or allegations unknown to Defendants to establish retaliation. Dr. Loux must, at the very least, show that the decisionmaker responsible for the adverse action was actually aware of her protected opposition when the decisionmaker took the adverse action. *Marcelin v. Eckerd Corp. of Fla.*, No. 8:04-cv-491-T-17MAP, 2006 WL 923745, at *9 (M.D. Fla. Apr. 10, 2006) (concluding that there was no protected activity where the plaintiff "concede[d] that he did not complain expressly about racial or national origin discrimination").

During her deposition, Dr. Loux conceded that she never complained of discrimination to any member of Baycare's management. Dkt. 226-1 at 7. Dr. Loux also conceded that she never complained of discrimination to Team Resources, to a member of administration, or by calling the corporate responsibility hotline in accordance with the governing Harassment-Free Workplace Policy. *Id*. at 7; Dkt. 226-30. Dr. Loux never complained of discrimination to Dr. Butler, her direct supervisor at BMG. Dkt. 226 at 7, 23, 43; Dkt. 226-1 at 7.

Despite Plaintiff's concessions on this point, she continues to assert that the foregoing is disputed. *See* Dkt. 258 at 7–8. In support of her position, Dr. Loux asserts that she reported discrimination "to both BMG and Hospital administration in that she reported discrimination to Dr. Geissler and Dr. Charvat (CMO of St.

Joseph's) multiple times, including in a meeting which included Dr. Fitzwater." *Id*. at 7 (citation modified).

As plainly evidenced by her position, Dr. Loux does not directly rebut her prior testimony that she never complained of any discrimination to any member of BMG management, Team Resources, or to Dr. Butler. Instead, Dr. Loux's position appears to be that her alleged reports to Dr. Geissler and Dr. Charvat constituted protected activity for purposes of establishing her retaliation claim against BMG.

First, neither Dr. Charvat nor Dr. Geissler was a decisionmaker for BMG. Second, Dr. Loux's complaints to them do not appear to have involved allegations that BMG was discriminating against her because of her sex.

Turning to Dr. Charvat, he was the Chief Medical Officer of St. Joseph's. *See* Dkt. 226 at 11. Dr. Loux's discussions with Dr. Charvat focused on her role as Medical Director of Pediatric Trauma—a contractual position with St. Joseph's. *See* Dkt. 226-1 at 9. Dr. Loux raised concerns with Dr. Charvat regarding the amount of time required for her medical director position and her desire to have more paid hours allocated to that position. *See* Dkt. 226 at 11, 14; Dkt. 226-1 at 11. Because these concerns did not include reports of discrimination or other illegal activity under Title VII, they do not constitute protected activity under Title VII. *See* 42 U.S.C. § 2000e-3; *see also Webb v. R & B Holding Co.*, 992 F. Supp.

1382, 1389 (S.D. Fla. 1998) ("[T]he employee must, at the very least, communicate her belief that discrimination is occurring to the employer."). Even if Dr. Loux had attributed the alleged insufficiency in hours to sex discrimination, that decision appears to have been under the control of St. Joseph's—not BMG. Had Dr. Charvat been made aware by Dr. Loux that she perceived the contract to be discriminatory, there is no evidence that Dr. Charvat participated in the termination decision by BMG.

With respect to Dr. Geissler, Dr. Loux has offered evidence that she complained to him about not showing her proper respect. *See* Dkt. 226 at 20. Her complaints focused on Dr. Geissler's occasional failure to refer to her as "Dr." Loux in front of patients and other professionals, as well as her perception that his attempts at mentorship amounted to "treating her like a resident." *Id.*; Dkt. 226-1 at 4–5. Dr. Loux does not say that she accused Dr. Geissler of sexism and therefore does not rise to the level of unlawful employment practice by BMG.

Even if these complaints could be equated with protected opposition activity, there is nothing in the record identifying Dr. Geissler as a decisionmaker with respect to BMG's termination of Dr. Loux. Dr. Geissler denied having any involvement in the termination decision made by BMG. *See* Dkt. S-200-1 at 191. Notably, Dr. Butler did *not* include Dr. Geissler on his April 10, 2020, email discussing next steps with respect to Dr. Loux's employment following receipt of

the peer review committee's recommendations. *See* Dkt. 227-6. The termination decision was communicated by BMG President Dr. Andrew Fink and Team Resources Director Amy Hagland, who met with Dr. Loux to advise her of BMG's intent to terminate her employment if she failed to cure the breach of her employment agreement with BMG. Dkt. 226 at 48; Dkt. 226-12. Dr. Loux has not presented any evidence that Dr. Geissler participated in the termination decision.

Dr. Loux cannot show that she engaged in a protected opposition activity or that any BMG decisionmaker was aware of any such protected activity. Consequently, she has failed to establish the first element of her retaliation claim. *See Marcelin*, 2006 WL 923745, at *9.

BMG's written policy labeled "equal employment opportunity" states that any team member "who believes they have been the victim of discrimination must report the matter promptly to a department director, team resource manager or team resource director." Dkt. 226-1 at 6–7. Plaintiff admits in deposition she made no such report. *Id*. at 7.

The BMG written policy goes on to state that "Team members who believe they have been harassed and/or discriminated against have a responsibility to report such behavior immediately to team resources, the department manager/director, administration, or by calling the corporate responsibility hotline at 1-877-our-duty." *Id*. Plaintiff admits in deposition she made no such report. *Id*.

### *B. Causal connection*

Dr. Loux's retaliation claim likewise fails because she cannot establish a causal connection between any supposedly protected activity and any adverse employment action. It is well-settled that a causal connection does not exist where the alleged decisionmaker did not have knowledge of the alleged protected activity at the time it took the adverse employment action. *See Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). The decisionmaker's awareness of the protected conduct can be established through circumstantial evidence "but not by unsupported inference" or speculation. *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1053 (11th Cir. 2020) (citing *Brungart*, 231 F.3d at 799).

As noted above, Dr. Loux cannot establish that Dr. Butler or Dr. Fink had any knowledge that she had engaged in any activity protected by Title VII. *See* Dkt. 226-1 at 7. Because Dr. Loux cannot make this showing, she cannot establish the causal connection element of her claim.

Assuming Dr. Loux were able to establish a *prima facie* case of retaliation, BMG can dispel any inference of retaliation by simply articulating a legitimate, non-retaliatory reason for the employment action. *Gogel*, 967 F.3d at 1135. An employer may fire an employee for any reason, good or bad, as long as its action is

not for retaliatory reasons. *Id*. at 1148. The Court's inquiry is limited to whether BMG gave an honest explanation for its decision. *Id*. at 1149.

If BMG produces such a reason, the burden of production switches back to Dr. Loux to demonstrate that the reason proffered was merely pretext to mask retaliatory actions. *Id*. at 1135. To establish the necessary causation, Dr. Loux must demonstrate that her protected activity was a but-for cause of the alleged adverse action. *Id*. In other words, Dr. Loux must prove that had she not engaged in the protected conduct, she would not have been fired. *Id*.

BMG's decision to terminate Dr. Loux stemmed from the peer review committee's decision to restrict Dr. Loux's privileges. Section 7(b)(6) of Dr. Loux's employment agreement expressly authorized BMG to terminate the agreement for cause "if, after Physician becomes a member of the staff of a Health Care Facility, Physician's position as a member of the staff of the Health Care Facility is restricted, suspended, or revoked for any reason." Dkt. 226-2 at 8; Dkt. 226 at 48. On April 23, 2020, BMG notified Dr. Loux of its intent to terminate her employment pursuant to Section 7(b)(6) of her Physician Employment Agreement, that she had 30 days to cure the breach by having her privileges reinstated at St. Joseph's, and that her termination would become effective May 23, 2020, if she failed to cure the breach within this 30-day period. Dkt. 226 at 48; Dkt. 226-12. Because Dr. Loux was on a precautionary suspension imposed by the Hospital

when the 30-day cure period expired on May 23, she was unable to cure this breach. Dkt. 226 at 49; Dkt. 226-1 at 24.

Dr. Loux's argument that she cured this breach by revoking her acceptance of the peer review committee's recommendations on April 28, 2020, is unpersuasive. *See* Dkt. 258 at 13. This argument fails to account for the fact that St. Joseph's subsequently issued a precautionary suspension of her privileges (which St. Joseph's expressly warned her it might do if she refused to comply with the committee's recommendations). Dkt. 226-15. Thus, Dr. Loux's privileges were still suspended when the 30-day cure period expired. Just as BMG informed Plaintiff pursuant to the April 23, 2020, notice, BMG then terminated her employment.

Dr. Loux has not offered evidence sufficient to show that BMG's concerns about the quality of her care through the back-to-back complications and the impact of her suspension on her partners were unreasonable or unwarranted. It is undisputed that BMG was contractually permitted to terminate Plaintiff's contract. Given the very minimal evidence of oppositional activity, no reasonable jury could find that any alleged oppositional activity was the but-for cause of Dr. Loux's termination.

***C. Convincing mosaic***

Although Plaintiff has failed to demonstrate a prima facie case of retaliation, the Court must consider the circumstantial evidence under a convincing mosaic framework. *Ismael*, 161 F.4th at 760 (first citing *Tynes*, 88 F.4th at 946, and then citing *Berry v. Crestwood Healthcare*, 84 F.4th 1300, 1310 (11t h Cir. 2023)) (applying convincing mosaic to retaliation). There is simply no circumstantial evidence, as discussed in detail above, that infers retaliation on the part of BMG. Summary judgment is warranted on Count II.

## III. Counts III and IV against St. Joseph's: Title VII sex-based discrimination/retaliation

### *A. St. Joseph's liability under Title VII as an employer*

Although BMG, not St. Joseph's, employed Plaintiff as a physician pursuant to the Physician Employment Agreement, Plaintiff contends that BMG and St. Joseph's are joint employers. *See* Dkt. 236 ¶ 5. Applying the hybrid approach, the issue is whether St. Joseph's transformed the parties' working relationship into one of employer-employee. *Ashkenazi v. S. Broward Hosp. Dist.*, 607 F. App'x 958, 961 (11th Cir. 2015) (describing the hybrid approach as agency principles "tempered by" the "economic realities"). Courts consider a variety of factors to determine the issue including: (1) the kind of occupation and whether the work is usually done under supervision or by specialists without supervision; (2) the skill required; (3) who furnishes the equipment and workplace; (4) length of employment; (5) method of payment; (6) manner of termination; (7) whether

annual leave is provided; (8) whether work is integral to the employer's business; (9) retirement benefits; (10) social security payments; and (11) the parties' intention. *Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 340 (11th Cir. 1982); *see also Ashkenazi,* 607 F. App'x at 962, 964.

In support of her argument that BMG and St. Joseph's are joint employers, Dr. Loux focuses on the fact that *BMG* required Dr. Loux to have a medical staff membership at St. Joseph's as a condition of her employment, *BMG* required her to only practice medicine at St. Joseph's, and that *BMG* demanded and then confiscated Dr. Loux's hospital badge. Dkt. 236 ¶ 5. As her employer, however, BMG could require all these.

Although she claims that she "reports to" Dr. Geissler at both BMG and St. Joseph's, this statement is misleading. *See id*. Her direct supervisor at BMG was Dr. Butler, and Dr. Loux confirmed that Dr. Geissler was "not functioning as a supervisor over [her] employment." Dkt. 226 at 7, 26, 43; Dkt. 246-1 ¶ 29. Dr. Geissler was head of the Department of Pediatric Surgery and also a Medical Director for Pediatric Surgery at St. Joseph's. Dkt. 226 at 19; Dkt. 246-1 ¶¶ 20, 23. Dr. Geissler was also one of her colleagues, a partner physician, and Plaintiff readily affirms that the team of four partner physicians (Geissler, Fitzwater, Reyes, and Plaintiff) discussed cases regularly. Dkt. 226 at 11, 18, 23, 24, 25, 28, 43. Dr.

Geissler was employed by BMG and never held any leadership positions with BMG. Dkt. 246-1 ¶¶ 14, 28.

Furthermore, as a member of the Medical Staff of St. Joseph's, Dr. Loux concedes that the St. Joseph's Medical Staff is a separate entity from BMG. Dkt. 226 at 8. Several circuits have held that physicians do not ordinarily become employees of a hospital solely because they have privileges at the hospital. *See, e.g.*, *Ashkenazi*, 607 F. App'x 958; *Wojewski v. Rapid City Reg'l Hosp., Inc.*, 450 F.3d 338 (8th Cir. 2006); *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256 (4th Cir. 1997); *Diggs v. Harris Hosp.--Methodist, Inc.*, 847 F.2d 270 (5th Cir. 1988). These cases suggest that the primary focus of the Court's inquiry should be the manner and means by which the services are delivered as opposed to the control inherent in maintaining medical standards and patient safety that is crucial in every physician-hospital relationship.

Consistent with this principle, Dr. Loux conceded during her deposition that she "was free to exercise [her] judgment and give [her] recommendations" pursuant to her medical director role. Dkt. 226-1 at 8–9. Dr. Loux also confirmed that St. Joseph's never told her what recommendations she should give. *Id*. at 9.

Nor does Dr. Loux's contract with St. Joseph's to serve as Medical Director of Pediatric Trauma, standing alone, change the calculus. Dkt. 226-3. The medical director agreement signed by Dr. Loux expressly states that Dr. Loux is an

employee of BMG and does not contain any indication that the parties intended to create an employment relationship between Dr. Loux and St. Joseph's. *Id*. at 1. To the contrary, the agreement makes clear that its scope is limited to the performance of certain administrative duties related to pediatric trauma and, in fact, required Dr. Loux to agree "not to provide patient care services at Hospital in [her] capacity as Medical Director." *Id*. at 3. This agreement makes clear that any treatment of patients by Dr. Loux remains outside its scope and nothing gives St. Joseph's any right to control any such treatment. *See id*. at 3. Finally, the agreement does not contain a noncompete provision or otherwise restrict Dr. Loux's ability to work elsewhere. *See* Dkt. 226-3.

It is also undisputed that being an employee of BMG is not a prerequisite to serving in a medical director position for St. Joseph's, Dkt. 224 ¶ 37, or to possessing privileges at St. Joseph's, Dkt. 226 at 8. Indeed, after learning that Dr. Loux was in the process of being terminated by BMG, Dr. Anthony Pidala (President of St. Joseph's Medical Staff) requested that Dr. Loux send the Medical Staff an updated business address, the status of her plans to continue practicing in Hillsborough County, and a copy of her updated certificate of insurance by June 19, 2020. Dkt. 226-19. While continuing to practice at St. Joseph's would have

violated Dr. Loux's noncompete with BMG,[11] and the issues pertaining to the restriction of Dr. Loux's privileges at St. Joseph's remained ongoing at the time, St. Joseph's afforded Dr. Loux the opportunity to update her address to avoid automatic relinquishment of her privileges. This demonstrates that, at least from St. Joseph's perspective, BMG's termination of Dr. Loux's employment did not—in and of itself—automatically foreclose Dr. Loux from being a member of the St. Joseph's Medical Staff.

Although St. Joseph's did not have the right and did not attempt to control Dr. Loux's daily work either as a pediatric surgeon or as a medical director or to restrict where and who Dr. Loux worked for either as a surgeon or as a medical director, "the district court must look beyond a mere corporate shield and analyze a joint employer theory that concentrates on the degree of control an entity has over the adverse employment decision on which the Title VII suit is based." *Scott v. Sarasota Doctors Hosp., Inc.*, 145 F. Supp. 3d 1114, 1123 (M.D. Fla. 2015) (quoting *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1244–45 (11th Cir. 1998)) (citation modified), *aff'd*, 688 F. App'x 878 (11th Cir. 2017). Moreover,

---

[11] The record is silent as to whether Dr. Loux ever considered the buyout provision in her employment agreement with BMG that would have allowed her to continue working at St. Joseph's and establishing a new workplace within the restricting area on the condition she pay one year's salary. *See* Dkt. 226-2 at 12 ("Release from Non-Competition Covenant"). At the very least, the availability of this option further confirms that BMG's termination of Dr. Loux's employment did not—in and of itself—foreclose Dr. Loux from continuing as a member of the St. Joseph's Medical Staff.

the language of 42 U.S.C. § 2000e-2(a) makes it clear "that Congress intended that the rights and obligations it created under Title VII would extend beyond the immediate employer-employee relationship." *Id*. (quoting *Zaklama v. Mt. Sinai Med. Ctr.*, 842 F.2d 291, 294 (11th Cir. 1988)).

Under the *Pardazi* exception, Title VII applies to impose liability when a defendant, such as a hospital, interferes with a plaintiff's employment relationship with a third party. *Pardazi v. Cullman Med. Ctr.*, 838 F.2d 1155, 1156 (11th Cir. 1988). *Pardazi* held that even if an employer hospital did not directly employ an individual physician, the employer hospital could nevertheless be liable for interfering with the individual's terms or conditions of employment with a different employer. *Id*. The Court finds that this exception applies here because St. Joseph's decision to restrict Dr. Loux's privileges affected the terms or conditions of her employment with her actual employer, BMG, and the decision ultimately resulted in BMG terminating her employment.

Defendants, however, urge this Court to find that the *Pardazi* exception is limited in scope. Defendants argue that this exception covers only actions taken by St. Joseph's that interfered with Loux's employment at BMG, such as the Medical Staff's restriction of her privileges. Following this logic, Defendants argue that the *Pardazi* exception does not permit Dr. Loux to advance any issues that related solely to her interactions with St. Joseph's (e.g., her medical director contract, her

interactions with other doctors, etc.) or to advance her retaliation claim against St. Joseph's. Defendants, however, cite no case law. On balance, the Court will not limit the *Pardazi* exception to consideration of only St. Joseph's restriction of hospital privileges.

In *Scott*, the court faced similar issues as here. There, the district court found that taking the evidence in the light most favorable to the plaintiff, an issue of fact still existed as to whether the hospital acted as a joint employer sufficient to invoke Title VII liability. 145 F. Supp. 3d at 1124. Although in *Scott*, the physician plaintiff was jointly hired by both the hospital and the third-party corporation, the plaintiff was directly supervised by an employee of the third-party corporation. *Scott*, 145 F. Supp. 3d at 1124 (joint hire), 688 F. App'x at 888 (third-party supervisor). The district court denied summary judgment on the hospital's liability, finding a genuine issue of material fact. Scott, 145 F. Supp. 3d at 1128. Summary judgment was granted, however, in favor of the third-party employer. *Id*.

The *Scott* case proceeded to a jury trial against the hospital for sex discrimination and retaliation, and the jury returned a verdict that the hospital was not the physician's employer. 688 F. App'x at 886. The district court denied a motion for new trial, finding that the jury's verdict was not against the great weight of the evidence, which the Eleventh Circuit affirmed. 688 F. App'x at 887. As in

*Scott*, this Court finds the prudent decision is to consider as a contested factual issue whether St. Joseph's is an employer of Plaintiff. Because Defendants argue that even assuming St. Joseph's was also Plaintiff's employer, gender-based discrimination and retaliation against St. Joseph's would fail, the Court will address same.

## IV. Count III against St. Joseph's: Gender-based discrimination

In Count III of her Complaint, Dr. Loux contends that St. Joseph's discriminated against her based on her sex in violation of Title VII. Because Dr. Loux has brought this discrimination claim against St. Joseph's pursuant to a single-motive/pretext theory,[12] Dr. Loux must show St. Joseph's would not have taken the alleged actions against her but for her sex. *Bostock*, 590 U.S. at 656.

### ***A. Whether St. Joseph's restricted Plaintiff's privileges because of her sex***

The heart of Dr. Loux's discrimination claim against St. Joseph's is that St. Joseph's discriminated against her based on her sex when it restricted her privileges. Defendants maintain that St. Joseph's restricted Dr. Loux's privileges because it was concerned about patient safety.

[12] Courts need not address a mixed-motive theory where the plaintiff has failed to raise any argument for mixed-motive in opposition to summary judgment. *See* Dkt. 26 at ¶¶ 28, 53, 54, 68; Dkt. 237 at 12–23; *see Williams v. Hous. Auth. of Savannah, Inc.*, 834 F. App'x 482, 489 (11th Cir. 2020); *see also DeLaughter*, 2024 WL 4956730, at *17 (rejecting suggestion that plaintiff could treat motivating factor standard as addition route to prove discrimination and noting that the motivating factor theory is "fatally inconsistent" with the *McDonnell Douglas* framework, which requires proof of a single, "true reason" for adverse action that "was illegal").

Certain events leading up to the Peer Review Committee's review of Dr. Loux are not in dispute. Between February 12 and February 13, Dr. Loux made two dire mistakes while operating on two different pediatric patients. *See* Dkt. 226 at 28–30. Dr. Loux herself called these errors "never events" for which she takes full responsibility. *Id*. at 31, 39.

Dr. Geissler learned of the first of these events after Dr. Loux told him about it. Dkt. 246-1 ¶ 50. He became aware of the second event due to becoming personally involved in the care of that second patient. *Id*. ¶ 55.

Dr. Geissler had previously expressed concerns about Dr. Loux's surgical care to Dr. Alfonso about four to six months prior to the peer review committee meeting. Dkt. 229 at 32. At that time, Dr. Alfonso had already been reviewing Dr. Loux's cases due to concerns he received from the medical director of the NICU and medical director of the ICU regarding Dr. Loux. *Id*. at 33.

Dr. Alfonso testified at deposition that there were numerous complaints from OR staff, pediatric ICU, and NICU "regarding [Dr. Loux] not following policy with obtaining consent and not having a timeout before she did the procedure." *Id*. at 27. There were also complaints from the nursing staff about Loux's "verbal approach" as "unprofessional and rude." *Id*. Dr. Alfonso confirmed that he spoke directly with the physicians in ICU and NICU who wrote the complaint about what the two physicians saw and witnessed concerning Dr. Loux's behavior. *Id*. at 28.

The medical director in the NICU and in ICU told Dr. Alfonso in a follow-up conversation that "in addition to the complaint that they had submitted, they had other complaints that had not been written up." *Id*. The NICU physician stated that "I don't want her touching any of my kids." *Id*. The medical director of the NICU surgeon would wait for another pediatric surgeon rather than have Plaintiff handle the patient. *Id*. "[S]he didn't want Dr. Loux handling any of her babies." *Id*.

When describing one of the incidents relayed to him, Dr. Alfonso testified that Plaintiff attempted to open the patient's abdomen in NICU instead of taking the patient to ICU with an operating room. *Id*. at 29. Dr. Alfonso recalled that the physician directors in NICU and ICU told him that they had discussed the concerns with Dr. Loux. *Id*. In any event, Dr. Alfonso knew that these concerns were made clear to Plaintiff at the peer review committee meeting. *Id*. As he stressed, "When a physician tells me, I don't want that surgeon taking care of my patients, I have to take that seriously." *Id*. at 37. Dr. Alfonso stressed that he places the information he has received before a separate peer review committee "to review these cases of different specialties, and they're the ones that come to the decision that we don't see any issue here." *Id*.

On April 2, 2020, Dr. Geissler memorialized his concerns in an email to both Dr. Butler and Dr. Alfonso. Dkt. 227-5. Dr. Geissler wrote that Dr. Loux "had a

series of complications starting back in November [2019] which seem to be accelerating [and] some have been brought up to risk management[.]" *Id*. at 1. He noted that "Dr. Pham compiled a list of at least 10 cases of serious concern to him before he left." *Id*. Dr. Geissler speaks to the NICU and PICU "actively steer[ing] away from [Dr. Loux.]" *Id*. He gave the names of the two physicians there. *Id*. He wrote that the "ACPs [advanced care providers or practitioners] and others who work with her in the OR see that she pulls, rips, and hurries her way through cases and none of them would allow their children to be under her care." *Id*. He names three ACPs who felt this way. *Id*.

In this email, Dr. Geissler also advised of additional patient issues with Dr. Loux that had come up just that week in April. *See* Dkt. 227-5. After Dr. Loux took some time off following "the serious true iatrogenic problems where she sewed off the wrong ends of the bowel on 2 occasions, . . . [s]he has come back defiant and defensive." *Id*. at 1. In the recent examples he cited, he stated that Dr. Loux "forcibly t[ore] and pull[ed] friable bowel aggressively causing multiple elongated deserosalizations" and the surgical assistant was upset to the point that she "doesn't even want to assist [Dr. Loux] anymore as do most ACPs." *Id*. at 1–2. On one of the case, Dr. Geissler stated that Dr. Loux refused Dr. Cynthia Reyes's help in surgery and when Dr. Loux removed the gall bladder, "she pulled on it so hard it tears in half, spilling stones and bile throughout the abdomen." *Id*.

at 2. The surgical assistant said that "it was bloody" and difficult to "see well." *Id*. Dr. Geissler made it clear that he has "no administrative authority" but that he wanted Drs. Alfonso and Butler to "be aware of my safety concerns." *Id*.

Based on these concerns, and pursuant to his role as Chief of Surgery for St. Joseph's, Dr. Alfonso deemed it appropriate to bring a selection of Dr. Loux's cases (about twenty) forward for review by the peer review committee. *See* Dkt. 229 at 25. The committee then heard from Dr. Loux and subsequently proposed significant restrictions on her privileges. Dkt. 226 at 37, 39; Dkt. 228 at 15, 17.

***1. <u>Comparators</u>***

As evidence of Dr. Loux's position that the peer review process and outcome was discriminatory based on her sex, Dr. Loux contends that male surgeons were treated more favorably for actions that were similar or worse than hers and identifies several alleged comparators as examples. As discussed previously, to establish the existence of a similarly situated comparator, Dr. Loux must demonstrate that she and her proffered comparator were similarly situated in all material respects. To be "similarly situated in all material respects," any comparators identified by Dr. Loux must have engaged in the same basic conduct (or misconduct), must have been subject to the same employment policy, guideline, or rule, will ordinarily (although not invariably) have been under the

jurisdiction of the same supervisor, and must share her employment or disciplinary history. *Lewis I*, 918 F.3d at 1227–28.

Dr. Loux identifies several male surgeons pursuant to her deposition testimony without much detail at all. Her later declaration in support of this contention greatly expounds upon the comparators, much to the surprise of Defendants. *See* Dkt. 236 ¶ 84. These male surgeons must be considered as comparators in keeping with *Lewis I*.

As to Pediatric Surgeons A, B, and C, Dr. Loux does not offer any evidence or testify to having any knowledge regarding whether: (1) they committed back-to-back surgical errors;[13] (2) their complication rates were reportedly accelerating; or (3) multiple individuals raised concerns about them or started to avoid or rotate how they covered their cases. With respect to the ENT pediatric surgeon, however, Dr. Loux contends that he had back-to-back unexpected deaths because of surgeries he performed on two children. *See* Dkt. 236 ¶ 84(e). There is little to no detail regarding what occurred with respect to those alleged events including the dates. During her deposition, Dr. Loux testified that she did not know the timing of these alleged events and could not comment on it. Dkt. 226-1 at 15.

---

[13] For example, as to Pediatric Surgeon A, Dr. Loux identifies a surgical issue that occurred in December of 2015 and then not does not identify the dates for the other two surgical issues discussed. As to Pediatric Surgeon B, Dr. Loux discusses three surgical issues that took place over a 10-month period in 2017 and then fails to identify when the fourth surgical issue occurred. As to Pediatric Surgeon C, Dr. Loux does not identify the dates of any of these surgical issues.

Dr. Loux's issues, however, were not limited to the back-to-back issues in February of 2020. Dr. Loux had another significant event the following month in March of 2020. *See* Dkt. 226 at 35, 36–37. Several individuals raised concerns to Dr. Alfonso about Dr. Loux's standard of care. *See* Dkt. 229 at 33. The record is devoid of evidence of similar concerns with respect to the ENT Pediatric Surgeon.

Dr. Loux also identifies a medical director as an alleged comparator. *See* Dkt. 236 ¶ 84(f)). According to Dr. Loux, this medical director had severe alcohol-related problems that "later resulted in him not being able to perform his *medical director* duties." *Id*. (emphasis added). Unlike this alleged comparator, Dr. Loux was never disciplined in her role as a medical director and she voluntarily resigned from that position without cause. Dkt. 226-4. Further, Dr. Loux concedes that this medical director was "not a pediatric surgeon." Dkt. 236 ¶ 84(f)).[14] Accordingly, a medical director with alcohol-related problems is not a proper comparator.

Even assuming these doctors were potential comparators, there is no evidence that the peer review committee was aware of them. The peer review committee stood as the actual decisionmaker for St. Joseph's as it initially

---

[14] At her deposition, Dr. Loux testified that she did not have the information to make an opinion as to whether she was treated differently than males who were employed as medical directors or contracted with as medical directors at St. Joseph's. Dkt. 226-1 at 9. Dr. Loux does not offer any evidence in the form of testimony or otherwise to demonstrate how she later came to acquire this knowledge for purposes of offering the testimony provided in her declaration.

recommended restricting Dr. Loux's privileges. When the decisionmaker is not aware of the alleged comparators' performance, its failure to address that performance cannot be deemed evidence of discriminatory intent.

Lastly, Dr. Loux contends that she was treated differently than other male physicians because Dr. Alfonso gave the peer review committee information regarding her complications over the course of several years. *See, e.g.*, Dkt. 236 ¶¶ 24–25, 37. Yet Dr. Loux has failed to offer or point to any evidence to support her belief. Nor does she offer evidence to rebut Dr. Alfonso's testimony that his regular practice was to provide the peer review committee with all of the information held by the Quality Department about the physician's quality of care from the time that the physician was granted privileges up until the time of the review. *See* Dkt. 229 at 26. In any event, Dr. Loux would not be able to have personal knowledge of Dr. Alfonso's practices in that regard. *See* Dkt. 226-1 at 17. Because Dr. Loux has failed to explain the inconsistencies in her own testimony, failed to establish personal knowledge regarding this practice, and failed to otherwise cite evidence calling into question Dr. Alfonso's testimony, Dr. Loux's self-serving declaration, without more, cannot create an issue of fact to overcome summary judgment. *See Hughes v. Amerada Hess Corp.*, 187 F.R.D. 682, 686 (M.D. Fla. 1999) ("Where there is a strict statutory requirement that an

affidavit be based upon personal knowledge, as in Rule 56(e), then an affidavit based on information and belief is insufficient.").

### 2. ***Convincing mosaic***

Although Plaintiff may not have provided valid comparators under the *McDonnell Douglas* analysis, the Court must move directly to a "convincing mosaic" analysis. To create a convincing mosaic, the record only need show that there is "simply enough evidence for a reasonable factfinder to infer intentional discrimination in an employment action." *Tynes*, 88 F.4th at 946. "[I]t is the jury's role—not ours—to determine how much weight comparator evidence should be given." *Ismael*, 161 F.4th at 764 (first quoting *Tynes*, 88 F.4th at 947; and then citing *Jenkins*, 26 F.4th at 1251 (which finds that circumstantial evidence is probative even when lacking "strict comparator")).

Dr. Loux argues that the peer review committee was used as a cat's paw by either Dr. Alfonso or Dr. Geissler. Under this theory, the recommender's alleged discriminatory animus is imputed to the decisionmaker (here, the Hospital's peer review committee) if the decisionmaker essentially "rubber stamped" the biased recommendation. *See Duncan v. Alabama*, 734 F. App'x 637, 639 (11th Cir. 2018) (citing *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331–32 (11th Cir. 1999)). Regardless, employers are generally not liable for a decision based only on another employee's hidden animus where the employer independently investigated the

employee's side of the story before making the employment decision. *See id*. Further, the non-decisionmaker's discriminatory animus (here Dr. Geissler or Dr. Alfonso) must be a but-for cause of the termination. *Ossman*, 82 F.4th at 1020.

While it is undisputed that Dr. Geissler raised concerns to Dr. Alfonso about Dr. Loux's surgical care, *see* Dkt. 227-5, it is also undisputed that Dr. Geissler was not the first individual to raise concerns about Dr. Loux to Dr. Alfonso. *See* Dkt. 229 at 33. Even if Dr. Geissler had been the first and only individual to raise concerns about Dr. Loux to Dr. Alfonso, Dr. Alfonso did his own review of Dr. Loux's cases before referring Dr. Loux to the peer review committee. *See* Dkt. 229 at 32–33. Moreover, as Chief of Surgery, it was Dr. Alfonso's responsibility to bring concerns regarding a surgeon's performance to the peer review committee's attention. Dkt. 226 at 43.

Dr. Loux contends that Dr. Alfonso's review was not truly independent because Dr. Alfonso was not a pediatric surgeon and relied on Dr. Geissler to assist him in this review. Nothing in the Eleventh Circuit's precedent, however, requires the decisionmakers to have the same level of specialized knowledge as the employee whose performance is being reviewed. Such a rule would be inconsistent with cases in which an independent review by a civil service board or a board of county commissioners has been held to negate the cat's paw argument. *See Stimpson*, 186 F.3d at 1328 (civil service board); *Wood v. Calhoun Cnty. Fla.*,

626 F. App’x 954 (11th Cir. 2015) (board of county commissioners). The requirement is only that the decisionmaker made enough of an effort to independently investigate the fact that his or her decision cannot be deemed a “rubber stamp.”

Here, Dr. Alfonso is an experienced general surgeon whose role as Chief of Surgery requires him to review the performance of all surgeons at St. Joseph’s, no matter the specialty. *See* Dkt. 224 ¶ 25; Dkt. 229 at 15; *see also* Dkt. 226 at 43. As Chief of Surgery, Dr. Alfonso also served on the Quality Committee and reviewed surgical cases that he received from the Quality Office. Dkt. 229 at 6. He reviewed evidence provided by the Quality Department as well as individual patient files. *See* Dkt. 229 at 32–33. Finally, Dr. Loux has not shown that any information Dr. Geissler provided Dr. Alfonso was actually inaccurate. *See Williams v. Unified Gov't of Athens-Clarke Cnty. GA*, No. 24-13609, 2025 WL 2502875, at *4 (11th Cir. Sept. 2, 2025). (“The plaintiff must show that the biased non-decisionmaker manipulated the decisionmaker into terminating her. It is not enough to show that the decisionmaker considered *accurate* information from the biased non-decisionmaker.”) (citation modified).

On April 8, 2020, Dr. Loux met with St. Joseph’s Peer Review Committee. Dkt. 226 at 37. During this meeting, Dr. Loux was asked to defend several cases presented, including the back-to-back February 2020 errors. *Id*. at 37, 39. It is

undisputed that when the peer review committee asked Dr. Loux whether her performance could be remediated, she took a long pause and did not answer the question. *Id*. at 38.

Neither Dr. Geissler nor Dr. Alfonso were part of the peer review committee's deliberations with respect to its ultimate recommendations. *See* Dkt. 228 at 15, 18; Dkt. 246-1 ¶ 33. Dr. Loux does not allege, and there is no evidence supporting any contention, that any member of the peer review committee held any discriminatory animus towards Dr. Loux.

Even if the Court gave Dr. Loux the benefit of the doubt and found that Dr. Geissler and/or Dr. Alfonso acted as cat's paws and somehow tainted the outcome of the April 8 peer review committee meeting, Dr. Loux had another opportunity to defend herself and present her side of the story when she was invited to meet with the St. Joseph's Medical Executive Committee. This meeting was scheduled after Dr. Pidala issued a precautionary suspension in consideration of the peer review committee's findings following Dr. Loux's revocation of her acceptance of the committee's recommendations and restrictions. *See* Dkt. 226 at 49; Dkt. 226-16. During her meeting with the MEC, Dr. Loux discussed her concerns about the suspension and her concerns about the cases selected. Dkt. 226 at 49. The MEC ultimately decided to lift the precautionary suspension but upheld the peer review committee's April 8 recommendations. Dkt. 226-18; Dkt. 226 at 50. As with the

peer review committee, Dr. Loux does not allege, and there is no evidence supporting any contention, that any member of the MEC held any discriminatory animus towards Dr. Loux.

Dr. Loux then had a third opportunity to present her position before a Fair Hearing panel on the MEC's recommendations. Dkt. S-200-1. During the Fair Hearing, which was overseen by an independent hearing officer, Dr. Loux was represented by counsel, had the opportunity to present multiple witnesses, and was given additional medical records regarding her patients to allow her to review those records with her witnesses and expert.[15] Dkt. 226 at 51. The Fair Hearing

[15] Witnesses at the Fair Hearing included Dr. Cherie Foster, Medical Director of the St. Joseph's Neonatology practice, who testified regarding her personal experience with Dr. Loux in the operating room in addition to concerns shared with her by others. Dkt. S-200-1 at 21–46. Dr. Foster is a neonatologist hired by MEDNAX (not BMG) and served at the time as the medical director of the NICU at St. Joseph's Women's Hospital. *Id*. at 21–22. Dr. Foster was the director for four to five years while Dr. Loux was performing surgery on NICU patients. *Id*. at 23–24. Dr. Foster observed during this time that the babies Dr. Loux operated on "seemed to be more sick after she was the surgeon responsible for whatever surgery or surgeries they needed." *Id*. at 25. When asked what "more sick" meant, Dr. Foster answered "compared to other surgical patients cared for by other surgeons." *Id*. Dr. Foster witnessed both a difference in care and results, which manifested itself "in longer ventilator time, infections, more repeat trips to the operating room." *Id*. at 25–26. Dr. Foster also personally observed "rough handling of the bowel." *Id*. at 27. As the medical director, Dr. Foster received reports from other neonatologists about Dr. Loux concerning the babies postoperatively were "very sick" and "her babies are sicker than the other surgeons." *Id*. at 28–29. Dr. Foster first reached out to Dr. Pham, who was Dr. Geissler's predecessor, and after Dr. Pham left, she turned to Dr. Geissler. *Id*. at 29–31. Dr. Foster did talk to Dr. Loux about not wearing open-toes sandals in NICU due to OSHA regulations. *Id*. at 32. At one point, Dr. Foster reached out to Dr. Alfonso to discuss Dr. Loux, and Dr. Foster told him that she did not want Dr. Loux to perform surgery on anyone who she cared about. *Id*. at 33–34.
Another witness at the Fair Hearing was Dr. Leopoldo Malvezzi, Dr. Loux's expert witness regarding Dr. Loux's training and skills and he offered his opinion that Dr. Loux did not fail to meet the standard of care with respect to the cases at issue. Dr. Malvezzi ultimately conceded that (1) the Peer Review Committee had a reasonable concern regarding Dr. Loux's back-to-back

lasted over 17 hours. *See* Dkt. S-200-1. The Fair Hearing panel ultimately upheld the bulk of the MEC's recommendations. Dkt. 226-23; Dkt. 226 at 51. As with the other two committees, Dr. Loux does not allege, and there is no evidence supporting any contention, that either the hearing officer or any member of the Fair Hearing panel held any discriminatory animus towards Dr. Loux.

Dr. Loux's theory rests on the proposition that the concerns raised about her performance and each subsequent layer of independent review were not legitimate but instead were orchestrated to remove her solely because of her sex. This position would require the Court (or the factfinder) to infer that every adverse fact, every concern raised, and every independent review—spanning months and involving numerous individuals and committees—was merely a façade concealing discriminatory animus. Such an inference finds no support in the record, and the Eleventh Circuit has rejected similar chains of inference. *See Williams*, 2025 WL 2502875, at *4; *Vincent v. Jefferson Cnty. Bd. of Educ.*, 152 F.4th 1339, 1349–50 (11th Cir. 2025).

### ***B. Whether St. Joseph's discriminated regarding her Medical Director agreement***

surgical issues in February of 2020, (2) the back-to-back surgical issues deserved investigation and giving her the chance to come in and explain what happened, (3) the results of the February 2020 back-to-back surgical issues were both "never events, and (4) when asked whether Dr. Malvezzi would require any sort of remediation before taking her back into his practice today, he answered " I need something. We have to look at it." *See id*. at 358–-521.

As discussed above, the Court finds that the *Pardazi* exception allows Dr. Loux to proceed with her discrimination claim against St. Joseph's with respect to the Medical Staff's restriction of her privileges. To the extent Plaintiff argues the *Pardazi* exception allows Dr. Loux to challenge St. Joseph's handling of her Medical Director Agreement, Plaintiff remains unable to establish sex discrimination as it relates to this relationship.

First, it is difficult to compare the various medical director positions at St. Joseph's. For example, Dr. Loux's position as the medical director of the pediatric trauma program does not encompass the sheer volume of cases as adult surgeries or trauma. *See* Dkt. 224 ¶ 40; Dkt. 229 at 15–16. Dr. Loux was compensated for the administrative duties as medical director of pediatric trauma in accordance with her medical director agreement. When the medical director of pediatric trauma agreement came up for renewal in 2018, Dr. Loux negotiated for additional compensation based on her belief that not enough hours were allotted for this position for purposes of ensuring that state standards were met. Dkt. 226 at 10–11. As a result, Dr. Loux requested 10 hours per week. *Id*. at 11. In response, St. Joseph's offered Dr. Loux a one-time $40,000 a year to be distributed in hourly increments but advised that she needed to "fit the requirements into the allotted time period." *Id*.

Negotiations continued through Dr. Loux's attorney in 2019. *Id*. at 12. Dr. Loux chose not to accept the offer and ultimately decided to resign from the medical director position, effective March 8, 2020, without cause. Dkt. 226-4. Although Dr. Loux claims that her contractual compensation as medical director is discriminatory, she rejected efforts to increase same. Accordingly, this record would not allow a reasonable factfinder to infer that St. Joseph's discriminated against Dr. Loux with respect to the terms of her Medical Director Agreement.

***C. Whether other actions of St. Joseph's evidence sex discrimination***

The additional conduct identified above in Part I, C., which is listed in Dr. Loux's declaration in paragraph 10, refers to BMG. Dkt. 236 ¶ 10. The issue is whether the *Pardazi* exception is so broad as to allow Dr. Loux to proceed against St. Joseph's based on any alleged conduct beyond St. Joseph's restriction of her privileges. Assuming the *Pardazi* exception allows Dr. Loux to pursue additional allegedly discriminatory conduct, the other alleged conduct does not fall within the scope of Title VII.

For example, Plaintiff contends that male surgeons were allowed to select their operating room staff while female surgeons were not. Dr. Loux, however, conceded during her deposition that the OR charge nurse was in charge of placing the staff in the rooms. Dkt. 226-1 at 10. Dr. Loux did not remember any of the names of the people, some female, who made the decisions regarding staffing. *Id*.

She also conceded that Dr. Pham and Dr. Geissler contemporaneously felt that they (also) were not getting the staff assigned that they wanted. *Id*. Dr. Loux readily admits that her practice partners, Drs. Geissler, Fitzwater, and Reyes, shared the same exact concerns regarding staffing in the operating room, and all wanted more support from St. Joseph's with respect to the level of trained staff in the operating room. *See* Dkt. 226 at 27, 34; Dkt. 231 at 9–10, 13; Dkt. 229 at 13–14; Dkt. 230 at 7–8.

Absent any evidence that male surgeons were treated more favorably with respect to selection of operating room staff, the Court is left with Dr. Loux's subjective belief, which does not establish either a *prima facie* case of discrimination or a convincing mosaic of evidence inferring discrimination. *See Holifield*, 115 F.3d at 1564. Dr. Loux's male practice partners had the same perception of the OR staffing and raised concerns with Dr. Alfonso. In any event, none of the examples in her declaration rise to the level of harm that Title VII is intended to proscribe as Dr. Loux has failed to show that any of the alleged conduct injured her or otherwise left her worse off—especially considering that Dr. Loux's male practice partners also shared the same perception and raised the same concerns as Dr. Loux regarding staffing in the operating room. *See DeLaughter*, 2024 WL 4956730 at *10. Accordingly, summary judgment is warranted as to Count III.

## V. Count IV against St. Joseph's: Retaliation

### A. Even if St. Joseph's were liable under Title VII as Dr. Loux's employer, Dr. Loux's retaliation claim against St. Joseph's fails.

Defendants argue that the *Pardazi* exception does not necessarily extend to Dr. Loux's retaliation claim against St. Joseph's. *See Albert v. Am. Family Ins. Co.*, No. 1:14-cv-1112-TCB-GGB, 2014 WL 13002235, *4 (N.D. Ga. Oct. 9, 2014), *adopted by*, 2014 WL 13002246 (N.D. Ga. Dec. 29, 2014) (limiting *Pardazi* to anti-discrimination provision of Title VII). The Court will instead follow *Scott*, a case in this district, which applied *Pardazi* to Title VII retaliation. 145 F. Supp. 3d 1114.

As previously discussed, to establish retaliation, Dr. Loux must show that: (1) she participated in a protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between her the protected activity and the adverse employment action. *Gogel*, 967 F.3d at 1134. Plaintiff cannot establish the first or third elements of her retaliation claim.

During her deposition, Dr. Loux conceded that she never complained of discrimination to Dr. Alfonso. Dkt. 226-1 at 7–8, 11. Plaintiff also conceded that she never complained of discrimination to any members of the St. Joseph's administration or to any member of BayCare's Team Resources department. *Id*. at 7, 11.

Nonetheless, Dr. Loux asserts that she complained of discrimination to Dr. Geissler and Dr. Charvat (CMO of St. Joseph's). *See* Dkt. 258 at 7–8. Dr. Loux's discussions with Dr. Charvat focused on her concerns regarding the amount of time required for her medical director position and increasing the allocation of hours for that position. *See* Dkt. 226 at 11, 14; Dkt. 226-1 at 11. This does not constitute protected activity under Title VII. There is no evidence that she made it clear to Dr. Charvat that she believed she was not receiving additional pay for the medical director position because she was female.

While it is undisputed that Dr. Loux met with Dr. Geissler on at least one occasion in November of 2019 to discuss certain concerns she had regarding his failure to treat her like a peer, *see* Dkt. 226 at 20, it is likewise undisputed that Dr. Geissler was not part of the Peer Review Committee's deliberations. Dkt. 246-1 ¶ 33. As discussed earlier, any cat's paw theory of discrimination suggesting Dr. Geissler influenced the peer review committee would have been remedied by the fact that the peer review committee's recommendations were subsequently evaluated both at the MEC and at the Fair Hearing levels.

Nor can a causal connection exist where the alleged decisionmaker did not have knowledge of the alleged protected activity at the time it took the adverse employment action. *See Brungart*, 231 F.3d at 799 ("[T]emporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there

is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct.”). Dr. Loux does not allege, and there is no evidence here, that the Peer Review Committee, the MEC, or the Fair Hearing panel had any knowledge of any prior concerns raised by Dr. Loux about discrimination, whether those concerns were raised to Dr. Geissler or Dr. Charvat.

Lastly, even if Dr. Loux was able to establish that a causal connection exists between any complaint by her and the subsequent action taken by St. Joseph's Medical Staff against her privileges, no genuine issue of material fact exists to dispute that St. Joseph's restricted Dr. Loux's privileges out of concern for patient safety. Dr. Loux herself conceded that the February 2020 surgical errors were severe, “never events.” *See* Dkt. 226 at 31, 39. She accepted full responsibility for the outcome of these errors. *See id*. Dr. Loux herself was “extremely concerned” about these outcomes. *See id*. at 31.

Although, under the convincing mosaic analysis, the plaintiff is not required to prove that the decisionmaker's reason was false, it stands to reason that St. Joseph's would also be concerned about the shocking back-to-back never events. The Court finds that a reasonable factfinder could not deem St. Joseph's restriction of Dr. Loux's privileges based on patient safety concerns so weak, implausible, inconsistent, incoherent, or contradictory to find them unworthy of credence. *See Melton*, 166 F.4th at 916. Summary judgment is warranted as to Count IV.

## VI. Count VI against Dr. Nayee (Chair of Peer Review): Fraud

To prove fraud, Dr. Loux must establish (1) a false statement concerning a material fact, (2) knowledge by the person making the statement that the representation is false, (3) the intent by the person making the statement that the representation will induce another to act on it, and (4) reliance on the representation to the injury of the other party. *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1182 (11th Cir. 2002); *Compania de Elaborados de Café v. Cardinal Cap. Mgmt., Inc.*, 401 F. Supp. 2d 1270, 1281 (S.D. Fla. 2003).

Dr. Loux's fraud claim centers on Dr. Nayee's representations in the email dated April 16, 2020, which were made in response to questions raised by Dr. Loux regarding the terms of the collegial intervention recommended by the Peer Review Committee on April 8, 2020. *See* Dkt. 226-9. Specifically, Dr. Loux takes issue with two of Dr. Nayee's representations.

First, Dr. Loux raised the following question to Dr. Nayee:

> What does "assistance" mean for surgical cases? Is the assistant required to fill something out? Is it a formal proctorship? Are they required to participate in pre- and postoperative planning and decision making?

*Id*. Dr. Nayee responded: "Assistance means one of your partners need to be present as first assistant (scrubbed in) to directly observe your cases. This is not formal proctorship." *Id*. Dr. Loux contends that she relied on this representation by accepting the terms of the Peer Review Committee's recommendations and that,

contrary to Dr. Nayee's representation, St. Joseph's reported Dr. Loux to the National Practitioner Data Bank three days after she accepted the peer review committee's recommendations. Dkt. 236 ¶¶ 44–46.

As a preface to asking questions, Dr. Loux states that she has discussed the peer review committee's recommendations with her partners "since agreeing to move forward with the intervention affects them as well" and "[t]hey have, appropriately, not yet decided whether they will be able to support [her] according to these terms." Dkt. 226-9. Dr. Loux then states that "[h]aving a response to some of these questions may help them in their decision making." *Id*. Dr. Loux confirmed during her deposition that the "assistance" question concerned the level of involvement that her partners would have in her cases. Dkt. 226 at 47.

Based on Dr. Nayee's deposition testimony, Dr. Nayee also understood Dr. Loux's first request to concern the level of involvement expected of her practice partners. For example, Dr. Nayee testified that, when writing the word "formal" in "formal proctorship," he meant that there were not any structures regarding education and filling out forms. Dkt. 228 at 21. This understanding is also consistent with Dr. Nayee's subsequent representations in that same email. He advised Dr. Loux to log her observed cases for the next 90 days, that her colleagues would not be involved in her pre- and post-procedure planning unless she felt the need to ask their professional opinion, that office procedures need not

be observed, and that there would be no formal paperwork to be filled out. Dkt. 226-9.

Notably absent from this email exchange is any express reference to the NPDB by Dr. Loux or Dr. Nayee. *Id*. No evidence in the record calls into dispute Dr. Nayee's testimony that he never expressly discussed with Dr. Loux what was reportable or not reportable to the NPDB and that the peer review committee never discussed the reportability of any of its recommendations to the NPDB. Dkt. 228 at 19, 24.

To find for Plaintiff, the Court would have to disregard her deposition testimony about the proctorship question and to accept her new contention at summary judgment that she intended for this first question to concern the reportability of this "formal proctorship" to the NPDB (though other evidence in the record suggests otherwise).[16] Moreover, the Court has not been presented with evidence to contradict Dr. Nayee's explanation of how he understood her questions—she was asking about the level of involvement of Dr. Loux's practice partners as envisioned by the peer review committee. Accordingly, the Court finds

[16] Even though Dr. Loux used the term "formal proctorship" first, Dr. Loux conceded during her deposition that she did not know why she asked whether it was a formal proctorship. Dkt. 226 at 47–48. Nor did Dr. Loux personally research the NPDB's reporting requirements or know how the NPDB defined the term "proctorship" pursuant to its reporting obligations. *Id*. at 47.

that a reasonable juror could not find that Dr. Nayee's representation on this point was false or intended to trick Plaintiff into agreeing to the restrictions.

Even more importantly, Dr. Nayee testified without contradiction that he did not have personal knowledge regarding what is reportable to the NPDB. Dkt. 228 at 20. Absent the required knowledge, Dr. Nayee did not have the required intent to commit fraud with respect to his representations.

The second representation with which Dr. Loux takes issue states:

> This decision for observing is strictly a hospital decision. BMG will have to coordinate call coverage through their means available. We are not directly involved in any BMG contractual decisions.

Dkt. 226-9. Dr. Loux contends that she relied on this representation by accepting the terms of the peer review committee's recommendations and, contrary to the representation "that BMG would have to provide coverage," it was BMG who "refused to provide any support" for the sanctions/restrictions and then terminated her employment "because of the Sanction on April 23, 2020." *See* Dkt. 236 ¶¶ 44, 47.

Dr. Nayee made it clear, and Dr. Butler confirmed, that BMG did not have any input regarding the terms of the collegial intervention posed by the peer review committee. Dkt. 228 at 15, 18; Dkt. 227 at 10. Neither Dr. Nayee nor Dr. Alfonso were aware of or involved in BMG's decision to terminate Dr. Loux's employment. Dkt. 228 at 25; Dkt. 229 at 44. It was up to Dr. Loux's partners at

BMG to decide whether they could support her, and Drs. Geissler, Fitzwater, and Reyes ultimately decided they could not. *See* Dkt. 230 at 14, 22; Dkt. 231 at 17; Dkt. 226 at 40. Dr. Loux understood that Dr. Nayee could not speak for BMG. Dkt. 226 at 43.

Furthermore, when Dr. Loux sent the April 15 email she already knew that her partners might not be able to provide the required coverage. Dkt. 226-1 at 20. Dr. Loux conceded during her deposition that she understood Dr. Nayee's response to mean that he was not in a position to speak for BMG with regard to its plans. Dkt. 226 at 43; Dkt. 226-1 at 20. Dr. Loux admitted that she understood Dr. Nayee's response to mean that BMG could terminate her. Dkt. 226 at 42.

Still, knowing all of this, including that BMG could possibly terminate her employment and that her partners were unlikely to support her, Dr. Loux accepted the peer review committee's recommendations. Dkt. 226-10. Because she had full knowledge of the risks and possible outcomes, Dr. Loux cannot show that she relied on Dr. Nayee's representations.

Even if the Court accepts Dr. Loux's assertion that she relied on Dr. Nayee's representations, she did not do so to her detriment because she ultimately revoked her acceptance of the peer review committee's recommendations. *Id.* Summary judgment is warranted on Count VI.

### VII. Count VII against St. Joseph's: Breach of medical staff bylaws and policies

### *A. __Statutory immunity__*

Having determined that summary judgment is warranted in Defendant's favor on Dr. Loux's fraud claim, the breach of contract claim against St. Joseph's is barred based on statutory immunity. Florida law dictates that there "shall be no monetary liability on the part of, and no cause of action for damages against, any licensed facility, its governing board or governing board members, peer review panel, medical staff, or disciplinary body, or its agents, investigators, witnesses, or employees, a committee of a hospital; or any other person for any action taken *without intentional fraud*" as part of the peer review process. Fla. Stat. § 395.0193(5) (2025) (emphasis added).

The parties do not dispute that Dr. Loux's breach of contract claim arises out of the peer review process, which is covered by section 395.0193. *See* Dkt. 26 ¶¶ 109–121; *see also* Dkt. 226-1 at 24. In the absence of intentional fraud, these are the exact circumstances where this statutory immunity applies. *See, e.g.*, *Ashkenazi*, 607 F. App'x at 966 (finding statute barred plaintiff's age-based retaliation claim where claims arose out of processes covered by statute and plaintiff failed to sufficiently plead intentional fraud); *Nguyen v. Mem'l Healthcare Sys.*, No. 22-60903-CIV, 2023 WL 11822481, at *5 (S.D. Fla. Aug. 31, 2023) (finding statute barred five counts where plaintiff "pled that Defendants manipulated the peer review process as well as the process of reporting to the

NPDB using materially false statements and/or omissions of material fact to destroy [plaintiff's] career"); *Awwad v. Largo Med. Ctr., Inc.*, No. 8:11-CV-1638-T-24TBM, 2011 WL 5006503, at *7 (M.D. Fla. Oct. 20, 2011) (finding statute barred breach-of-contract claim where plaintiff's allegations related to defendant failing to follow its own bylaws and where plaintiff failed to sufficiently allege intentional fraud).

Assuming, for argument's sake, that statutory immunity does not bar Count VII, the Court will address the entirety of this claim on the merits.

***B. Breach of contract***

To establish breach of contract, Dr. Loux must establish: (1) a valid contract; (2) a material breach; and (3) damages. *IPS Avon Park Corp. v. Kinder Morgan, Inc.*, No. 22-10547, 2023 WL 3750708, at *2 (11th Cir. June 1, 2023). Plaintiff alleges that St. Joseph's breached Sections 8.E(1) and 6.D.2 of the St. Joseph's Bylaws, Policies, and Rules and Regulations ("Bylaws") and Sections 6.B, 7.A.3, 7.A.5, 7.C.4 and 7.D.3 of the Credentials Policy of St. Joseph's Hospital ("Credentials Policy"). *See* Dkt. 225-1 (Bylaws); Dkt. 225-2 (Credentials Policy); Dkt. 236 ¶¶ 74–79.

While the parties do not dispute the contractual force of the Bylaws, the parties do dispute the contractual force of the Credentials Policy. In support of the argument that the Credentials Policy does have contractual force, Dr. Loux

contends that pursuant to Section 9.B of the Bylaws, the Bylaws adopted the Credentials Policy, which has "the same force and effect of the Bylaws unless the Policy is in conflict with the Bylaws." Dkt. 26 ¶ 111; Dkt. 236 ¶ 69; Dkt. 237 at 26. By contrast, Defendants contend that there is nothing in the Bylaws to suggest that St. Joseph's intended for the Credentials Policy to have the same force and effect as the Bylaws. Dkt. 222 at 29–30.

Section 9.B of the Bylaws (titled "Other Medical Staff Documents") states in pertinent part:

> (1) In addition to the Medical Staff Bylaws, there shall be policies, procedures and rules and regulations that shall be applicable to all members of the Medical Staff and other individuals who have been granted clinical privileges or a scope of practice.
>
> . . . .
>
> (7) Adoption of and changes to the Credentials Policy, Medical Staff Organization Manual, Policy on Allied Health Professionals, Medical Staff Rules and Regulations, and other Medical Staff policies will become effective only when approved by the Board.
>
> (8) The present Medical Staff Rules and Regulations of the Hospital are hereby readopted and placed into effect insofar as they are consistent with these Bylaws, until such time as they are amended in accordance with the terms of these Bylaws. To the extent any present Rule or Regulation is inconsistent with these Bylaws, it is of no force of effect.

Dkt. 225-1 at Bates No. 500585-587. There is nothing contained in this section of the Bylaws (or any other that the Court can find) that expressly states or implies that the Credentials Policy has "the same force and effect of the Bylaws unless the Policy is in conflict with the Bylaws." Further, the "Medical Staff Rules and

Regulations" are clearly not the same as the Credentials Policy as they are addressed separately throughout the Bylaws.

Under Florida law, unilateral policy statements cannot, without more, give rise to an enforceable contract. *See Gamb v. Hilton Hotels Corp.*, No. 95-466-civ-ORL-19, 1997 WL 893874, at *10 (M.D. Fla. Sept. 26, 1997) (finding that an "employee safety responsibility statement" as a matter of law was a policy statement, not a binding contract). Accordingly, any breach-of-contract claim premised on an alleged breach of the Credentials Policy must fail.

Even if the Credentials Policy were contractually enforceable, Count VII still fails because: (1) St. Joseph's did not materially breach any provision of the Credentials Policy or the Bylaws; and (2) Dr. Loux has not shown that she was damaged as the result of any alleged breach—material or otherwise.

For example, Section 8.E(1) of the Bylaws authorizes the President of the Medical Staff to suspend a physician's privileges whenever "a failure to take action *may* result in imminent danger to the health and/or safety of any individual." Dkt. 225-1 at Bates No. 500582 (emphasis added). Unequivocally, the Notice of Precautionary Suspension that Dr. Anthony Pidala, the Medical Staff President, sent to Dr. Loux on May 19, 2020, states that he has determined that a "failure to take action may result in imminent danger to the health and/or safety of a patient," which mirrors the exact language of Section 8.E(1). Dkt. 226-15.

Dr. Loux's claim rests on her contention that she could not be an "imminent danger" to the health and/or safety of any individual because she could not practice at St. Joseph's without her hospital badge, which had been confiscated by BMG, and without her employment agreement with BMG, which contained a noncompete. She also argues that she could not practice because she did not have an office to see patients outside of the Hospital, and she had agreed not to practice at St. Joseph's during the investigation. Dkt. 237 at 25–26.

Regardless of whether BMG employed Dr. Loux or not, it is undisputed that Dr. Loux technically still had privileges at St. Joseph's and that she was actively seeking to resume her practice. Indeed, if Dr. Loux was not actively seeking to resume her practice, her request that BMG immediately reinstate her following her revocation of her acceptance of the peer review committee's recommendations would have been nonsensical. *See* Dkt. 226-14. Her attorney wrote that "Dr. Loux is not subject to the Letter Agreement or its restrictions on her privileges at St. Joseph's Hospital" because she had revoked her prior acceptance of April 8.

Additionally, applying the plain terms of Section 8(E)(1), the imposition of a precautionary suspension does not require that imminent harm to the health and/or safety of a patient be inevitable. The word "may" means that the imminent harm is a possibility. While Dr. Loux may disagree with the likelihood of that harm

occurring, it remained a possibility based on the undisputed fact that she still had privileges at St. Joseph's and could potentially reestablish her practice.[17]

Another section of the Bylaws, Section 6.D.2, requires a 50% quorum for the MEC to take action. Dkt. 225-1 at Bates No. 500577. Though Dr. Loux alleges that there was not a proper quorum at the June 8 meeting when the MEC decided to uphold the Peer Review Committee's recommendations, *see* Dkt. 26 ¶117, the attendance record shows that nine of the eighteen MEC members (50 %) were present for that meeting. Dkt. 228-13; Dkt. 228 at 32. Accordingly, St. Joseph's did not breach this section.

As to the Credentials Policy, Section 6.B sets forth specific requirements regarding investigations. Dkt. 225-2 at Bates No. 500245–250. Dr. Loux alleges that St. Joseph's breached this section by failing to follow the requirements set forth therein. *See* Dkt. 26 ¶ 116. However, there is nothing in the record to indicate that the MEC ever decided to initiate a formal investigation under Section 6.B or that this Section was otherwise triggered. To the contrary, the only time that the Court can find that a formal investigation is ever mentioned was in the April 8, 2020, letter from Dr. Nayee notifying Dr. Loux of the peer review committee's recommendations, which states:

---

[17] For example, Dr. Loux's Employment Agreement with BMG contained a buyout provision that would allow Dr. Loux to be released from the noncompete provision if she paid the equivalent of one year's salary. Dkt. 226-2 at Bates No. 500057.

> If you do not agree to accept and comply with these recommendations, then a formal recommendation will be made to the Medical Executive Committee (MEC) to initiate a Formal Investigation which may lead to further disciplinary action under the Credentials Policy.

Dkt 226-7. Though this statement suggests that a recommendation could have been made to the MEC to initiate a formal investigation under Section 6.B once Dr. Loux revoked her acceptance of the peer review committee's recommendations, there is nothing in the record showing that this recommendation was ever made. Accordingly, no breach—material or otherwise—occurred.

Section 7.A.3 of the Credentials Policy provides that the CEO "shall promptly give special notice of a recommendation which entitles an individual to request a hearing." Dkt. 225-2 at Bates No. 500258. According to Dr. Loux, St. Joseph's breached this section because the CEO did not send a special notice to Dr. Loux setting forth the recommendations or the general reasons for the recommendation and did not provide a copy of Article 7 of the Policy ("Hearing and Appeal Procedures") as required by Section 7A.3. Dkt. 26 ¶ 118; Dkt. 236 ¶ 76. Plaintiff, however, received a letter from St. Joseph's President Kimberly Guy dated June 30, 2020, concerning the automatic relinquishment of her privileges effective June 24, 2020. Dkt. 226-20. In the letter, Ms. Guy also notified Dr. Loux that, despite her privileges being relinquished, she may still request a hearing based on the restriction of her privileges set forth by the peer review committee and upheld by the MEC "as described in the attached letter from the President of the

Medical Staff." *Id.*; Dkt. 226-18 (letter enclosure dated June 18, 2020, from Dr. Pidala).

Dr. Loux responded to Ms. Guy's June 30 letter on July 1, 2020, identifying Ms. Guy as both St. Joseph's President and CEO and requesting a hearing. Dkt. 226-21. She requested a Fair Hearing. *Id.*

Regardless of whether St. Joseph's followed the Credentials Policy as closely as Dr. Loux would have liked, Dr. Loux's response and subsequent receipt of a hearing demonstrates that this notice served the purpose for which it was intended. Plaintiff fails to demonstrate that there was any damage as a result of any alleged breach of this section.

Concerning Section 7.A.5 of the Credentials Policy, the President of the Medical Staff is required to schedule a hearing and provide, by special notice, certain information including but not limited to the time, place, and date of the hearing, proposed list of witnesses, the names of the Hearing Panel members and Presiding Officer, and a statement of specific reasons for the recommendation. Dkt. 225-2 at Bates No. 500259. Plaintiff claims that St. Joseph's breached this section because the President of the Medical Staff "did not provide any of the information required by Section 7.A.5." Dkt. 26 ¶ 119; Dkt. 236 ¶ 77. Yet counsel for the Medical Staff sent Dr. Loux correspondence on October 30, 2020, identifying the date and time of the hearing, the concerns giving rise to the

recommended restriction of Dr. Loux's clinical privileges, and the cases to be discussed. Dkt. 226-22. These were the same cases discussed during the prior MEC meeting in June of 2020. *See* Dkt. 226-17.

Plaintiff has failed to demonstrate how she was a damaged as a result of St. Joseph's notice. The record shows that Dr. Loux subsequently received the Fair Hearing requested and that this hearing lasted over 17 hours and afforded her the opportunity to testify herself, present multiple witnesses, and be represented by counsel. *See* Dkt. 200-1. Dr. Loux has not shown that she suffered any damages as a result of an alleged breach of this section.

Under Section 7.C.4 of the Credentials Policy, "[t]he hearing *shall not* be conducted according to the rules of evidence" and that "[e]vidence *shall not* be excluded merely because it is hearsay." Dkt. 225-2 at Bates No. 500265 (emphasis added). According to Dr. Loux, St. Joseph's breached this section by admitting hearsay statements that are not "the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs." Dkt. 26 ¶ 120; Dkt. 236 ¶ 78. independent Hearing Officer (an experienced healthcare lawyer of top repute) oversaw the admission of evidence, however, and his decisions cannot be attributed to St. Joseph's. Dkt. 226 at 51.

In any event, Dr. Loux was represented by counsel during the Fair Hearing and the transcript shows that counsel had the opportunity to object to hearsay—and

did so on just one occasion. *See* Dkt. S-200-1 at 28. The Fair Hearing transcript also shows that the Hearing Officer advised the Fair Hearing panel members of the meaning of the hearsay objection. *Id*. at 547. Even if the Hearing Officer's decisions could be attributed to St. Joseph's, the evidence fails to show that St. Joseph's breached this section or that Plaintiff was damaged as a result.

Finally, Section 7.D.3 of the Credentials Policy requires the Hearing Panel "[w]ithin 20 days after final adjournment of the hearing (which may be designated as the time the Hearing Panel receives the hearing transcript or any post-hearing statements, whichever is later" to conduct its deliberations. Dkt. 225-2 at Bates No. 500267. Dr. Loux takes issue with the timing because "[t]he Hearing Panel did not conduct its deliberations within 20 days after final adjournment." Dkt. 26 ¶ 121; Dkt. 236 ¶ 79. As Defendants point out, counsel for the parties requested several extensions before ultimately submitting their post-hearing briefs on or about November 24, 2020. Dkt. 222 at 32. Defendants also note that the Hearing Officer subsequently fell ill with COVID, which delayed the start of the Hearing Panel's deliberations until December 14. *Id*. The Hearing Panel ultimately issued its report on January 11, 2021. Dkt. 226-23; Dkt. 226 at 51. Dr. Loux does not rebut these contentions. *See* Dkt. 237.

Whether the Court accepts Defendants' version of events as stated does not alter the outcome. Under either version of events, Dr. Loux fails to cite or offer

any evidence showing that this alleged breach was material or damaging. For these reasons, there is no genuine issue of material fact, and summary judgment is warranted as to Count VII.

**VIII. Count VIII against BMG: Breach of employment contract**

In Count VIII, Dr. Loux alleges that BMG breached the Physician Employment Agreement by: (a) orchestrating a bad faith retrospective review of Dr. Loux's cases; (b) defrauding Dr. Loux into accepting the terms of the Peer Review Committee's recommended collegial intervention; (c) refusing to provide support and using the Sanction as a basis to terminate her employment with BMG; and (d) by refusing to reinstate her after she revoked the terms of the collegial intervention. *See* Dkt. 26 ¶ 128; Dkt. 236 ¶ 81. In response, Defendants contend that this claim fails for the same reasons that Dr. Loux's discrimination, retaliation, and fraud claims fail—mainly that BMG terminated Dr. Loux's employment for legitimate reasons consistent within the express terms of the Employment Agreement, that BMG did not have any direct involvement or influence with respect to the St. Joseph's Medical Staff's restriction of Dr. Loux privileges, and BMG had no contractual duty to provide any additional support in light of the Medical Staff's restriction of her privileges. Dkt. 222 at 32–34. Based on the undisputed evidence, and pursuant to the Court's prior findings, the Court agrees.

Specifically, the Employment Agreement expressly states that restriction of privileges after a physician becomes a member constitutes cause for termination. Dkt. 226-2 at 8 (Section 7.b.(vi)). St. Joseph's restricted Dr. Loux's privileges first by her acceptance of the collegial intervention and then by the imposition of the precautionary suspension. Dkt. 226-7. No one disputes that these actions put Dr. Loux in breach of the Employment Agreement. Dkt. 226 at 49; Dkt. 226-1 at 24.

On April 23, 2020, Dr. Fink (President of BMG) notified Dr. Loux of BMG's intent to terminate her contract pursuant to this provision if she could not cure this breach in 30 days by providing evidence of her privileges being reinstated. Dkt. 226-12. Though Dr. Loux contends that she cured this breach by revoking her acceptance of the collegial intervention, *see* Dkt. 258 at 13, it is undisputed that Dr. Loux's privileges remained restricted when the 30-day period expired. Dkt. 226 at 49; Dkt. 226-1 at 24. Dr. Loux never succeeded in having her privileges reinstated thereafter.

Because there is evidence that a cause for termination existed and that it was not cured within 30 days after BMG gave written notice, BMG's termination of Dr. Loux was justified and did not breach the Employment Agreement. Moreover, there is nothing in the record to support any contention by Dr. Loux that BMG had a contractual duty to provide extraordinary support after her actions resulted in restriction of her privileges. Nor can Dr. Loux show that her peers' expressions of

concerns about her violated any contractual duty. Accordingly, summary judgment is warranted as to Count VIII.

## IX. Count IX against BMG: Unpaid Wages

Dr. Loux alleges that BMG wrongfully deducted amounts from her last two paychecks. Dkt. 26 ¶ 132; Dkt. 236 ¶ 83. The parties do not dispute that BMG made this deduction pursuant to the Physician Employment Agreement and that the Employment Agreement obligated Dr. Loux to pay the necessary malpractice tail coverage if BMG terminated Dr. Loux's employment for cause. Dkt. 226-2 at 2–3. The success of this claim hinges on whether BMG should have terminated her employment for cause or not. Dkt. 226-1 at 24.

Because the Court has previously found that no genuine issue of material fact exists as to whether BMG breached Dr. Loux's Employment Agreement or as to whether BMG terminated Dr. Loux for legitimate, nondiscriminatory, and nonretaliatory reasons, no genuine issue of material fact remains as to whether BMG owes Dr. Loux any wages. For these reasons, summary judgment is granted as to Count IX.

## X. Motion to strike Plaintiff's declaration

Plaintiff's declaration filed in opposition to the motion for summary judgment is subject to a motion to strike if it does not meet the standard set forth in Federal Rule of Civil Procedure 56(c)(4). *Pashoian v. GTE Directories*, 208 F.

Supp. 2d 1293, 1297 (M.D. Fla. 2002). Under Rule 56(c)(4), a "declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." Examples of testimony that do not meet this standard include inadmissible hearsay, expert testimony belonging to an individual that has not been disclosed as an expert, and legal conclusions. *See Hughes v. Amerada Hess Corp.*, 187 F.R.D. 682, 687–88 (M.D. Fla. 1999) (striking portion of affidavit based on inadmissible hearsay where party failed to show admissibility under hearsay exception); *Leme v. S. Baptist Hosp. of Fla., Inc.*, 248 F. Supp. 3d 1319, 1336–37 (M.D. Fla. 2017) (excluding on summary judgment a portion of affidavit as inadmissible expert testimony because affiant-nurse unqualified to compare "bubble studies to clearing an A-line" based on bubbles "that might remain in an improperly cleared A-line"); *Ojeda v. Louisville Ladder Inc.*, 410 F. App'x 213, 215 (11th Cir. 2010) (finding affidavit inadmissible and excluded from consideration on summary judgement because affiant stated only legal conclusions and unsupported facts that ladder was defective).

Likewise, the sham affidavit rule precludes a party from manufacturing a genuine dispute of material fact by contradicting prior deposition testimony with an affidavit. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) (discussing difference between impermissible direct

contradictions and weighing contradictions with explanation of contradictions). The rule applies when a party has given clear answers to unambiguous questions that negate the existence of any genuine issue of material fact, but that party attempts thereafter to create such an issue by contradicting the previous testimony without explanation. *See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) (affirming district court's finding of sham affidavit).

Although the Court has determined that summary judgment is warranted on all counts, the Court will address the most material and egregious paragraphs worthy of striking. The motion to strike any paragraphs not addressed in this Order is denied as moot.

**A. Paragraphs 84(b)(iii) and 84(b)(iv)—inadmissible hearsay**

Federal Rule of Evidence 801 defines hearsay as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801. Inadmissible hearsay cannot be considered on a motion for summary judgment unless the hearsay evidence can be "reduced to admissible form" at trial or admitted at trial under an exception. *Pashoian*, 208 F. Supp. 2d at 1298.

With respect to these two paragraphs, Dr. Loux concedes that these statements constitute hearsay but asserts that they fall within the exception set forth

at Rule 803(4) of the Federal Rules of Evidence. Dkt. 253 at 18. The problem, however, is that this rule only applies to statements from an individual seeking medical treatment or someone with a special relationship to the patient—not statements from the physician. *See, e.g.*, *Field v. Trigg Cnty. Hosp., Inc.,* 386 F.3d 729, 735–36 (6th Cir. 2004) (finding medical-diagnosis exception is limited to statements made by the patient, not by consulting physicians to the treating physician); *Futrell v. Southeastrans, Inc.*, No. 1:20-cv-04674-WMR, 2022 WL 22867374, at *2 (N.D. Ga. Mar. 21, 2022) ("The declarant must be the person seeking medical treatment or someone with a special relationship to the patient—*not the patient's physician*.") (emphasis in original)); *Simpson v. Magic Burgers, LLC*, No. 5:18-cv-328-Oc-30PRL, 2020 WL 13389294, at *3 (M.D. Fla. Oct. 19, 2020) (citing first *Truschke v. Phyllis Chaney, LPN*, No. 5:17-cv-93, 2019 WL 1960344, at *5 (S.D. Ga. May 2, 2019)) (finding that Rule 803(4) does not apply to statements made by doctors to plaintiff-patient but only made by the patient to the doctor).[18]

Paragraphs 84(b)(iii) and paragraph 84(b)(iv) of Plaintiff's declaration discuss two different patients of "Pediatric Surgeon B." One paragraph contains a statement made to Plaintiff by the PA who had been with Surgeon B during the

[18] *See United States v. Keegan*, 161 F.4th 1334, 1341–42 (11th Cir. 2025) (discussing Rule 803(4) at length and finding that statements "made to medical professionals without the true goal of seeking treatment" do not fall within the exception).

procedure. This paragraph also contains gratuitous observations made by Plaintiff in the OR after she recommended the patient return to the operating room. The second paragraph contains statements made by Surgeon B to Plaintiff when she was questioning Surgeon B about a missed diagnosis. These paragraphs do not contain any statements made by the respective patients and therefore do not fall with the Rule 803(4) exception to hearsay. Because Plaintiff has failed to identify any exception that would render them admissible, the Court finds that these paragraphs are due to be stricken.

### B. Paragraphs 22 and 84 inadmissible and improper expert testimony from Dr. Loux.

Under the Federal Rules of Evidence, a witness may not offer a lay opinion that is based on scientific, technical, or specialized knowledge. Fed. R. Evid. 701. A witness who seeks to offer opinions based on scientific, technical, and specialized knowledge must meet the standards for admissibility of expert testimony. Fed. R. Evid. 702. Expert witnesses differ from lay witnesses because they are permitted to answer hypothetical questions. *Leme*, 248 F. Supp. 3d at 1335. A witness cannot testify as an expert if a party has failed to properly disclose them as an expert under Federal Rule of Civil Procedure 26(a)(2)(A). *See id*. at 1335–36.

Defendants contend that paragraphs 22 and 84 include expert testimony from Dr. Loux even though Dr. Loux has never disclosed herself as an expert

under Rule 26. Dkt. 245 at 22–24. Defendants move to strike the entirety of paragraph 22 on this basis but move to strike only certain portions of paragraph 84. The portions of paragraph 84 which Defendants seek to strike on this basis are:

- A pediatric surgeon [referring to Pediatric Surgeon A] should never use cautery during dissection of the esophagus in this specific case, rather only a blunt dissection should be used. Dkt. 236 ¶ 84(a)(i).
- The fact that [E.N.] required multiple intubation attempts was likely what caused [E.N.'s] vocal fold and recurrent laryngeal nerve injury, which also required further procedures to remediate. *Id*.
- Pediatric Surgeon A…. stapled the iliac vessels after mistaking the iliac vessels for the appendix, effectively preventing blood flow to the right leg. This is a very significant error, which should never occur. *Id*. ¶ 84(a)(iii).
- [Pediatric Surgeon B] did not perform a cholangiogram at this time to investigate the biliary tree, which is the standard of care when evaluating a grade 5 pancreaticoduodenal injury. *Id*. ¶ 84(b)(ii).
- The imaging that was initially done on [C.F.'s] arrival was inadequate to study the urinary collecting system, thus the injury was not identified early. *Id*.
- I found [J.C., a patient of Pediatric Surgeon C] to have perforation of the necrotic ileostomy below the level of the skin, with spillage of bowel contents into the abdominal cavity; given the severity of her condition it is evident that she had this condition for some time but it went undiagnosed by Pediatric Surgeon C. *Id*. at ¶ 84(c)(i).
- In summary, [E.New, a patient of Pediatric Surgeon C] had a very prolonged and difficult hospital course due to the undiagnosed perforation of the bowel from the initial surgery which should have been diagnosed and treated during the initial surgery. *Id*. ¶ 84(c)(ii).
- Unfortunately, Pediatric Surgeon D, assisted by Pediatric Surgeon B, twisted the new pulled through segment of the colon, which was an operative error not recognized at the time of surgery…. This is an extremely serious error, which should not have occurred. *Id*. ¶ 84(d)(i).
- Deaths for ENT pediatric surgery are extremely rare, even for very complicated procedures. Yet, ENT Pediatric Surgeon had two back-

to-back, unexpected deaths as a result of surgery he performed on two children. *Id.* ¶ 84(e)(i).

Dr. Loux does not dispute that she failed to disclose herself as an expert witness. Dkt. 253 at 18–20. Rather, Dr. Loux states that the testimony is admissible because a treating physician is entitled to testify without giving a thorough Rule 26(a)(2)(B) expert disclosure, citing *Coleman v. Am Family Mut. Ins. Co.*, 274 F.R.D. 641, 644–45 (N.D. Ind. 2011). *Id.* at 18–19. Dr. Loux also asserts that her role as an expert in reviewing these cases should be of "no surprise" and any claim of surprise can be easily cured "if Defendants wish to have one of its pediatric surgeons review the records, provide a statement as to each case, and testify." *Id.* at 19–20.

The *Coleman* case is distinguishable. There, the issue centered on whether the treating physicians were each required to file a summary report rather than a complete expert report. That is not the issue here. Dr. Loux submitted neither a summary nor complete report, and the outcome in *Coleman* is inapposite.

Plaintiff also cites *Dero Roofing, LLC v. Triton, Inc.*, 344 F.R.D. 566 (M.D. Fla. 2023). There, the court ultimately found that the plaintiff did not establish that its noncompliance with Rule 26 was substantially justified or harmless, explaining in pertinent part:

> [A]llowing Dero to belatedly comply with Rule 26 would interrupt these proceedings. Discovery has closed and Triton is seeking summary judgment. So this case would take a significant step back if discovery

> was reopened. To be sure, reopening discovery is an option. Yet that need not be done where there is undue delay by the disclosing party.

*Id*. at 574. In *Dero Roofing*, the court specifically noted that the case had been pending for more than two years. *Id*. at 575. Here, the case has been pending for over four years and the case is fully briefed for summary judgment. Reopening discovery at this juncture would undoubtedly cause undue delay.

Although Plaintiff blamed the belated production of medical records for this delayed disclosure, Dr. Loux has possessed these records since August of 2025. *See* Dkt. 209. Despite the foregoing, Dr. Loux waited until her response in opposition to the motion to strike to disclose her role as an expert in January of 2026. Dr. Loux does not adequately justify this gap of approximately five months or explain how or why disclosure pursuant to an opposition brief is acceptable.

To the extent that Dr. Loux contends that this ruling is unfair or prejudicial, Dr. Loux fails to explain why the expert she previously disclosed—pediatric surgeon Dr. Leopoldo Malvezzi—is incapable of providing testimony on these cases. There is simply no justification for this delay. For these reasons, paragraph 22 and the above-mentioned portions of paragraph 84 are stricken because they include inadmissible and improper expert testimony.

**C. Paragraphs 18, 19, 37, 61-66, 71-79, 81, and 83—legal conclusions**

Evidence submitted in support of a motion for summary judgment cannot consist of legal conclusions. *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir.

1991). Nonetheless, Dr. Loux states in conclusory terms that she was discriminated against (paragraphs 37, 61, 62, and 64) and that BMG and/or St. Joseph's retaliated against her (paragraphs 18, 19, 63, 65, and 66). In paragraphs 71-79, Dr. Loux states in conclusory terms that Dr. Joseph's breached certain portions of the Credentials Policy and the Bylaws. Plaintiff also states in conclusory fashion that BMG breached her employment contract (paragraph 81) and that BMG owes her unpaid wages (paragraph 83). Because these paragraphs consist of legal conclusions, they are due to be stricken.

**D. Paragraphs 10(c), 19, 24, 25, 27, 40, 62(a)-(c), 62(f), 63, and 84–86—not based on personal knowledge**

Statements in a declaration that are not based on personal knowledge do not meet the requirements of Rule 56(c)(4). *Pashoian*, 208 F. Supp. 2d at 1297. In paragraph 10(c), Dr. Loux broadly testifies that she "regularly" experienced sex discrimination and witnessed sex discrimination against other female physicians and that Dr. Geissler and "others" at St. Joseph's and BMG "regularly" requested second opinions on surgical decisions made by female surgeons including her. Dkt. 236 ¶ 10. Despite stating that this alleged conduct happened "regularly" to both her and other unnamed female physicians, Dr. Loux previously agreed during her deposition that she had no way of tracking how often someone's judgment gets questioned. Dkt. 226 at 25.

Plaintiff claims that "Defendants falsely assert that in paragraph 10(c) Dr. Loux states that she experienced and witnessed sex discrimination." Dkt. 253 at 13. She argues that paragraph 10(c) "only addresses Dr. Geissler and others regularly requesting second opinions for female surgeons but not male surgeons." *Id*. Yet paragraph 10 is prefaced with: "I regularly experienced sex discrimination and witnessed sex discrimination against other female physicians, including…" Dkt. 236 ¶ 10. Then Dr. Loux lists what she allegedly "regularly" experienced. *Id*. Based on Dr. Loux's answers to unambiguous questions during her deposition, she has not established that she has personal knowledge to support the broad statement set forth at paragraph 10(c).

Defendants contend that the following portions of paragraph 19 of Plaintiff's declaration are not based on personal knowledge: (1) that Dr. Geissler "knew" that the statement in Exhibit 2 to the declaration (that Dr. Loux "has a high complication rate in general, but had a series of complications starting back in November [2019] which seem to be accelerating") was false and (2) that Dr. Geissler "knew" that the statement that Dr. Loux "had a series of complications starting back in November" was false at the time he made the statement. *Id*. ¶ 19. In response, Dr. Loux contends that she had access to this data as part of her job and the complication rates for surgeons are publicly available. Dkt. 253 at 13–14. Even assuming this is true, this only shows what Dr. Loux knew regarding the

complication rates and that she knew that Dr. Geissler had access to this information. It does not show that she had personal knowledge of what *Dr. Geissler* knew or did not know or what information he actually accessed pursuant to his roles. As such, these statements are not based on personal knowledge.

In paragraphs 24, 25, and 27, Dr. Loux purports to have knowledge regarding how the peer review process was handled (or not handled) for others. In paragraph 24, Dr. Loux contends that "Drs. Geissler and Alfonso took the unusual step of reviewing all of [Dr. Loux's] complications since [she] started at St. Joseph's and BMG…" Dkt. 236 ¶ 24. In paragraph 25, Plaintiff contends that "[n]o male surgeon had all of their complications reviewed by BMG or St. Joseph's going back three years when none of those cases had previously been discussed with the physician." *Id*. ¶ 25. In paragraph 27, Dr. Loux contends that she knows of specific examples of male surgeons who were treated more favorably than she was. *Id*. ¶ 27.

Defendants contend that Dr. Loux lacks personal knowledge regarding the statements made pursuant to paragraphs 24, 25, and 27 because she conceded during her deposition that she does not know whether her male practice partners were ever called to meet with Dr. Alfonso about complications, *see* Dkt. 226-1 at 15, and conceded that she does not have knowledge about decisions made regarding certain cases because they are "not allowed access to that information."

*See id*. at 17. Dr. Loux counters that "[a]s the pediatric trauma surgery director she knows how far back complications are reviewed" and that "Defendants presented no admissible evidence of any male surgeon who ever had all of his complications reviewed." Dkt. 253 at 14–15.

The record—including Dr. Loux's own testimony—undermines these contentions. *See* Dkt. 226-1 at 15, 17. Additionally, Dr. Alfonso testified at deposition that every Peer Review Committee meeting that he was part of included all the information from the Quality Department from the time that the physician was instated or accepted medical privileges up until the time of the review and gave several examples of male surgeons who had all of their complications reviewed by the peer review committee from the time they started at St. Joseph's. *See* Dkt. 229 at 26–27. Dr. Loux cites no contradictory evidence.

Plaintiff also contends that "Dr. Loux's deposition was taken before she reviewed the medical records Defendants were required to produce in fall 2025, which is the basis, along with her personal involvement in most of the cases, for her detailed eight-page single-spaced description of each of these cases." Dkt. 253 at 15. As support, Dr. Loux cites her own declaration. *See id*.; Dkt. 236 ¶¶ 26, 84. In any event, while Dr. Loux's vague citation to "medical records" may demonstrate how she was able to acquire knowledge regarding treatment of patients and specific surgical procedures, it does not demonstrate how she was able

to acquire knowledge regarding peer review proceedings or decisions regarding whether to bring certain cases to peer review.

Because paragraphs 24, 25, and 27 are not based on personal knowledge and contradict Dr. Loux's prior deposition testimony, they are stricken.

In paragraph 40, Dr. Loux declares that Dr. Geissler "performed the original review and was the instigator of this bad faith review." Dkt. 236 ¶ 40. Defendants contend that Dr. Loux has not established that she has personal knowledge regarding this statement and is simply stating what she believes occurred. Dkt. 245 at 16.

Plaintiff also relies on Dr. Alfonso's testimony to establish Dr. Geissler's bad faith. Contrary to Plaintiff's assertion that "Dr. Geissler approached [Dr. Alfonso] about concerns he had with Dr. Loux, which initiated Dr. Loux's review", Dkt. 253 at 15, citing Dkt. 229 at 6, 32, Dr. Alfonso testified that he had already been reviewing Dr. Loux's cases when Dr. Geissler raised his concerns. Dkt. 229 at 33. Dr. Alfonso stated that he had previously been contacted by the medical director of the NICU and medical director of the ICU regarding Dr. Loux. *Id*.

Plaintiff cannot rely on some portions of Dr. Alfonso's deposition to the exclusion of others. As Dr. Loux has not otherwise demonstrated personal knowledge, paragraph 40 is due to be stricken.

Paragraph 62 of Dr. Loux's declaration includes alleged examples of how Dr. Loux was subjected to discrimination based on her gender. Dkt. 236 ¶ 62. Defendants contend that she does not have personal knowledge regarding subparagraphs 62(a)-(d) and 62(f). Dkt. 245 at 16–18. In support, Defendants cite Dr. Loux's testimony where she: (1) denied having the requisite knowledge regarding information to make an opinion on ways in which she was treated differently than males who were employed as medical directors or contracted with as medical directors at St. Joseph's, *see* Dkt. 226-1 at 9; (2) confirmed that she is not basing her observation regarding male surgeons having the ability to select or reject their assigned operating teams on a statistical review, *Id*. at 10; (3) answered "perhaps" when asked whether male surgeons seemed to get more staff that they requested because they simply tried to have them changed more often, *Id*. at 10; (4) denied knowing whether Dr. Alfonso ever called her male peers to meet with them about complications, *Id*. at 15; (5) answered that she "would only have the knowledge that was shared with [her] by [her] partners" when asked whether she had knowledge of actions taken by St. Joseph's to follow up and determine whether her named peers could meet the standard of care going forward, *Id*. at 15; and (6) confirmed that there was no way to track how often someone's judgment gets questioned. Dkt. 226 at 25.

Plaintiff counters by simply citing back to her own declaration and other deposition testimony without directly acknowledging the conflicting testimony cited by Defendants. *See* Dkt. 253 at 16. Nonetheless, at her deposition, Plaintiff admitted that she did not have the information to form an opinion about the alleged differential treatment of medical directors or otherwise support these contentions. Accordingly, these subparagraphs of paragraph 62 are due to be stricken.

Similarly, in paragraph 63 Dr. Loux contends that "[n]o male BMG surgeon has *ever* been similarly treated, even though the male surgeons' conduct, complications, and performance were much worse than mine." Dkt. 236 ¶ 63 (emphasis added). Defendants contend that Dr. Loux has not established any foundation to demonstrate that she has such expansive knowledge. Dkt. 245 at 18. Dr. Loux responds by referring back to "[t]he detailed factual basis for paragraph 63" as being "contained in paragraph 84." Dkt. 253 at 16.

Paragraph 84 is problematic because it focuses on a handful of alleged comparators. *See* Dkt. 236 ¶ 84. This paragraph, however, does not support Dr. Loux's significantly broader contention that *no male BMG surgeon has ever* been similarly treated despite allegedly having worse complications and performance. Moreover, Dr. Loux's prior deposition testimony demonstrates that her scope of knowledge is far more limited than she contends in paragraph 63. *See* Dkt. 226-1

at 15, 17. Because Dr. Loux has not demonstrated personal knowledge to support this broad statement, it is due to be stricken.

Lastly, and for related reasons, paragraphs 84, 85, and 86 include testimony from Dr. Loux regarding the medical treatment provided by alleged comparators and the subsequent handling (or lack of handling) by St. Joseph's. *See* Dkt. 236 ¶¶ 84–86. Though Defendants concede that Dr. Loux discussed these individuals during her deposition, Dr. Loux expressly denied during deposition that she had any knowledge about the actual cases or outcomes of the comparators' review. Dkt. 245 at 19 (citing Dkt. 226-1 at 15, 17). As to the ENT Pediatric Surgeon with "back-to-back" unexpected deaths, *see* Dkt. 236 ¶ 84(e)(i), Dr. Loux testified during her deposition that "[her] personal knowledge of complications on back-to-back days is limited." Dkt. 226-1 at 18.

In her response, Plaintiff contends that she had personal knowledge of her statements as set forth in paragraphs 84–86 based on her personal involvement in cases and her detailed review of the medical records. Dkt. 253 at 16–17. Notably, Dr. Loux's explanation does not wholly reconcile the inherent conflict between the breadth of knowledge she purports to have in paragraphs 84–86 and her prior scant deposition testimony. The Court agrees that production of medical records and her personal involvement in cases may provide Dr. Loux with the foundation to establish personal knowledge regarding the surgical procedures that Pediatric

Surgeons A–D and the ENT Pediatric Surgeon performed. However, as previously noted, medical records would not necessarily reveal information regarding peer review proceedings or decisions regarding whether to bring certain cases to peer review, whether a report was made to the NPDB, or whether any other adverse action was taken. And because Dr. Loux previously conceded that she did not have such knowledge, the record is void of any explanation to reconcile this gap.

Considering the foregoing, the Court strikes paragraphs 84–86 of Dr. Loux's declaration solely as it pertains to statements in which Dr. Loux purports to have personal knowledge regarding peer review proceedings or decisions regarding whether to bring certain cases to peer review, whether a report was made to the NPDB, or whether any other adverse action was taken.

**E. Paragraph 5(g)—direct contradiction of prior testimony**

In paragraph 5(g), Dr. Loux states that she reported to Dr. Geissler at both BMG and St. Joseph's. Dkt. 236 ¶ 5(g). This testimony directly contradicts her prior deposition testimony that "[she] didn't report to Dr. Geissler." Dkt. 226 at 26. Plaintiff's attempt to distinguish her deposition testimony and her subsequent testimony in her declaration is unavailing. *See* Dkt. 253 at 4–5. Accordingly, paragraph 5(g) is stricken to the extent Dr. Loux relies on it to contend that Dr Geissler, as opposed to Dr. Butler, had any hiring, firing, disciplinary, or any other

supervisory authority to impose negative consequence on the terms and conditions of her employment with BMG.

**F. Paragraphs 15, 16, 28, 37, and 65—directly contradict prior testimony**

Pursuant to paragraphs 15, 16, 28, 37, and 65, Dr. Loux broadly contends that she reported discrimination to Dr. Geissler, Dr. Charvat, Dr. Alfonso and "others" at BMG and/or St. Joseph's. Dkt. 236 ¶¶ 15, 16, 28, 37, 65. Contrary to this assertion, Dr. Loux expressly confirmed during her deposition that she did not report discrimination to: (1) Dr. Butler; (2) Team Resources; (3) Dr. Alfonso; or (4) any member of St. Joseph's management. *See* Dkt. 226-1 at 7, 8, 11. Accordingly, to the extent "others" includes the above, Dr. Loux's prior testimony contradicts these statements in her declaration and are due to be stricken.

**G. Paragraph 17—directly contradicts prior testimony**

In paragraph 17 of the declaration, Dr. Loux contends that she resigned from the Medical Director position at St. Joseph's because "St. Joseph's was unwilling to change its discriminatory practices…" Dkt. 236 ¶ 17. At her deposition, Dr. Loux described her resignation as being due to the considerable effort required by the pediatric trauma program, an alleged lack of resources, and burnout caused by extreme fatigue and personal stress associated with that fatigue and confirmed that there were no other facts. Dkt. 226 at 14, 28. Dr. Loux voluntarily resigned from the Medical Director position without cause. Dkt. 226-4.

Dr. Loux's attempt to rectify this inconsistency is unsuccessful as she simply cites the fact that the alleged lack of resources/additional as compared to her male counterparts "is part of her discrimination claim." Dkt. 253 at 8–9. This does not sufficiently resolve the fact that when asked the unambiguous question regarding why she resigned, she did not cite discrimination during her deposition. Accordingly, paragraph 17 is stricken.

**CONCLUSION**

In responding to the instant motion for summary judgment, Dr. Loux relied entirely on her own declaration submitted in opposition. *See* Dkts. 236, 237. Although Dr. Loux's declaration makes clear her theory of the case and her belief as to how and why her privileges were restricted and her employment was terminated, the declaration does not reflect, and in many cases is inconsistent with, the undisputed evidence including her own deposition testimony. Dr. Loux has failed to explain these inconsistencies.

Aside from those inconsistencies, no party disputes—including Dr. Loux—that the surgical issues Dr. Loux committed on children in February 2020 were serious and alarming. Defendants are each obligated to ensure patient safety and care pursuant to their respective realms and roles. While Dr. Loux may not agree with how Defendants met this obligation, the undisputed evidence in the record demonstrates that Defendants took steps that stemmed from this obligation.

The fact that Dr. Loux was a highly trained surgeon who cared about her patients does not alone negate Defendants' obligation to address the issues that she was admittedly having. Defendants carried the weight of resolving those concerns—pursuant to the means and resources available to each of them and in consideration of the specific circumstances. Absent discriminatory or retaliatory animus, breach of any agreement, or violation of any law, the Court is not at liberty to question Defendants' choices or manage Defendants in a different or better way to handle the situation.

Accordingly, Defendant's Motion for Summary Judgment, Dkt. 222, is **granted**. Defendant's motion to strike, Dkt. 245, portions of Plaintiff's declaration is **granted in part and denied in part** consistent with this Order.

The Clerk is directed to enter final summary judgment in favor of Defendants and against Plaintiff. The Clerk is directed to terminate any deadlines and hearings and close the case.

**DONE AND ORDERED** at Tampa, Florida, on September 3, 2026.

**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of record